IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| MSKP Oak Grove, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>CAROL VENUTO, individually and<br>as executrix of the Estate of<br>RALPH A. VENUTO, Sr., et al.<br><br>    Defendants. | Civil Action<br>No. 10-6465 (JBS/JS)<br><br>**OPINION** |

---

APPEARANCES:

Joseph A. Molinaro, Esq.
JOSEPH A. MOLINARO, LLC
648 Wyckoff Avenue
Wyckoff, New Jersey, 07481
 -and-
Robert A. Vort, Esq.
2 University Plaza, Suite 101
Hackensack, NJ 07601
 Counsel for Plaintiff

Dimitri L. Karapelou, Esq.
LAW OFFICES OF DIMITRI L. KARAPELOU, ESQ.
1600 Market Street, 25th Floor
Philadelphia, PA 19103
 Counsel for Defendants

**SIMANDLE**, Chief Judge:

I. **INTRODUCTION**

  This action, in which Plaintiff alleges various violations of the New Jersey Uniform Fraudulent Transfer Act, N.J. Stat. Ann. § 25:2-20 et seq., and other causes of action arising under New Jersey law, is before the Court on Defendants' motion to dismiss the Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  [Docket Item 20.]  This is the second time the Court has considered such a motion in this

action; Defendants previously moved to dismiss Plaintiff's original Complaint, which the Court granted without prejudice on August 8, 2011. [Docket Items 11 & 12.] The instant motion seeks to dismiss Plaintiff's Amended Complaint. [Docket Item 24.] In brief, this case involves the sale of substantially all of the assets of Defendant Hollywood Tanning Systems, Inc. ("HTS") to nonparty Tan Holdings, LLC in 2007 for approximately $40 million and a 25% ownership interest in Tan Holdings. Subsequent to this asset sale, HTS paid all creditors whose claims were due and owing, and then distributed approximately $16 million to its shareholders, Defendants Carol and Ralph A. Venuto, Sr.[1], Ralph A. Venuto, Jr., Carol Rebbecchi, and Richard P. Venuto ("the shareholders"). Approximately a year after the asset sale to Tan Holdings and apparently at some point after the distribution to shareholders, Plaintiff, a commercial landlord in Florida, notified HTS that it was in default on a lease; payment of which Plaintiff has not been able to secure from any party. Consequently, Plaintiff seeks to have a portion of the 2007 distribution to the shareholders set aside as a fraudulent conveyance, improper distribution, or unjust enrichment.

The principal questions at issue in Defendants' motion are (1) whether Plaintiff has alleged an intentionally fraudulent

---

[1] Ralph A. Venuto, Sr. died prior to the initiation of this action; Plaintiff names his estate as a Defendant, represented by Defendant Carol Venuto as executrix.

transfer with the requisite specificity and plausibility, (2)
whether, at the time of the shareholder distribution, HTS's
assets appeared sufficient to cover its liabilities, and (3)
whether Plaintiff is collaterally estopped from pursuing its
fraudulent transfer claims.  As discussed below, the Court
concludes that Plaintiff has sufficiently alleged the elements of
an intentionally fraudulent transfer as well as a constructive
fraudulent conveyance, but has failed to allege that HTS was
insolvent at the time of the shareholder distribution.  The Court
will grant in part and deny in part Defendants' motion.

## II.   BACKGROUND

The facts described below are taken from those facts alleged
in Plaintiff's Amended Complaint and from undisputedly authentic
documents upon which Plaintiff relies in its Amended Complaint.
See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998
F.2d 1192, 1195, n.1 (3d Cir. 1993).

Prior to the events alleged in this action, Defendant HTS
was a New Jersey corporation that operated tanning salons and
sold franchises and tanning equipment to independent tanning
salons.  Am. Compl. ¶¶ 7-8.  In 2003, HTS leased a commercial
retail space in a shopping center in Florida from a predecessor
in interest to Plaintiff MSKP Oak Grove, LLC ("MSKP" or
"Plaintiff").  Id. ¶ 19.  In 2004, Plaintiff's predecessor
consented to HTS's request to sublease the space to a franchisee

3

of HTS (a non-party entity known as Altamonte Chick Shades, Inc.), though HTS remained liable on the lease in the event of Alamonte's default.  Id. ¶¶ 20-21.  Plaintiff acquired the landlord's rights under the lease agreement in January of 2007.

On April 18, 2007, HTS and Tan Holdings entered into an asset purchase agreement in which Tan Holdings acquired almost all of HTS's assets in exchange for payment to HTS of approximately $40 million, approximately 25% of the issued and outstanding preferred units of Tan Holdings, and certain contingent "earn out" payments that would be made to HTS only if Tan Holdings' earnings met certain thresholds within the first two years following the asset purchase.  Id. ¶¶ 9-10, 12.  HTS apparently remained liable on its lease with Plaintiff despite the asset sale to Tan Holdings.  Id. ¶ 21 ("Hollywood Tanning remained liable on the lease" after subletting to its franchisee).

On June 22, 2007, the asset purchase agreement closed between Tan Holdings and HTS.  Am. Compl. ¶ 15.  After the deal closed, Defendant HTS used "much of" the $40 million acquisition price to settle all then-outstanding debts owed to creditors of HTS; Tan Holdings did not assume liability for such debts that were due and owing at the time of the closing.  Id. ¶ 13, 16; Asset Purchase Agreement at ¶ 2.4(d).  The remainder was distributed, some time thereafter not specified in the Amended

4

Complaint, to the Defendant shareholders of HTS, in the aggregate amount of approximately $16 million.  Id. ¶ 17.

After HTS had paid the company's debts that were due and owing at the time of the closing, and subsequently distributed the approximately $16 million to its shareholders, Defendant HTS's remaining assets were the approximately 25% ownership stake in Tan Holdings and the possibility of being paid specific "earn outs" should Tan Holdings meet certain earnings thresholds. Plaintiff does not allege sufficient facts from which the Court can estimate the approximate value of these assets, as no information about the aggregate valuation of Tan Holdings is alleged.  However, the Court notes that one of the Defendants later said that the 25% ownership interest seemed to be of "substantial value" to the HTS shareholders at that time.  Venuto June 18, 2010 Deposition at 27:5-10.[2]

On July 3, 2008, Plaintiff notified Defendant HTS that its sublettor franchisee had defaulted on its lease.  Id. ¶ 24. Plaintiff sued Defendant HTS and the franchisee Alamonte Chick Shades in state court in Florida to recover for breach of the

---

[2] While Plaintiff does not attach a copy of this deposition to the Amended Complaint, it cites to the deposition in the Amended Complaint and has attached a copy to its brief in opposition.  See, e.g., Am. Compl. ¶ 31; Ex. C to Pltf.'s Brief in Opposition.  Similarly, Plaintiff cites to language in the asset purchase agreement between HTS and Tan Holdings at multiple paragraphs in the Amended Complaint.  See Am. Compl. ¶¶ 9-13. Defendants attach an undisputedly authentic copy of the agreement to their motion to dismiss.  See Ex. A to Defs.' Mot. Dismiss.

lease.  Id. ¶ 25.  Plaintiff subsequently won a judgment against
Defendant HTS in the Florida action for approximately $411,573,
which remains unpaid.  Id. ¶ 26-28.  Tan Holdings, similarly, did
not succeed after the acquisition; in May of 2009, it turned over
its assets to its creditors.  Id. ¶ 37.  Defendant Ralph Venuto,
Jr. described the company as having gone bankrupt.  Venuto June
18, 2010, Dep. at 17:13.  In addition to Plaintiff, at least 14
other landlord creditors have sought to collect on various
liabilities of HTS after the shareholder distribution.  Am.
Compl. ¶ 39.

Plaintiff filed the original Complaint in this action on
December 13, 2010, naming as defendants only the shareholder
Defendants.  [Docket Item 1.]  Defendants moved to dismiss the
Complaint for failure to state a claim, which the Court granted
on August 8, 2011, dismissing the Complaint without prejudice to
Plaintiff filing a motion for leave to amend to cure the defects
of the original Complaint.  [Docket Items 11 & 12.]  Plaintiff
thereafter moved to file an amended complaint, which Defendants
did not oppose.  Plaintiff's Amended Complaint, which added HTS
as a Defendant, was subsequently docketed [Docket Item 24]; the
Amended Complaint asserts six counts against Defendants: Counts
One through Four involve claims under the New Jersey Uniform
Fraudulent Transfer Act ("NJUFTA"), N.J. Stat. Ann. § 25:2-20 et
seq.  Count Five seeks to recover based on a claim that the

6

shareholder distribution was an improper distribution under N.J. Stat. Ann. 14:6-12(1)(c); and the sixth count seek to recover under a theory of unjust enrichment.  Defendants subsequently moved to dismiss again for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## III. DISCUSSION

### A.  Standard of Review

Pursuant to Rule 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Specific facts are not required, and "the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Ericson v. Pardus, 551 U.S. 89, 93 (2007) (citations omitted). However, while a complaint is not required to contain detailed factual allegations, the plaintiff must provide the "grounds" of his "entitle[ment] to relief", which requires more than mere labels and conclusions.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

The Supreme Court has identified two working principles underlying the failure to state a claim standard: first, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Indeed, threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Id.

Second, a complaint must state a plausible claim for relief in order to survive a motion to dismiss; where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."  Id. at 679.  To survive a motion to dismiss, therefore, civil complaints must allege "sufficient factual matter" to show that a claim is facially plausible.  This "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.

After Iqbal and Twombly, the Third Circuit now requires that a district court presented with a motion to dismiss conduct a two-part analysis set forth in Iqbal: first, the factual and legal elements of a claim should be separated.  The district court must accept all the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Iqbal, 556 U.S. at 678-79.  Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  Id. at 679.  This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

8

In addition, Rule 9(b) imposes heightened pleading standards for a complaint alleging fraud; Rule 9(b) applies to claims under the NJUFTA. Ford Motor Credit Co. v. Chiorazzo, 529 F. Supp. 2d 535, 538 (D.N.J. 2008). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." This requirement is intended "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984). Notably, the Third Circuit has stated that "[a]though Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" In re Rockefeller Center Properties, Inc. Securities Litigation, 311 F.3d 198, 216 (3d Cir. 2002) (citations omitted).

In spite of Rule 9(b)'s heightened requirements, however, courts should be conscious of the fact that application of these more stringent pleading standards may allow "sophisticated defrauders" to "successfully conceal the details of their fraud." In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1418 (3d Cir. 1997). In situations where the required factual material "is peculiarly within the defendant's knowledge

or control, the rigid requirements of Rule 9(b) may be relaxed."
Id. However, "boilerplate and conclusory allegations will not
suffice" and "[p]laintiffs must accompany their legal theory with
factual allegations that make their theoretically viable claim
plausible." Id.

### B. Analysis

As stated above, Plaintiff asserts six counts in the Amended
Complaint. As Defendants seek to dismiss each count for
different reasons, the Court will address them in turn.

### 1. Fraudulent Conveyance under § 25:2-25(a)

Plaintiff's first count alleges that the $16 million
shareholder distribution runs afoul of the intentionally
fraudulent transfer provision contained in § 25:2-25(a). The
relevant provision of the statute states that

> [a] transfer made or obligation incurred by a
> debtor is fraudulent as to a creditor, whether
> the creditor's claim arose before or after the
> transfer was made or the obligation was
> incurred, if the debtor made the transfer or
> incurred the obligation:
>   a. With actual intent to hinder, delay,
>   or defraud any creditor of the debtor . .
>   .

N.J. Stat. Ann. § 25:2-25(a). Plaintiff alleges that Defendants
undertook the shareholder distribution in 2007 with the intent to
hinder, delay or defraud those creditors, like Plaintiff, whose
potential contractual liabilities were not satisfied by HTS prior
to the shareholder distribution. Plaintiff argues that: the

distribution constituted substantially all of HTS's liquid
assets; it was distributed to insiders of HTS; HTS received no
consideration from the shareholders for the distribution; and as
a result, the remaining assets of HTS were insufficient to
satisfy claims such as Plaintiff's against HTS.  Am. Compl. ¶ 34-
39.  Plaintiff alleges, generally, that the distribution was made
with the intent to hinder, delay or defraud creditors such as
Plaintiff.  Id. ¶ 40.

     "The purpose of the [NJUFTA] is to prevent a debtor from
placing his or her property beyond a creditor's reach" thereby
"deliberately cheat[ing] a creditor by removing his property from
the jaws of execution."  Gilchinsky v. Nat. Westminster Bank
N.J., 159 N.J. 463, 475 (1999) (internal quotation and citations
omitted).  The New Jersey Supreme Court has articulated two
elements that must be alleged and proven to prevail on such a
claim.

          The first is whether the debtor or person
          making the conveyance has put some asset
          beyond the reach of creditors which would have
          been available to them at some point in time
          but for the conveyance. . . The second is
          whether the debtor transferred property with
          an intent to defraud, delay, or hinder the
          creditor.

Id. at 475-76.

     Defendants argue that Plaintiff has not plausibly, and with
the requisite specificity, alleged the second element of this
provision.  They argue that the facts as alleged do not give rise

11

to the conclusion that Defendants "intended to thwart or evade [their] creditors." Id. at 476.  Gilchinsky holds that the Court should look to the "badges of fraud" enumerated in N.J. Stat. Ann. § 25:2-26 in order to evaluate whether the facts alleged state a claim for intentional fraud.  Id.

The factors listed in the statute include whether

> a. The transfer or obligation was to an insider;
> b. The debtor retained possession or control of the property transferred after the transfer;
> c. The transfer or obligation was disclosed or concealed;
> d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> e. The transfer was of substantially all the debtor's assets;
> f. The debtor absconded;
> g. The debtor removed or concealed assets;
> h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.J. Stat. Ann. § 25:2-26.

The parties agree on most of the factors.  Defendants concede that Plaintiff has plausibly alleged factors (a) and (h): that the transfer was to insiders and that the debtor (HTS) did

not receive consideration that was reasonably equivalent to the
$16 million HTS distributed to the Shareholder Defendants.  And
Plaintiff agrees that it has not alleged factors (b), (d), (f),
(g), (j), and (k).  Therefore the only disputes are over factors
(c), (e), and (i).

As to factor (c), Plaintiff offers no argument explaining
how or where it has alleged that the shareholder distribution was
concealed.  The Court can find no such allegation in the Amended
Complaint, nor has Plaintiff pointed the Court to any such fact
in any supporting document.  Therefore, the Court concludes that
Plaintiff has not alleged this factor.

Regarding factor (e), whether the transfer was of
substantially all of HTS's assets, Defendants argue that
Plaintiff fails to plausibly allege this point because the
Amended Complaint alleges that, even after the shareholder
distribution, HTS retained its 25% ownership stake in Tan
Holdings, which Defendants value at approximately $10 million as
of the asset sale and shareholder distribution in 2007.
Defendants arrive at this valuation by taking the acquisition
price of HTS's assets ($40 million) and dividing by four (25%) to
reach $10 million.  Other circumstances bring Defendants'
valuation of the shares into question, and it is plausible that
evidence may confirm Plaintiff's allegation that this 25%

13

ownership in Tan Holdings had minimal real value.[3]  Plaintiff
relies on the fact that, within a year after Tan's acquisition of
HTS, the value of the shares became worthless.  This is powerful
circumstantial evidence that Tan's true equity position after it
borrowed funds and paid to acquire HTS was insubstantial or even
negative.  At this stage, the Court is not obligated to accept
Mr. Venuto's deposition testimony that the shares had
"substantial value," when history shortly thereafter demonstrated
otherwise.  The Plaintiff's allegation on this point proffers a
plausible basis to conclude that factor (e) may be demonstrated
at trial.  Plaintiff has met its pleading burden on this point as
required by Rule 9(b).

     Consequently, the Court concludes that Plaintiff has
sufficiently alleged facts from which the Court can infer that
factor (e) (that the transfer comprised substantially all of the
debtor's assets) is present.

     Finally, Defendants claim that Plaintiff has not
sufficiently alleged factor (i), that HTS was insolvent or became

_____

     [3] For example, the Court notes that Tan Holdings apparently
had to take on debt in order to raise the cash needed to pay HTS
the $40 million purchase price (see Asset Purchase Agreement at
52, ¶ 6.6(a)).  It would therefore seem unlikely that a full and
fair valuation of Tan Holdings at the time of the shareholder
distribution would lead to a $40 million valuation, and therefore
the 25% ownership interest retained by HTS would likely be worth
somewhat less than $10 million.  It would be worth, at most, only
25% of the assets minus liabilities of Tan Holdings, reduced
further by the illiquidity of such an investment in a closely
held enterprise.

insolvent shortly after the transfer was made.  Defendants merely deny that HTS became insolvent after, or because of, the transfer.  The Court finds this argument unpersuasive, noting that Plaintiff quotes Defendant Ralph Venuto, Jr. as saying that the company was insolvent no later than August or September of 2008, just over a year after the asset purchase agreement closed and the subsequent shareholder distribution.  The Court finds such facts sufficient to allege this badge of fraud under factor (i).

Consequently, the Court finds that Plaintiff has sufficiently alleged four separate badges of fraud, namely factors (a), (e), (h) and (i).  The Court now must determine whether the presence of these four factors meets the standard articulated in Gilchinsky:

> The proper inquiry is whether the badges of fraud are present, not whether some factors are absent.  Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.

Id. at 477.  In the instant action, the Court finds that, while only four badges of fraud are adequately alleged to be present, the Court concludes that these four, in combination, are sufficient to state a claim for intentional fraud under § 25:2-25.  As the New Jersey Supreme Court has held, the presence of a single badge of fraud is sufficient to cast suspicion on the

15

transferor's intent.  Gilchinsky at 477.  Here, the Amended Complaint alleges with requisite specificity that the suspect transfer was to insiders, HTS received no consideration for the transfer, the transfer was for substantially all of HTS's assets, and shortly thereafter, the company had become insolvent. Perhaps after discovery and on a summary judgment record, the evidence will provide a more full explanation for why HTS became insolvent so soon after the shareholder distribution, the amount of debt Tan took on to purchase HTS, and the value of the 25% interest in Tan.  But on the few but sufficient facts and circumstances alleged here, the Court concludes that Plaintiff has pointed to sufficient indicia of fraud in the distribution to the Defendant Shareholders to survive a motion to dismiss.  See In re B. Moss Clothing Co. Ltd, Slip Op. 2011 WL 3878387 (Bankr. D.N.J. Aug. 31, 2011) ("the presence of two badges of fraud are surely sufficient then to state a claim for actual fraud" under § 25:2-25(a)).  See also In re Lopresti, Slip Op. 2006 WL 2708605 (Bankr. D.N.J. Sep. 20, 2006) (finding claim stated on allegation of three badges of fraud).

The cases cited by Defendants are factually distinguishable based on the fact that the plaintiffs in those cases were unable to sufficiently allege more than a single badge of fraud, or as strong a connection between the badges as Plaintiff has here. See, e.g. In re Actrade Fin. Techs. Ltd., 377 B.R. 791, 809-10

16

(Bankr. S.D.N.Y. 2005) (listing two suspicious facts not traditionally considered badges of fraud, and determining that "few if any" badges of fraud were present); Nisselson v. Softbank Am. Corp. (in re MarketXT Holdings Corp.), 361 B.R. 369, 396-97 (Bankr. S.D.N.Y. 2007) (finding only one badge of fraud: the inadequacy of consideration).

Accordingly, the Court cannot find that Plaintiff has failed to state a claim for intentional fraudulent transfer under § 25:2-25(a).  The Court will, therefore, deny Defendants' motion to dismiss Plaintiff's first count.

### 2.  Fraudulent Conveyance under § 25:2-25(b)(1)

In Count Two, Plaintiff alleges that Defendants' shareholder distribution constitutes constructive fraud pursuant to § 25:2-25(b)(1).  Under this provision of the statute, a transfer is fraudulent

> if the debtor made the transfer . . . (b)
> Without receiving a reasonably equivalent
> value in exchange for the transfer . . . , and
> the debtor: (1) Was engaged . . . in a
> business or a transaction for which the
> remaining assets of the debtor were
> unreasonably small in relation to the business
> or transaction . . .

Id.  Thus, to state a claim under this subsection, Plaintiff must allege both (1) that HTS executed the $16 million shareholder distribution without repayment and (2) that as a result of the distribution, Defendant HTS's remaining assets were unreasonably small in relation to its continuing liabilities to Plaintiff and

17

other creditors.

The Third Circuit, interpreting the Pennsylvania analogue to the NJUFTA, defined "unreasonably small" assets as

> the inability to generate sufficient profits
> to sustain operations.  Because an inability
> to generate enough cash flow to sustain
> operations must precede an inability to pay
> obligations as they become due, unreasonably
> small capital would seem to encompass
> financial difficulties short of equitable
> insolvency.

Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992).  "The question of whether a debtor left itself with unreasonably small assets to carry on its business is ultimately one of foreseeability."  United States v. Rocky Mountain Holdings, Inc., 782 F. Supp. 2d 106, 119 (E.D. Pa. 2011) (quoting Peltz v. Hatten, 279 B.R. 710, 744 (D. Del. 2002)).  The question, therefore, is whether, at the time of the transfer, the Defendants expected that the debtor (HTS) retained sufficient assets to meet its foreseeable liabilities, including this liability to Plaintiff.

Thus, to state a claim for constructive fraudulent transaction under § 25:2-25(b)(1), Plaintiff must allege that it was reasonably foreseeable, at the time of the shareholder distribution, that the assets retained by HTS after the distribution would be insufficient to pay claims by potential creditors such as Plaintiff.

Defendants argue that it was not foreseeable at the time of

18

the distribution that Plaintiff would seek to collect on a claim

for unpaid rent on a sublease contract because at that time,

Defendants expected the lease agreements with landlords such as

Plaintiff to be paid by other parties such as Tan Holdings or the

franchisees who were subletting the properties, much as they had

been paid prior to the asset sale and shareholder distribution.

Thus, while the theoretical possibility existed that a

landlord such as Plaintiff would seek payment of back rent

because the franchisee had defaulted, such a liability would be

merely a contingent liability.  For contingent liabilities such

as these, courts typically take into account the apparent

likelihood of the contingent event happening when comparing such

liabilities against assets.  In re R.M.L., Inc. v. Mellon Bank,

N.A., 92 F.3d 139, 156 (3d Cir. 1996) (holding that for

contingent assets or liabilities, "a court must take into

consideration the likelihood of that event occurring from an

objective standpoint.").  See also Xonics Photochemical, Inc.,

841 F.2d 198 (7th Cir. 1988) ("the asset or liability must be

reduced to its present, or expected, value before a determination

can be made whether the firm's assets exceed its liabilities")

(quoted in R.M.L. at 156).  Thus, the possibility of franchisee

default as a liability is discounted according to its apparent

likelihood at the time of the shareholder distribution.  This

liability could therefore be described as appearing to be small,

but of greater than zero value.

The question, then, is whether it was foreseeable at the

time of the distribution that HTS's assets after the distribution would become insufficient to satisfy its probabilistically small but existent liabilities.  The only asset Defendants point to that they argue could have satisfied such liabilities is the 25% ownership interest in Tan Holdings, which had some value, "substantial" or otherwise, that is not alleged.  Plaintiffs have alleged that this asset was insufficient to satisfy the foreseeable, if unlikely, lease liabilities.  The Court concludes that, on these facts and circumstances, Plaintiff has plausibly alleged that it was foreseeable that the potentially heavily encumbered 25% share in Tan Holdings, likely lacking in liquidity, would not be sufficient to meet any claims that could foreseeably arise in the future.  Accordingly, the Court will deny Defendants' motion to dismiss Plaintiff's claim for constructive fraudulent transfer under § 25:2-25(b) in Count Two.

### 3.  Fraudulent Conveyance under § 25:2-27

In Counts Three and Four, Plaintiff additionally seeks relief under § 25:2-27; under subsection (a) in Count Three and subsection (b) in Count Four.  The two provisions apply to slightly different factual contexts, so the Court will address them separately, beginning with subsection (a).

Subsection (a) provides that

> A transfer made or obligation incurred by a
> debtor is fraudulent as to a creditor whose
> claim arose before the transfer was made or
> the obligation was incurred if the debtor made
> the transfer or incurred the obligation
> without receiving a reasonably equivalent
> value in exchange for the transfer or

20

> obligation and the debtor was insolvent at
> that time or the debtor became insolvent as a
> result of the transfer or obligation.

N.J. Stat. Ann. § 25:2-27(a).  Defendants seek to dismiss

Plaintiff's claim under this subsection on the grounds that (1)

Defendant HTS received a reasonably equivalent value in exchange

for the relevant asset transfer; and (2) Defendant HTS was not

insolvent at the time of the relevant transfer and was not made

insolvent as a result of the transfer.

    With regard to the reasonably equivalent value, Defendants

analyze the issue as though the transfer or conveyance at issue

were the asset purchase agreement with Tan Holdings, under which

HTS received more than $40 million in exchange for selling

substantially all its assets.  This argument fails because, as

Plaintiff points out in opposition, Plaintiff has no complaints

with the asset purchase agreement.  Plaintiff, instead, alleges

that it was the shareholder distribution that violates § 25:2-

27(a).  Defendants argue, in reply, that such a position "seems

inconsistent" because "[e]ither both are part of a fraudulent

transaction or neither is."  Defendants offer no explanation for

why this would be so, however, other than mere ipse dixit.

Consequently, the Court is unpersuaded by Defendants' argument

and finds that Plaintiff has sufficiently alleged that in the

relevant transaction of the shareholder distribution, Defendant

HTS did not receive a reasonably equivalent value in exchange for

distributing approximately $16 million among the shareholders.

    As to Defendant HTS's alleged insolvency, Defendants argue

that Plaintiff fails to sufficiently allege this element of the
statute because the allegations show that, at the time of the
distribution and subsequent to it, Defendant HTS retained its 25%
ownership interest in Tan Holdings, which Defendants value at $10
million, in addition to the Tan Holdings performance-based
contingent earnings (the "earn outs").  Defendants compare these
assets, at the time of the distribution, with the contingent
liability of Defendant's sublettor defaulting, and concludes that
Defendant HTS was not insolvent at the time of the distribution.

        The Court concludes, however, that Plaintiff need not only
allege that HTS <u>was</u> insolvent at the time of the distribution;
Plaintiff could also allege that Defendant HTS <u>became</u> insolvent
<u>after</u> the distribution as a result, at least in part, of the
distribution.  Plaintiff cites Defendant Ralph Venuto, Jr.,
stating that Defendant HTS became insolvent in August or
September of 2008, not more than one year after it distributed
approximately $16 million to its shareholders.  Plaintiff alleges
the reasonable inference that, had Defendant HTS not distributed
$16 million in liquid assets to its shareholders in 2007, it
would not have become insolvent in 2008 mere months after
Plaintiff served notice of default on its commercial lease.  Am.
Compl. ¶ 49.  Consequently, the Court will deny Defendants'
motion to dismiss Plaintiff's third count.

        With regard to subsection (b), however, the result is
different.  Pursuant to that provision

                [a] transfer made by a debtor is fraudulent as

                                22

> to a creditor whose claim arose before the
> transfer was made if the transfer was made to
> an insider for an antecedent debt, the debtor
> was insolvent at that time, and the insider
> had reasonable cause to believe that the
> debtor was insolvent.

N.J. Stat. Ann. § 25:2-27(b).  To survive Defendants' motion to dismiss on this claim, Plaintiff must plausibly allege that, at the time of the distribution, Defendant HTS was insolvent and the shareholder Defendants had reason to believe so.  This, however, Plaintiff does not do.  At most, Plaintiff alleges that because of the distribution, HTS <u>became</u> unable to satisfy its liabilities at some point after the distribution.

Consequently, the Court concludes that Plaintiff has failed to sufficiently allege the elements of a claim under § 25:2-27(b), and will therefore grant Defendants' motion to dismiss Plaintiff's fourth count.  Because the Court has granted Defendant's motion to dismiss as to the fourth count, the Court need not address Defendants' argument regarding whether Plaintiff's claim under § 25:2-27(b) is barred by the one-year statute of limitations.

### 4.  Collateral Estoppel

Defendants additionally argue that Plaintiff's claims under the NJUFTA are barred under the doctrine of collateral estoppel because an unrelated plaintiff, AMC Delancey Richboro Partner, LP ("AMC"), has previously filed a similar complaint against Defendants in the Superior Court of New Jersey, Camden County Law Division, docketed at L-5169-10.  The AMC complaint was filed on

October 15, 2010, <u>see</u> Defs.' Ex. C, and, on June 10, 2011, the
complaint was dismissed without prejudice for failure to state a
claim.  <u>See</u> Defs.' Ex. F.

Collateral estoppel, otherwise known as issue preclusion,
"bars relitigation of any issue that was actually determined in a
prior action, generally between the same parties, involving a
different claim or cause of action."  <u>Zirger v. General Accident
Insurance Co.</u>, 144 N.J. 327, 337 (1996).  New Jersey courts
require the party asserting collateral estoppel to demonstrate
five elements:

> (1) the issue to be precluded is identical to
> the issue decided in the prior proceeding; (2)
> the issue was actually litigated in the prior
> proceeding; (3) the court in the prior
> proceeding issued a final judgment on the
> merits; (4) the determination of the issue was
> essential to the prior judgment; and (5) the
> party against whom the doctrine is asserted
> was a party to or in privity with a party to
> the earlier proceeding.

<u>State v. Brown</u>, 394 N.J. Super. 492, 502 (App. Div. 2007)
(quoting <u>First Union Nat'l Bank v. Penn Salem Marina</u>, 190 N.J.
342, 352 (2007)).

The only element disputed here is whether or not Plaintiff
MSKP is in privity with AMC.  Defendants argue that privity
exists here under <u>Zirger</u>'s definition of privity.  In <u>Zirger</u>, the
New Jersey Supreme Court explained that a non-party to an earlier
adjudication could usually only be considered to be in privity
with one of the parties "when the party is a virtual
representative of the non-party, or when the non-party actually

controls the litigation."  Id. at 338 (quoting Collins v. E.I. DuPont de Nemours & Co., 34 F.3d 172, 176 (3d Cir. 1994)).

The Court agrees with Plaintiff that the AMC plaintiff did not fit the "virtual representative" category as described in Zirger.  There is no indication that, other than both being commercial landlords holding a judgment against Defendant HTS, AMC and Plaintiff share any other factual connection or similarity.  That the two plaintiffs pursued similar legal theories of recovery is not enough to fall within the relatively narrow scope of "privity" as described in Zirger.

The Court further concludes that, were the New Jersey Supreme Court to address the scope of privity in the context of collateral estoppel today, the Court would likely follow the lead of many other courts, including the Third Circuit and the United States Supreme Court, which have rejected the "virtual representative" standard for assessing privity in collateral estoppel cases in favor of a significantly more narrow definition.  In Nationwide Mutual Fire Ins. Co. v. George V. Hamilton, Inc., 571 F.3d 299 (3d Cir. 2009), the Third Circuit explicitly rejected the "virtual representative" definition: "privity requires a prior legal or representative relationship between a party to the prior action and the nonparty against whom estoppel is asserted."  Id. at 312 (applying holding of Taylor v. Sturgell, 553 U.S. 880 (2008)).  Thus, were the New Jersey Supreme Court to address the proper scope of privity after Nationwide and Taylor, the Court is confident that it would

25

follow the United States Supreme Court in narrowing the field of
nonparties affected by a prior judgment under collateral
estoppel; the result of such a narrower application in the
instant case results in the conclusion that Plaintiff MSKP is not
in privity with the AMC plaintiff, as there is no indication that
the two have ever had a prior legal or representative
relationship, and that collateral estoppel is therefore
inappropriate here.

     5.  <u>Improper Distribution of Corporate Assets</u>

Plaintiff's fifth count seeks to recover from Defendants
under a theory of director liability pursuant to N.J. Stat. Ann.
§ 14A:6-12(1)(c).  The cited portion of the statute provides a
cause of action against certain directors of a corporation who
vote for or concur in "the distribution of assets to shareholders
during or after dissolution of the corporation without paying, or
adequately providing for, all known debts . . . ."  <u>Id.</u>

Defendants argue that Plaintiff cannot state a claim under
this statute because Plaintiff has not alleged that Defendant HTS
had dissolved or was undergoing dissolution at the time of the
shareholder distribution.  Plaintiff does not respond to this
argument, but rather argues simply that the shareholder
distribution caused Defendant HTS to become insolvent, after
which HTS stopped filing annual reports, allegedly causing "the
State to administer corporate euthanasia."  Plf.'s Br. in Opp. at
19.  Even were this allegation contained in the Amended Complaint
so that the Court could consider it on a motion to dismiss, it

26

would still be insufficient to state a claim under the statute.
The New Jersey legislature has enumerated specific ways in which
a corporation can be dissolved, none of which are encompassed by
the facts alleged in the Amended Complaint or in Plaintiff's
briefs.  See N.J. Stat. Ann. § 14A:12-1(1).  Accordingly,
Plaintiff has not adequately plead that Defendants approve the
distribution to shareholders after HTS had dissolved, or during a
dissolution, as that term "dissolution" is commonly understood.
Consequently, the Court concludes that Plaintiff has failed to
state a claim for relief under § 14A:6-12(1)(c) and will grant
Defendants' motion to dismiss the fifth count of the Amended
Complaint.

   6.  <u>Unjust Enrichment</u>

  Finally, Plaintiff seeks recovery from the shareholder
Defendants under the equitable theory of unjust enrichment.
Plaintiff argues that though no direct contractual relationship
existed between Plaintiff and the shareholder Defendants, the
Plaintiff did have a contractual relationship with Defendant HTS,
and that rather than setting aside money to pay the debts it
eventually was found to owe Plaintiff, HTS instead distributed
its remaining liquid assets to the shareholders.  Therefore,
Plaintiff argues, for the shareholders to retain the money that
Defendant HTS owes to Plaintiff would be unjust.

  Defendants argue that this claim should be dismissed for two
reasons, first because Plaintiff already has an adequate remedy
at law (fraudulent transfer under the NJUFTA), and second because

Plaintiff does not allege, as it must, that there exists any direct contractual relationship between Plaintiff and the shareholder Defendants.  Plaintiff's brief in opposition does not respond to either of these arguments.

The Court declines to dismiss the claim on the basis of there being an adequate remedy at law available, as Plaintiff is permitted to plead alternative theories of recovery.  See In re K-Dur Antitrust Litigation, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (denying motion to dismiss claims of unjust enrichment on the basis that equitable remedies such as unjust enrichment should not be granted where there exists an adequate remedy at law, and noting that plaintiffs "are clearly permitted to plead alternative theories of recovery.")

However, the Court agrees with Defendants that Plaintiff has failed to state a claim for unjust enrichment on these facts because Plaintiff has not alleged that any contractual relationship existed between Plaintiff and the shareholder Defendants from whom Plaintiff seeks recovery.  Unjust enrichment is a theory of quasi-contractual liability that requires a direct relationship between the parties.  See Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 109 (App. Div. 1966) (holding that "quasi-contract cases involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit" and therefore "[a] plaintiff is not entitled to employ the legal fiction of quasi-contract to substitute one promisor or debtor for another.") (internal

28

quotation marks and citations omitted).

> The unjust enrichment doctrine requires that
> plaintiff show that it expected remuneration from
> the defendant at the time it performed or conferred
> a benefit on defendant and that the failure of
> remuneration enriched defendant beyond its
> contractual rights.

VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994).

In the instant matter, Plaintiff does not allege that it had a direct relationship with the shareholder Defendants.  Indeed, Plaintiff alleges specifically that "[a]lthough plaintiff had a lease with Hollywood Tanning, it had no direct agreement with the shareholders of Hollywood Tanning."  Am. Compl. ¶ 61.  Plaintiff further does not allege that it conferred any benefit directly on the shareholder Defendants, but merely that they benefitted from the breach of Defendant HTS.  As a result, Plaintiff's claim for unjust enrichment fails to state a claim.  The Court will, accordingly, grant Defendant's motion to dismiss the sixth count of the Amended Complaint.


## IV.   CONCLUSION

Plaintiff has sufficiently alleged a fraudulent transfer under three of the subsections of the NJUFTA, but has failed to allege a violation of one other.  Plaintiff plausibly alleges that Defendant HTS distributed $16 million to its shareholders with no repayment, rendering it substantially without assets shortly before HTS became insolvent, raising the plausible inference that the transfer was intended to hinder, delay, or

defraud its creditors.  Similarly, because Plaintiff has plausibly alleged that after the distribution, HTS's assets were foreseeably insufficient to cover its liabilities, Plaintiff states a claim for constructive fraudulent transfer as well. Additionally, Plaintiff has sufficiently alleged that HTS made the distribution without receiving payment of a reasonably equivalent value, and HTS subsequently became insolvent as a result of the distribution.  Therefore, the Court will deny Defendants' motion to dismiss as to Plaintiff's first, second, and third counts.  However, Plaintiff has failed to plausibly allege facts to support a claim under § 25:2-27(b) because Plaintiff has not alleged facts suggesting that Defendant HTS was insolvent at the time of the distribution.  Therefore, the Court will grant Defendants' motion to dismiss as to Plaintiff's fourth count.

Finally, the Court is also granting Defendants' motion to dismiss as to the fifth and sixth counts of the Amended Complaint because Plaintiff has not alleged that the shareholder distribution occurred during or after the dissolution of Defendant HTS and because Plaintiff has failed to allege a direct contractual relationship between Plaintiff and the shareholder Defendants.

The accompanying Order will be entered.


**June 20, 2012**                          **s/ Jerome B. Simandle**
Date                                JEROME B. SIMANDLE
                                    Chief U.S. District Judge