IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MSKP OAK GROVE, LLC, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 10-6465 (JBS/JS) |
| CAROL VENUTO, individually and as executrix of the Estate of RALPH A. VENUTO, Sr., et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Robert A. Vort, Esq.
2 University Plaza, Suite 101
Hackensack, NJ 07601
-and-
Joseph A. Molinaro, Esq.
666 Godwin Avenue, Suire 220
Midland Park, NJ 07342
        Attorneys for Plaintiff

Dimitri Luke Karapelou, Esq.
LAW OFFICES OF DIMITRI L. KARAPELOU, LLC
Two Penn Center
1500 JFK Boulevard, Suite 920
Philadelphia, PA 19102
        Attorney for Defendants

**SIMANDLE, Chief Judge:**

**I.    INTRODUCTION**

        In this action, Plaintiff MSKP Oak Grove, LLC ("MSKP")

asserts claims under the New Jersey Uniform Fraudulent Transfer

Act, N.J.S.A. § 25:2-20 et seq. ("NJUFTA"), arising from an

allegedly fraudulent transfer of assets through which Defendants intended to avoid payment to certain creditors, including Plaintiff.  Plaintiff is a commercial landlord to which Hollywood Tanning Systems, Inc. ("HTS") is indebted by a 2009 judgment in the amount of $411,573.45.  Plaintiff alleges that following an asset purchase agreement with another corporation, Tan Holdings, LLC, in 2007, HTS fraudulently distributed $23 million to its shareholders, Defendants Carol and Ralph A. Venuto, Sr.,[1] Ralph A. Venuto, Jr., Carol Rebbecchi, and Richard P. Venuto ("the Shareholders"), and rendered HTS without sufficient assets to satisfy future obligations to creditors, including HTS's obligation to Plaintiff relating to a defaulted lease agreement.

    After the conclusion of nearly five years of dismissal motion practice and discovery and a lengthy stay, the parties now bring a host of motions before the Court: a motion for judgment on the pleadings as to Count IV of the Second Amended Complaint by Defendants Carol Venuto, Ralph A. Venuto, Jr., Carol Rebbecchi, Richard P. Venuto, and Hollywood Tanning Systems, Inc. ("HTS") [Docket Item 148]; a motion in limine to exclude Plaintiff's expert, Shelley Brown, as an expert witness

---

[1] Because Ralph A. Venuto, Sr. died prior to the initiation of this action, Plaintiff names his estate as a defendant, represented by Defendant Carol Venuto as executrix.

pursuant to Fed. R. Evid. 702 and Daubert by Defendants [Docket Item 150]; a motion by Plaintiff to enjoin proceedings currently pending in the Superior Court of New Jersey [Docket Item 161]; and cross-motions for summary judgment by Plaintiff and by Defendants. [Docket Items 178 & 187.] The Court convened a hearing regarding admissibility of Ms. Brown's proposed expert testimony on June 22, 2016.

For the reasons discussed below, the Court will deny Defendants' motion for judgment on the pleadings as to Count IV, deny Defendants' Daubert motion to exclude Ms. Brown as an expert, deny Plaintiff's motion to enjoin proceedings in the New Jersey state courts, and deny the cross-motions for summary judgment.

## II. BACKGROUND

**Factual Background**

Prior to the events at issue in this action, HTS was a New Jersey corporation that operated tanning salons and sold franchises and tanning equipment to independent tanning salons. (Def. Summary Judgment Ex. A [Docket item 178-5] at 9:17-10:1). HTS was founded in 1994 by Ralph A. Venuto, Sr., who is now deceased. (Def. Summary Judgment Ex. B [Docket Item 178-6] at 2.) HTS was owned by Ralph A. Venuto, Sr. and his wife Carol Venuto, Ralph A. Venuto, Jr., Carol Rebbecchi, and Richard P. Venuto, who also acted as HTS's officers. (Pl. Summary Judgment

3

Ex. I [Docket Item 187-5].) Franchisees operated over 300
Hollywood Tanning salons. (Def. Summary Judgment Ex. C [Docket
Item 178-7] at 11:25.)

In 2003, HTS leased a commercial retail space in a shopping
center in Florida from TSO Oak Grove, LLC ("TSO"), a predecessor
in interest to Plaintiff MSKP. (Second Am. Compl. ¶ 19.) In
2004, TSO consented to HTS's request to sublease the space to a
franchisee of HTS (a non-party known as Altamonte Chick Shades,
Inc.), although HTS remained liable on the lease in the event of
Altamonte's default. (Id. ¶¶ 20-21.) Plaintiff acquired the
landlord's rights under the lease agreement in January 2007.
(Id. ¶ 23.)

In the spring of 2007, HTS entered into an asset purchase
agreement with non-party Tan Holdings, LLC, in which Tan
Holdings acquired almost all of HTS's assets and assumed many of
HTS's debts in exchange for $40 million, 25% of the issued and
outstanding preferred units of Tan Holdings, and certain
contingency payments depending on Tan Holding's future earnings.
(Def. Summary Judgment Ex. D [178-9] at 15-24.) Tan Holdings was
operated by ACI Capital ("ACI"), a company with a "successful
track record of growing consumer-service franchise businesses,"
including Jenny Craig. (Def. Summary Judgment Ex. B at 11.) ACI
engaged several third parties to perform due diligence prior to
the sale. (Id. at 4.)

4

The asset purchase agreement closed on June 22, 2007. (Def. Summary Judgment Ex. D.) That same day, the four Defendant shareholders each individually received distributions in the amount of $5,858,547.67, or more than $23.8 million of the $40 million from the sale. (Second Am. Compl. ¶ 17.) The parties dispute the nature of the payment to HTS's shareholders, whether it was a diversion from Tan Holdings straight to the shareholders or a proper shareholder distribution. Other proceeds of the sale went towards settling HTS's then-outstanding debts, which was required by the terms of the asset purchase agreement. (Def. Summary Judgment Ex. D.) HTS retained a few small receivables but otherwise substantially ended its operations as of June 22, 2007. (Def. Summary Judgment Ex. A at 26:15-27:20.) The parties dispute the nature and amount of HTS's debts and liabilities, if any, that remained afterwards.

After the closing of the sale Tan Holdings was unable to maintain operations. (Def. Summary Judgment Ex. A at 17:6-9.) The company ultimately declared bankruptcy and changed its corporate structure. (Id.)

On July 3, 2008, over a year after the asset sale and shareholder distribution, Plaintiff notified HTS that Altamonte, its sublettor franchisee, had defaulted on its lease. (Second Am. Compl. ¶ 24.) Plaintiff sued HTS and Altamonte in Florida state court to recover damages for breach of the lease. (Id. ¶

5

25.) Plaintiff subsequently won a judgment against HTS for
$411,573.45, which was recorded in the Superior Court of New
Jersey on July 30, 2009 and remains unpaid. (Pl. Summary
Judgment Ex. A [Docket Item 187-4] and Ex. B [Docket Item 187-
4].)

**Procedural History**

Plaintiff filed the original Complaint in this action on
December 13, 2010, naming only the individual shareholders as
defendants.  [Docket Item 1.]  Defendants moved to dismiss the
Complaint for failure to state a claim and for failure to join a
necessary party, namely HTS, which the Court granted on August
8, 2011, dismissing the Complaint without prejudice to Plaintiff
filing a motion to amend and to join the new party.  [Docket
Items 11 & 12.]  Plaintiff subsequently filed an Amended
Complaint on November 14, 2011.  [Docket Item 24.]  The Amended
Complaint asserted six counts against Defendants: Counts One
through Four involved claims under the NJUFTA, Count Five sought
to recover under a theory of improper distribution under
N.J.S.A. § 14:6-12(1)(c), and Count Six sought to recover under
a theory of unjust enrichment.[2]  Defendants again moved to
dismiss for failure to state a claim pursuant to Fed. R. Civ. P.
12(b)(6).  The Court denied Defendants' motion as to the first

---

[2] This Court exercises diversity jurisdiction over Plaintiff's
state law claims pursuant to 28 U.S.C. § 1332.

three counts, holding that Plaintiff had sufficiently alleged a
fraudulent transfer under three subsections of the NJUFTA, but
granted Defendants' motion as to Counts Four, Five, and Six.
MSKP Oak Grove, LLC v. Venuto, 875 F. Supp. 2d 426, 443 (D.N.J.
2012).  Following entry of an Order granting in part and denying
in part Defendants' motion to dismiss [Docket Item 34],
Defendants filed an Answer to the Amended Complaint on July 13,
2012.  [Docket Item 40.]

    Thereafter, Defendants filed their first motion for
judgment on the pleadings due to untimeliness. [Docket Item 41.]
In January, 2013, the Court issued an Order [Docket Item 59]
staying all scheduling and motion practice until factual
findings were issued in a related case pending before Judge Noel
Hillman, Rowen Petroleum Properties, LLC v. Hollywood Tanning
Sys., Inc., 899 F. Supp. 2d 303 (D.N.J. 2012). Following Rowen's
dismissal, on March 5, 2014, the Court relisted for
consideration Defendants' motion for judgment on the pleadings
and permitted the parties to submit supplemental briefing
regarding a related New Jersey state court case, GS Partners,
LLC v. Carol Venuto, et al., No. C-12044 (N.J. Super. Ct. Ch.
Div. Nov. 8, 2012), in which another of Defendants' creditors
asserted similar claims against Defendants[3] under the NJUFTA

---

[3] All Defendants in the present action were named in GS Partners
with the exception of HTS.

based on the same allegedly fraudulent transfer at issue in the present action. The Court then denied Defendants' motion for judgment on the pleadings [Docket Items 75 & 76], finding Plaintiff's NJUFTA claims under §§ 25:2-25(a), 25:2-25(b)(1), and 25:2-27(a) timely because the Amended Complaint relates back to the filing date of the Complaint under N.J. Ct. R. 4:9-3. MSKP Oak Grove, LLC v. Venuto, Case. No. 10-6465, 2014 WL 4385979, at *10 (D.N.J. Sept. 5, 2014).

Plaintiff sought, and was granted, leave to file a Second Amended Complaint on March 25, 2015. [Docket Item 96.] This iteration included an amended NJUFTA claim under N.J.S.A. § 25:2-27(b), which had been dismissed by this Court from the Amended Complaint in 2012. Defendants filed an Answer and Affirmative Defenses to the Second Amended Complaint. [Docket Item 102.] After further discovery, the parties filed the motions now before the Court: Defendants' second motion for judgment on the pleadings as to Count IV [Docket item 148]; Defendants' motion to exclude Plaintiff's Expert Shelley Brown and her expert reports under Daubert [Docket Item 150]; Plaintiff's motion to enjoin discovery in New Jersey state court [Docket Item 161]; and the parties' cross-motions for summary judgment. [Docket Items 178 & 187.] The Court heard oral argument only as to Defendants' Daubert motion on June 22, 2016, and heard testimony from Ms. Brown at that time.

# III. DISCUSSION

## A. Defendants' Motion for Judgment on the Pleadings On Count IV

First, Defendants bring a motion for judgment on the pleadings as to Count IV of Plaintiff's Second Amended Complaint, contending that the Plaintiff's new claim is time barred by the NJUFTA statute of repose and that it does not relate back to the Amended Complaint and the original Complaint. [Docket Item 148.] Plaintiff added a new claim under NJUFTA, N.J.S.A. § 25:2-27(b) to its Second Amended Complaint, alleging that the company was insolvent as of March 31, 2007, three months before the asset sale and shareholder distribution.[4] (See Second Am. Compl. ¶¶ 53-55.) Defendants contend that this March 2015 addition falls outside of the four-year statute of repose established by N.J.S.A. § 25:2-31 and that it does not relate back to the filing of the original Complaint because statutes of

---

[4] Plaintiff had originally included a claim for relief in its first Amended Complaint under § 25:2-27(b), which was dismissed by this Court on June 20, 2012, for failure to state a claim upon which relief could be granted. MSKP Oak Grove, LLC v. Venuto, 875 F. Supp. 2d 426, 439-40 (D.N.J. 2012). There, the Court found that the Amended Complaint failed to state a claim for a constructive fraudulent transfer because Plaintiff, at most, alleged that HTS became unable to satisfy its liabilities because of the shareholder distribution, where it was required by the statute to allege that HTS was insolvent at the time of the distribution. Id. Plaintiff, by its Second Amended Complaint, attempted to cure that deficiency by adding new factual allegations establishing HTS's insolvency as of the distribution.

repose do not allow for equitable tolling or relation back. (Pl. Br. at 15, 17-18.)

Plaintiff takes the position that Defendants waived this argument by not seeking review of Judge Schneider's order permitting the amendment, and in the alternative that relation back applies per this Court's September 4, 2014 Opinion denying Defendants' first motion for judgment on the pleadings. MSKP Oak Grove, LLC v. Venuto, Case No. 10-6465 (JBS/JS), 2014 WL 4385979 (D.N.J. Sept. 5, 2014). For the reasons that follow, the Court will deny Defendants' motion for judgment on the pleadings as to Count IV.

### 1. Standard of Review

A defendant may move to dismiss a complaint before or after filing an answer. Fed. R. Civ. P. 12(b)(6) and (c); see also Borough of Sayreville v. Union Carbide Corp., 923 F. Supp. 671, 675 (D.N.J. 1996). A motion made before an answer is filed is a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). A motion made after an answer is filed is a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). See Fed. R. Civ. P. 12(h)(2) ("Failure to state a claim upon which relief can be granted . . . may be raised . . . by a motion under Rule 12(c).").

The differences between Rules 12(b)(6) and 12(c) are purely procedural, and the pleading standards of Rule 12(b)(6) are

applied for both. Turbe v. Gov't of the Virgin Islands, 938 F.2d
427. 428 (3d Cir. 1991). Thus, the Court must "accept all
factual allegations as true, construe the complaint in the light
most favorable to the plaintiff, and determine whether, under
any reasonable reading of the complaint, the plaintiff may be
entitled to relief." Fleischer v. Standard Ins. Co., 679 F.3d
116, 120 (3d Cir. 2012). The complaint must contain "sufficient
factual matter, accepted as true, to state a claim to relief
that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009) (internal quotation marks omitted). "A claim has
facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Id.

### 2. Discussion

#### a)    Judge Schneider's Order

As a threshold matter, Plaintiff takes the position that
Defendants' motion is barred by their failure to seek review of
Magistrate Judge Joel Schneider's March 23, 2015 Order [Docket
Item 94] allowing Plaintiff to file a Second Amended Complaint
including Count IV. Plaintiff contends that Judge Schneider's
finding that "the then-proposed count pleaded a viable claim for
relief" constitutes law of the case because Defendants did not
exercise their right to appeal within fourteen days pursuant to

11

Fed. R. Civ. P. 72(a) and L. Civ. R. 72.1(c)(1)(A). (Pl. Opp. at 5-6.)

Plaintiff is mistaken and confounds Judge Schneider's permission to file an amended complaint pursuant to Rule 15(a)(2), Fed. R. Civ. P., with Defendants' present attack on the timeliness of Plaintiff's claims under the NJUFTA's statute of repose. These are two separate inquiries. Judge Schneider permitted the addition of Count IV because "the Court does not find that the defendant will be prejudiced by the amendment." (Pl. Br. Ex. B at 18.) Judge Schneider's Order addressed neither the merits nor the timeliness of Plaintiff's new constructive fraudulent transfer claim, and inquired only into whether "justice so requires" that the Court grant Plaintiff leave to amend its complaint under the Federal Rules of Civil Procedure's liberal amendment policy. Defendants are still permitted to attack the sufficiency of the claims in the Second Amended Complaint; a party may still move to dismiss an amended complaint on grounds that were not available on its earlier dismissal motion. See Fed. R. Civ. P. 12(g)("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.") Accordingly, the Court will consider Defendants' arguments regarding the NJUFTA statute of repose.

12

b)   **Relation Back under the NJUFTA**

This Court already rejected Defendants' contention that the NJUFTA statute of repose categorically prohibits the relation back of any amended complaints. <u>MSKP Oak Grove</u>, 2014 WL 4385979, at *7 ("Thus, the Court holds that the statute of repose in N.J.S.A. § 25:2-31 does not preclude the possibility of relation back if N.J. Ct. R. 4:9-3 is satisfied."). Instead, an out-of-time amendment alleging claims under the NJUFTA will be considered to relate back to the original filing date when "the claim . . . asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." N.J. Ct. R. 4:9-3. The standards for relation back under N.J. Ct. R. 4:9-3 are to be liberally applied. <u>Notte v. Merchants Mut. Ins. Co.</u>, 185 N.J. 490, 499 (2006).

Critical to the undersigned's earlier finding that the claims in Plaintiff's first Amended Complaint related back to the date of the original pleading was the fact that "Plaintiff's Amended Complaint did not change the nature of Plaintiff's claims or add any parties not already on notice as to Plaintiff's claims." <u>MSKP Oak Grove</u>, 2014 WL 4385979, at *8. Here, Plaintiff's amended Count IV clarifies Plaintiff's claim for a fraudulent conveyance: asserting that the shareholder distribution was fraudulent because HTS was insolvent <u>before</u> the

13

conveyance, not merely that HTS became insolvent <u>as a result of</u> the conveyance. While this is an additional theory of liability, it is essentially attacking a label to the conduct that was attempted to be set forth in the original pleading, and it thus relates back.

Moreover, "The chief consideration underlying [statutes of repose] is said to be fairness to a defendant." <u>In re Sharps Run Assoc., L.P.</u>, 157 B.R. 766, 785 (1993) (quoting <u>Rosenberg v. Town of North Bergen</u>, 61 N.J. 190, 201 (1972)). Here, Defendants can scarcely claim to be surprised by the amendment, since their alleged fraudulent conveyance has been alleged from the beginning, albeit in deficient form until now. It may fairly be said that this is the claim Plaintiff attempted to set forth in its Complaint. Indeed, Defendants have had no difficulty addressing this Count IV claim in their summary judgment motion, addressed below.

Accordingly, the Court will deny Defendants' motion for judgment on the pleadings as to Count IV on the grounds that the claim is untimely under the NJUFTA statute of repose.

### B. Defendants' <u>Daubert</u> Motion

Defendants next seek an Order excluding Plaintiff's expert, Shelley Brown, as an expert witness and excluding both of her expert reports pursuant to Fed. R. Evid. 702 and <u>Daubert</u>. [Docket Item 150.] The Court convened a <u>Daubert</u> hearing on June

22, 2016, to hear testimony of Ms. Brown and the arguments of counsel upon this motion to determine the admissibility of her opinions. Ms. Brown, the Director of Forensic and Valuation Services for Paritz & Company, PA, produced two expert reports in August of 2015 on Plaintiff's behalf: the first, examining HTS's solvency before and after the shareholder distribution on June 22, 2007, the "Fraudulent Conveyance Report" [Docket Item 150-2], and the second, the "Valuation Report" [Docket Item 150-3], which provided an opinion as to the fair market value of Tan Holdings as of June 22, 2007, the date of the HTS asset sale. Ms. Brown specifically rendered the following opinions:

1. HTS did not receive reasonably equivalent value in return for the distributions and diversion of cash to the Venutos.
2. Remaining assets of HTS were unreasonably small in relation to the business or transaction.
3. The distributions to the Venutos and the diversion to them occurred when HTS knew or should have known that it would incur debt beyond its ability to pay them as they became due. The distribution and diversion left HTS with debts greater than its assets at fair market value.
4. The distribution and diversions to the Venutos left HTS insolvent immediately or shortly after they were made.
5. Evidence of HTS post sale insolvency contained [sic] in December 31, 2007 financial statements.
6. Tan Holdings' liabilities exceeded its assets on the day before the date of the sale, June 21, 2007, and on the date of the sale of HTS's assets, June 22, 2007.

(Fraudulent Conveyance Report at 2-3; Valuation Report at 1.)

Defendants contend that Ms. Brown's fraudulent conveyance report is fatally flawed because she cited no reliable principles or methodology, she inappropriately used hindsight to

15

value HTS, and she rendered opinions on Defendants' state of mind which she is unqualified to present. Defendants also take the position that Ms. Brown's valuation report is inadmissible because it is not helpful to the trier of fact and because Ms. Brown should be excluded as an expert. In opposition, Plaintiff argues that Ms. Brown's reports should be read as two pieces of one expert opinion, such that the principles and methodology discussed in the later valuation report are part of her fraudulent conveyance report as well. For the reasons that follow, the Court will deny Defendants' motion to exclude Ms. Brown's expert reports.

## 1. Standard of Review

Ms. Brown's testimony is subject to the Federal Rules of Evidence, which mandate that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert opinions may be based on

> facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data

> would otherwise be inadmissible, the proponent of
> the opinion may disclose them to the jury only if
> their probative value in helping the jury evaluate
> the opinion substantially outweighs their
> prejudicial effect.

Fed. R. Evid. 703.

This Rule has been distilled into "a trilogy of restrictions on expert testimony: qualification, reliability, and fit." Schneider ex. rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted). Qualification refers to the requirement that the witness possess specialized expertise. The Third Circuit has "interpreted the specialized knowledge requirement liberally, and ha[s] stated that this policy of liberal admissibility of expert testimony extends to the substantive as well as the formal qualification of experts." Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994)).

Reliability means that the expert's testimony must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation," and "[p]roposed testimony must be supported by appropriate validation . . . ." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 (1993). Daubert announced a nonexhaustive list of factors that bear on the inquiry of reliability: (1) whether the theory or technique can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or

17

potential rate of error and the existence of and maintenance of standards controlling the technique's operation, and (4) general acceptance of the practice. Oddi v. Ford Motor Co., 234 F.3d 136, 144-45 (3d Cir. 2000) (quoting Daubert, 509 U.S. at 593-97). "[A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir. 1994); see also In re TMI Litig., 193 F.3d 613, 695 (3d Cir. 1999); In re Human Tissue Products Liab. Litig., 582 F. Supp. 2d 644, 656 (D.N.J. 2008). However, reliability does not require correctness. In re Paoli, 35 F.3d at 744. Rather, the party need only demonstrate "by a preponderance of the evidence" that the expert's opinion bears adequate indicia of reliability, not that it is objectively "true." Krys v. Aaron, 112 F. Supp. 3d 181, 190 (D.N.J. 2015.)

The fit requirement "goes primarily to relevance" by "requir[ing] a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 591-92. "In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404 (citations omitted).

### 2. Discussion

At the outset, there can be no dispute that Ms. Brown is qualified as an expert to offer an opinion on the fair market value of HTS and Tan Holdings as of June 2007. According to her resume, [Docket Item 150-4], she is a Certified Public Accountant of many years of business evaluation experience, and she is "accredited in Business Valuation (ABV) and Financial Forensics by the American Institute of Certified Public Accountants (AICPA), and is certified to perform business valuations by the National Association of Certified Valuation Analysts (NACVA)." (Resume at 1.) Ms. Brown also testified at the June 22 hearing that she had been appointed as an expert to value businesses by New Jersey state courts in Bergen, Morris, Passaic, Hudson, and Essex counties and by the Hudson County Prosecutors Office.

Similarly, there is no dispute that Ms. Brown's reports demonstrate "fit" with the claims at issue in this case. The ultimate disposition of Plaintiff's claims under the NJUFTA hinge on HTS's financial health before and after the June 22, 2007 distribution; her opinions are certainly relevant to that inquiry.

The disposition of this motion then depends on the reliability of the methodology employed in Ms. Brown's report. As a threshold matter, the Court will consider the two documents designated as the Fraudulent Conveyance Report and the Valuation

Report to be part of one cohesive expert report for the purposes
of the description of Ms. Brown's methodology. At the June 22
hearing, Ms. Brown testified that she prepared a report
consisting of 5 parts, and that she produced that report in two
pieces only in an effort to facilitate and expedite discovery
between the parties. The reports were produced within a few days
of each other. Taken together, and augmented by Ms. Brown's
explanation, the combined report supplies an ample summary of
Ms. Brown's methodology. Accordingly, the Court rejects
Defendants' position that the Fraudulent Conveyance Report is
per se unreliable because it includes no summary of Ms. Brown's
methodology.

      The crux of the parties' arguments over the admissibility
of Ms. Brown's report, including both the Fraudulent Conveyance
and Valuation Report portions, is whether she explains her
methodology in a way that allows the Court to evaluate the
reliability of her opinions. Ms. Brown clarified at the June 22
hearing that the Valuation Methodologies and Valuation
Approaches sections found at pages 33-37 of the Valuation
Report, and the AICPA standards and valuation treatises attached
as exhibits, were all intended to cover both portions of the
report. Together, those sections of her report and exhibits
describe the normalization adjustments she performed in the
Fraudulent Conveyance portion to reverse engineer HTS's

financial health from the incomplete records she had received in order to render an opinion as to HTS's solvency or insolvency as of June 22, 2007, the date of the shareholder distribution.

The Fraudulent Conveyance portion of Ms. Brown's report clearly lays out the problems with the HTS financial documents she received from Defendants in this case; many documents "normally maintained by companies of this size for tax and management purposes" were unavailable, or were produced in PDF rather than native format without important underlying information. (Fraudulent Conveyance Report at 6.) Accordingly, Ms. Brown performed "normalization adjustments" as instructed by the Statements on Standards for Valuation Services Section 100 promulgated by the AICPA (referred to at the June 22 hearing as VS-100), the Pratt and Hitchner treatises, and Generally Accepted Accounting Principles (GAAP) to recreate income statements and balance sheets for the company, based on the partial information she received.

For example, VS-100.41 suggests that a business's valuation should be discounted to account for non-operating assets and excess operating assets. Ms. Brown testified that she consequently discounted the value of HTS's assets in "investment in stores held for resale" on her normalized balance sheet for franchises that had not re-opened for over a year, having concluded from losses booked by HTS on its 2006 tax filings that

21

those stores had been abandoned and should not have been treated the same as functioning stores. From this, Ms. Brown concluded that HTS overstated its net income accounts receivable by over $3 million. Ms. Brown also testified that she adjusted ACI's projections of Tan Holdings' prospective ability to generate income, in accordance with Pratt's examples of normalizing adjustments that may be performed, because the compound annual growth rates cited in the Crowe Chizek draft investment memo were significantly higher than the historical growth rate she calculated based on HTS's 2006 and 2007 financial documents. Throughout the report, Ms. Brown identifies the assumptions and scope restrictions and limitations on her opinion in keeping with VS-100.18 and .19.

In sum, VS-100 and the Pratt and Hitchner treatises discussed in and attached to Ms. Brown's report contemplate a business valuation based on the sorts of adjustments to financial documents which Ms. Brown performed for HTS. In her report, Ms. Brown normalized HTS's incomplete financial records and identified the assumptions and estimates on which she relied, in accordance with accepted business valuation principles. In short, she described her application of reliable, recognized principles of accounting and valuation analysis.[5]

---

[5] Moreover, while this Court may have detected some confusion or non-responsiveness to several cross-examination questions, those

It is up to a jury, then, to resolve the weight due to opinions in a report which, by necessity, relies so heavily on assumptions and is subject to so many scope limitations. "Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined." Kannankeril v. Terminix Intern., Inc., 128 F.3d 802, 806 (3d Cir. 1997) (citing In re Paoli R. R. Yard PCB Litig., 35 F.3d 717, 743-46 (3d Cir. 1994)). In the absence of any reason to exclude a report which undoubtedly offers insights into issues critical to this dispute, the Court will deny Defendants' motion to exclude Plaintiff's expert, Shelley Brown.

### C. Plaintiff's Motion for Preliminary Injunction

Next, Plaintiff seeks an Order from this Court enjoining proceedings in the Superior Court of New Jersey wherein Defendants seek discovery from Plaintiff's former counsel regarding MSKP's efforts to mitigate its damages before and after the entry of its Florida judgment. [Docket Item 161.] Plaintiff takes the position that this injunction is not barred by the Anti-Injunction Act, that the New Jersey Uniform Enforcement of Foreign Judgment Act bars Defendants' attempted discovery, and that the Full Faith and Credit Clause requires

---

hesitations are relevant to the witness's demeanor or manner on the witness stand and are relevant to the weight of her testimony, not its admissibility under Fed. R. Evid. 702 & 703.

23

that New Jersey enforce Plaintiff's Florida judgment in full.
Defendants concede that this Court has ruled that mitigation is
not a relevant defense to Plaintiff's fraudulent transfer
claims, but contend that this discovery is relevant to the
underlying judgment entered in the New Jersey state courts and
is permitted by Florida law. For the following reasons the Court
will deny Plaintiff's motion.

The Anti-Injunction Act's "core message is one of respect
for state courts. The Act broadly commands that those tribunals
shall remain free from interference by federal courts." Smith v.
Bayer Corp., 564 U.S. 299, 306 (2011) (citing Atl. Coast Line R.
Co. v. Locomotive Eng'rs, 398 U.S. 281, 282 (1970)).
Accordingly, a federal court is prohibited from enjoining state
court proceedings except where such an injunction falls into one
of the three limited and specifically defined circumstances
contemplated by the Act: where "expressly authorized by an Act
of Congress, or where necessary in aid of its jurisdiction, or
to protect or effectuate its judgments." 28 U.S.C. § 2283; see
also In re General Motors Corp. Pick-Up Truck Fuel Prods.
Liability Litig., 134 F.3d 133, 144 (3d Cir. 1998). These
exceptions "are narrow and are not to be enlarged by loose
statutory construction." Chick Kam Choo v. Exxon Corp., 486 U.S.
140, 146 (1988); In re Diet Drugs Prods. Liability Litig., 369
F.3d 293, 305 (3d Cir. 2004). Indeed, "[a]ny doubts as to the

24

propriety of a federal injunction against state court
proceedings should be resolved in favor of permitting the state
courts to proceed." Atl. Coast Line, 398 U.S. at 297. Here,
Plaintiff suggests that its sought-after injunction is
permissible under the second and third exceptions of the Act.
Plaintiff is mistaken on both grounds.[6]

The "necessary in aid of its jurisdiction" exception is
inapplicable here; it works only "to prevent a state court from
so interfering with a federal court's consideration or
disposition of a case as to seriously impair the federal court's
flexibility and authority to decide that case." Id. (citing Atl.
Coast Line, 398 U.S. at 295). In practical terms, this exception
applies only in in rem cases, where "a federal court is
entertaining complex litigation" involving a class of parties
from multiple states or a consolidation of cases from multiple
districts, or where a court retains jurisdiction to enforce a
settlement agreement. In re Diet Drugs, 369 F.3d at 306; 1975
Salaried Retirement Plan for Eligible Employees of Crucible,
Inc. v. Nobers, 968 F.2d 401, 407 (3d Cir. 1992). Plaintiff

_____

[6] The cases Plaintiff cites for the proposition that this Court
can enjoin duplicate litigation are inapposite; all deal with
parallel cases in different federal district courts, and as such
are not concerned with the peculiar boundaries of the Anti-
Injunction Act and its respect for federalism and comity.

presents no such circumstances in support of its request for an injunction.

The "protect or effectuate its judgments" exception, known also as the relitigation exception, is similarly inapplicable. "The relitigation exception was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court." Chick Kam Choo, 486 U.S. at 147. In other words, this exception applies only where the state law claims would be precluded by doctrine of res judicata. As such, an essential prerequisite of this exception is that "the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." Id. at 148. In this case, Judge Schneider has already determined that Defendants' request for discovery on the issue of mitigation of damages is irrelevant to the disposition of this fraudulent transfer action, but he was not presented with the question of whether MSKP's efforts to mitigate its damages, or lack thereof, should affect the amount outstanding on the underlying Florida judgment.

Accordingly, because Plaintiff has not shown that its request falls into any of the exceptions recognized by the Anti-Injunction Act, the Court will deny Plaintiff's motion under the

26

general principle that federal courts are prohibited from enjoining state court litigation.

### D. Cross-Motions for Summary Judgment

Finally, both parties present cross-motions for summary judgment on all counts of the Second Amended Complaint. [Docket Items 178 & 187.] The parties' failure to meaningfully comply with L. Civ. R. 56.1 complicates the Court's assessment of the record for disputes of material fact; at best, the parties have dumped nearly 1,500 pages of potentially relevant material without specific citations to the record, and at worst drawn unsupported conclusions from the mountain of evidence presented. For the following reasons, the Court will deny both motions.

### 1. Standard of Review

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. Id. Conclusory, self-

27

serving submissions cannot alone withstand a motion for summary judgment. Gonzalez v. Sec'y of Dept. of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012) (internal citations omitted).

In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, and must provide that party the benefit of all reasonable inferences.  Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).  However, any such inferences "must flow directly from admissible evidence [,]" because "'an inference based upon [] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'"  Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990); citing Anderson, 477 U.S. at 255).

### 2. Discussion

#### a)    Count I, NJUFTA § 25:2-25(a)

Plaintiff's first count alleges that the $23.8 million shareholder distribution runs afoul of the intentionally fraudulent transfer provision of the NJUFTA. Both parties seek summary judgment on this count. Section 25:2-25(a) provides that

> A transfer made . . . is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer or incurred the obligation:
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor. . .

28

The New Jersey Supreme Court has articulated two elements that must be proven to prevail on such a claim:

> The first is whether the debtor or person making the conveyance has put some asset beyond the reach of creditors which would have been available to them at some point in time but for the conveyance . . . The second is whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor.

Gilchinsky v. Nat. Westminster Bank N.J., 732 A.2d 482, 475–76 (N.J. 1999). Because fraudulent intent is difficult to prove by direct evidence, Gilchinsky holds that the Court should look to the "badges of fraud" enumerated in N.J.S.A. § 25:2-26 in order to evaluate whether the facts presented allow an inference of intentional fraud. Id. at 476.

The factors listed in the statute include whether:

    a. The transfer or obligation was to an insider;

    b. The debtor retained possession or control of the property transferred after the transfer;

    c. The transfer or obligation was disclosed or concealed;

    d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    e. The transfer was of substantially all of the debtor's assets;

    f. The debtor absconded;

g. The debtor removed or concealed assets;

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.J.S.A. § 25:2-26. Courts are instructed to balance these factors along with "any other factors relevant to the transaction." Gilchinsky, 732 A.2d at 489. "Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." Id. at 489-90 (citing Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254-55 (1st Cir. 1991)).

Both parties argue that they are entitled to summary judgment on Plaintiff's intentional fraudulent transfer claim.

30

Plaintiff argues that it is entitled to summary judgment on this claim because the record shows evidence of markers (a), (c), (e), (h), and (i) relevant to HTS's intent to defraud its creditors.[7] Defendants principally argue that there are no indicia of intentional fraud by HTS in the record, and that they could not have intended to defraud creditors at the time of the shareholder distribution because the Venutos all believed that Tan Holdings, and by extension HTS's interest in the company, would be successful and valuable going forward. Defendants contend that they had no reason to believe at the time of the shareholder distribution that any of its franchisees' liabilities that it guaranteed were in default or likely to be in default. (Def. Ex. E.) As follows, the Court finds that material factual disputes persist over these badges of fraud, such that summary judgment would be inappropriate as to either party on Plaintiff's intentional fraudulent transfer claim.

There is no factual dispute that the individual Defendants were all insiders of HTS within the meaning of the NJUFTA,[8] as

---

[7] Plaintiff further argues that Defendants' conduct in this litigation and others is further evidence of its intent delay, and suggests that its motion practice may violate Rule 11. This argument is irrelevant to the fraudulent conveyance claim; what is relevant to Plaintiff's success on Count I is only proof of Defendants' intent to defraud or delay creditors by means of a fraudulent conveyance, in this case the shareholder distribution, and not any other conduct.

[8] "Insider" includes the following individuals, when the debtor is a corporation: "(1) A director of the debtor; (2) An officer

subsection (a) suggests may be indicative of fraudulent intent. N.J.S.A. § 25:2-26(a). At the same time, there is no factual dispute that the shareholder distribution was not of substantially all of HTS's assets, see N.J.S.A. § 25:2-26(e). Plaintiff asserts that the shareholder distribution comprised nearly all of HTS's assets, because only $117,647.38 of the $40,000,000 sale to Tan Holdings remained in HTS's Investment Account after the shareholder distribution. (Pl. Br. at 15-16.) However, Defendants produced evidence that HTS retained value after the closing of its asset sale to Tan Holdings; Plaintiff's assumption ignores the value of HTS's 25% interest in Tan Holdings, something HTS's officers thought "would be worth more than $10 million" (Def. Ex. E at ¶ 6), the contingent earn-outs from Tan Holdings that HTS was entitled to receive in the future, and a few receivables still due HTS from franchisees. (Def. Ex. D at 21; Def. Ex. A at 26:15-27:20.)

However, factual disputes remain over the other indicators. Subsection (c) provides that fraudulent intent may be inferred

---

of the debtor; (3) A person in control of the debtor; (4) A partnership in which the debtor is a general partner; (5) A general partner in a partnership described in paragraph (4) of subsection b. of this definition; or (6) A relative of a general partner, director, officer, or person in control of the debtor." N.J.S.A. § 25:2-22(b). In this case, Ralph Venuto, Jr., Carol Rebbecchi, and Richard Venuto were officers of HTS according to its 2006 tax return (see Pl. Mot. Ex. I), and Carol Venuto was married to Ralph Venuto, Sr., another officer.

where the transfer was concealed.[9] N.J.S.A. § 25:2-26(c).
Plaintiff claims that the shareholder distribution was concealed
because the payments to Defendants were not recorded in HTS's
books and records on June 22, 2007. (Pl. Br. at 15.) HTS's
general ledger from that date shows only deposits of
$4,279,399,59 from "Proceeds from ACI transaction" and of
$127,812,81 from "Transfer from other accts" and does not
anywhere account for the portion of the $40 million sale to ACI
disbursed to the individual shareholders. (Def. Ex. D.)
Defendants take the position that the "closing documents"
provided for ACI to pay the shareholders directly, but without a
citation to a specific provision in the Asset Purchase Agreement
or the Schedules appended thereto (but not included in the
record on summary judgment), the Court cannot resolve the
dispute over concealment. (Def. Reply at 9-10.) As will be
discussed further, infra, with respect to Counts II and III, the
Court cannot conclude as a matter of law at this juncture
whether the value of consideration received by the HTS was
reasonably equivalent to the value of the shareholder
distribution or whether the HTS was insolvent or became

---

[9] This Court concluded that Plaintiff had not alleged this factor
in its First Amended Complaint, see MSKP Oak Grove, LLC v.
Venuto, 875 F. Supp. 2d 426, 435 (D.N.J. 2012), but Plaintiff
contends that it corrected that deficiency in the Second Amended
Complaint. [Docket Item 96, ¶¶ 35-41.]

insolvent shortly after the transfer was made. N.J.S.A. §§ 25:2-26(h) and (i). Accordingly, the Court finds summary judgment inappropriate as to Count I.

### b)    Count II, NJUFTA § 25:2-25(b)(1)

Plaintiff's second count alleges that the shareholder distribution constitutes a constructive fraudulent transfer under the NJUFTA because HTS's remaining assets were unreasonably small in relation to its business. N.J.S.A. 25:2-25(b)(1) provides that

> A transfer made . . . is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer or incurred the obligation: (b) Without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor (1) Was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

Thus, to prevail on such a claim, Plaintiffs must show both (1) that HTS executed the shareholder distribution without repayment, and (2) that as a result of the distribution, HTS's assets were unreasonably small in relation to its continuing liabilities to Plaintiff and other creditors.

At the outset, there is a factual dispute over whether HTS received reasonably equivalent value for the shareholder distribution. Plaintiff contends that Defendants have produced "no evidence that they paid anything or gave any asset to HTS which constitutes consideration for the distribution of the

34

proceeds of sale of its assets." (Pl. Br. at 10.) On the other hand, Defendants maintain that, as shareholders, they had an ownership interest in the company and conveyed their interest in HTS's assets to the company for sale to ACI – the excess of which came back as a shareholder distribution to compensate "for the loss of income that HTS would have provided the shareholders had the sale of HTS not occurred." (Def. Br. at 21.) Neither party points to evidence in the record supporting their proposition.

The record is similarly unclear on the issue of HTS's remaining assets in relation to its business. In order to prevail on their claim, Plaintiff must show that HTS's assets were unreasonably small in relation to its continuing liabilities. A business's assets are "unreasonably small," and may contribute to a finding of a fraudulent transfer, where a business is unable

> to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency.

Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992.) "The question of whether a debtor left itself with unreasonably small assets to carry on its business is ultimately one of foreseeability." United States v. Rocky

Mountain Holdings, Inc., 782 F. Supp. 2d 106, 119 (E. D. Pa. 2011) (quoting Peltz v. Hatten, 279 B.R. 710, 744 (D. Del. 2002)). For contingent liabilities, such as HTS's guarantee of the Altamonte lease, courts typically take into account the apparent likelihood of the contingent event happening when comparing such liabilities against assets. In re R.M.L., Inc., 92 F.3d 139, 156 (3d Cir. 1996) (holding that for contingent assets or liabilities, "a court must take into consideration the likelihood of that event occurring from an objective standpoint."). The crux of Plaintiff's claim, then, as this Court noted earlier, is "whether, at the time of the transfer, the Defendants expected that the debtor (HTS) retained sufficient assets to meet its foreseeable liabilities, including this liability to Plaintiff." MSKP Oak Grove, LLC v. Venuto, 875 F. Supp. 2d 426, 438 (D.N.J. 2012).

It is clear what assets HTS retained after the sale to Tan Holdings: the remaining cash in HTS's Investment Account, the 25% interest in Tan Holdings, contingent earn-outs from Tan Holdings, and small receivables from a few franchisees that were not transferred to Tan Holdings. (See Def. Ex. A, D, & E.) However, factual disputes arise over the value of the two largest assets: HTS's 25% interest in Tan Holdings and its future expectancy of earn-outs. Plaintiff contends that these assets were worthless because Ms. Brown's expert reports show

36

that Tan Holdings acquired useless encumbered assets from HTS in the sale and because the HTS was already unable to meet its obligations by the end of October 2007, when the Venutos had to loan $1,430,000 to the company.[10] (See Pl. Ex. D at 112.) Defendants contend that the 25% interest was valuable at the time of sale because HTS was purchased for $40,000,000 and that it was reasonable for them to believe that Tan Holdings would be a successful company over time, given the health of HTS's assets transferred over and ACI's track record with running other national lifestyle businesses. (See Def. Ex. A, B at 3-4).

The parties further disagree over what of HTS's obligations remained after the asset sale to Tan Holdings, and, crucially, how foreseeable those obligations were at the time. Plaintiff argues that, at the time of the shareholder distribution, HTS remained liable for nearly all of its franchisees' leases, for outstanding tax obligations in New York and New Jersey, and for a judgment in the case of Warminster Group L.P. v. McGuire and Hollywood Hands, d/b/a Hollywood Tanning Systems, Inc., No. 2000-4882 (Court of Common Pleas, Bucks County, Pennsylvania)

---

[10] Plaintiff further claims that HTS was even more cash-poor than the documents suggest because the Venutos "cleaned out the company bank account and transferred it to an investment account" (Pl. Br. at 26). But Plaintiff provides no further detail as to the functional difference between the two accounts, leaving the Court to guess at the significance of this point.

(hereinafter "the Warminster judgment") – the sum of all of which far outpaced the $117,647 liquid cash remaining in HTS's account after the shareholder distribution. (See Pl. Ex. K, R, & S.) Defendants take the position that Tan Holdings assumed nearly all of HTS's debt outstanding after HTS paid off all current creditors as a precursor to the asset sale (Def. Ex. D ¶ 2.1) and that each of the obligations Plaintiff points to were either not debts known at the time of the transaction or were so contingent as to count as $0. According to Defendant, its liquid cash along with its 25% interest in Tan Holdings should have been enough to cover HTS's foreseeable liabilities.

The parties principally disagree over the leases entered into by HTS's franchisees. Defendants contend that all leases were current as of the shareholder distribution and that HTS was only contingently liable on those agreements, such that the amount potentially owed on the outstanding leases should be discounted accordingly. (See Def. Reply Br. at 4.) Plaintiff contends that HTS was the named lessee on over 300 leases and that the leases qualify as "claims" under N.J.S.A. § 25:2-21[11] which should count fully. (Pl. Br. at 23-24; Pl. Ex. U; Def Ex. C at 163:10-165:14; Def. Ex. H at 14.)

---

[11] The NJUFTA defines claim as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." N.J.S.A. § 25:2-21.

38

With respect to HTS's tax obligations, Plaintiff's Exhibit R shows that, as of August 2010, HTS owed $114,157.87 in taxes, penalties, and interest to the State of New Jersey for the return period of 2007. Plaintiff's Exhibit S shows that, as of December 2010, HTS owed $107,409.10 in taxes and interest to New York State for the period ending August 31, 2007. In response, Defendants point out that neither were assessed until 2010, and offer an affidavit from Ralph A. Venuto, Jr. declaring that HTS was not aware of the tax debts until several years after the asset sale and that they were paid in full. (Def. Reply Ex. A at ¶¶ 3-9).

Finally, with respect to the Warminster judgment, Plaintiff claims that a judgment was entered in favor of the Warminster Group, L.P. for $457,725.29 against "Hollywood Hands d/b/a Hollywood Tanning Systems, Inc." and should be considered one of HTS's liabilities. (Pl. Ex. K.) Defendants contend that HTS was neither a party to the Warminster case nor a party to the Hollywood Hands lease that was at issue there. (Pl. Ex. L; Def. Reply Ex. A at ¶¶ 10-14.)

Accordingly, with so many factual disputes remaining at this time, the Court cannot conclusively compare the assets HTS retained with its ongoing liabilities to grant summary judgment to either party on Plaintiff's constructive fraudulent transfer

claim. Both motions are denied with respect to Count II of the Second Amended Complaint.

### c) Count III, NJUFTA § 25:2-27(a)

The Court will similarly deny both parties' motion for summary judgment as to Plaintiff's Count III, which alleges that the shareholder distribution caused HTS to become insolvent. N.J.S.A. 25:2-27(a) provides that

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Thus, to prevail on this claim, Plaintiff must show that (1) Plaintiff's claim arose before the shareholder distribution; (2) HTS did not receive a reasonably equivalent value in exchange for the shareholder distribution; and (3) HTS was insolvent at the time of the distribution or became insolvent as a result of the distribution.

Plaintiff can show the first element: that its claim arose before the July 2007 shareholder distribution. Although HTS was not made aware of its franchisee's default until on or about July 3, 2008, N.J.S.A. § 25:2-21 defines a "claim" as "a right to payment whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured"

40

and a "creditor" as "a person who has a claim." (Emphasis
added.) Thus, although the Altamonte lease was only a contingent
liability in 2007 – HTS's franchisee was primarily liable on the
lease and HTS had no reason to think the franchisee or HTS would
become unable to pay – it was still a "claim" against which a
conveyance could be fraudulent.

    As above with respect to Count II, there is a factual
dispute over whether HTS received reasonably equivalent value
for the shareholder distribution. Similarly, the record is
unclear as to whether HTS was insolvent at the time of the
distribution or whether HTS became insolvent as a result of the
distribution.

    Under the NJUFTA, "A debtor is insolvent if the sum of the
debtor's debts is greater than all of the debtor's assets, at a
fair valuation." N.J.S.A. § 25:2-23(a). HTS's solvency as of
June 22, 2007 is unclear, for the reasons discussed in
subsection 2, supra: the parties dispute the value of HTS's
assets and liabilities as of the asset sale and shareholder
distribution. Furthermore, even if HTS was not insolvent on June
22, 2007, it became presumably insolvent by July 2008, when
Plaintiff tried to collect on its claim for the Altamonte lease
and HTS did not pay. See N.J.S.A. § 25:2-23(b). The Court cannot
glean from this record, however, what caused that insolvency:
the distribution of over $23 million to HTS's shareholders, as

Plaintiff claims, or factors outside of HTS's control such as the Great Recession experienced nationwide in 2008, as Defendants contend. Accordingly, the Court will deny both parties' motions with respect to Count III.

### d)      Count IV, NJUFTA § 25:2-27(b)

The Court will also deny Defendants' motion for summary judgment as to Plaintiff's Count IV, which alleges that the shareholder distribution constitutes a constructive fraudulent transfer under the NJUFTA because HTS was insolvent at the time and because the shareholders had reasonable cause to believe so at the time. N.J.S.A. § 25:2-27(b) provides that

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Thus, to prevail on such a claim, Plaintiff must show that (1) Plaintiff's claim arose before the shareholder distribution; (2) that HTS was insolvent at the time of the shareholder distribution; and (3) that Defendants, as insiders, had reasonable cause at the time of the shareholder distribution to believe that HTS was insolvent.

Plaintiff can show that its claim arose before the shareholder distribution, but there are factual disputes over the other two elements of Plaintiff's Count IV. As discussed above, the Court cannot conclude as a matter of law whether HTS

was solvent or insolvent as of June 22, 2007. Similarly, factual disputes persist over whether the Venutos had reasonable cause to believe that HTS was insolvent at the time of the asset sale and shareholder distribution. Ms. Brown's report offers evidence sufficient to describe why Defendants should have known that HTS was insolvent, while Defendants have pointed out deposition testimony from the Venutos suggesting that none of them knew or believed there were any problems with HTS prior to the sale to Tan Holdings. For these reasons, the Court will deny Defendants' motion for summary judgment as to Count IV.

## IV.   CONCLUSION

An accompanying Order will be entered.


**June 29, 2016**                          **s/ Jerome B. Simandle**
Date                                       JEROME B. SIMANDLE
                                           Chief U.S. District Judge