**LAW OFFICES OF JOSEPH A. MOLINARO, LLC**
648 Wyckoff Avenue
Wyckoff, New Jersey 07481
201-857-3075
jam@molinarolaw.com
Bar Id. 001491994
      and
**ROBERT A. VORT**
2 University Plaza
Hackensack, New Jersey 07601
201-342-9501
rvort@vortlaw.com
Attorneys for Plaintiff
Bar Id. 204601968

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MSKP OAK GROVE, LLC**, a limited: liability company of Florida, : | Civil Action No. **10-6465** (Hon. Jerome B. Simandle) |
| Plaintiff, : | |
| -vs- : | **NON-JURY TRIAL** |
| : | |
| **CAROL VENUTO**, individually and as executrix of the Estate of : RALPH A. VENUTO, Sr., deceased, **RALPH A. VENUTO, JR., CAROL** : **REBBECCHI, RICHARD P. VENUTO,** and **HOLLYWOOD TANNING SYSTEM,** : **INC.**, a New Jersey corporation : | **JOINT PRE-TRIAL ORDER** |
| Defendants. : | |

_____ :

The following shall constitute the Final Pretrial Order pursuant to Rule 16, Federal Rules of Civil Procedure. This Final Pretrial Order shall govern the conduct of the trial of this case.

Amendments to this Order will be allowed only in exceptional circumstances to prevent manifest injustice. See Fed.R.Civ.P. 16(e). Counsel are urged to move to amend in a timely fashion any portion of the Order that must be changed or modified between the filing of the Order and the trial date.

**APPEARANCES:**

Robert A. Vort, Esq., Attorney for Plaintiff
Joseph A. Molinaro, Esq., Attorney for Plaintiff

Dimitri L. Karapelou, Esq., Attorney for Defendants

**Part I.   Jurisdiction and Brief Summary of the Case.**

Plaintiff MSKP Oak Grove, LLC ("MSKP" or "plaintiff") is a limited liability company of Delaware qualified to transact business in Florida.   The only member of MSKP is Babcock Florida Corporation, a Florida Corporation.

Defendants Carol Venuto, Ralph A. Venuto, Jr., Carol Rebecchi, Richard Venuto are citizens of New Jersey.   The Estate of Ralph A. Venuto, Deceased was administered in New Jersey.   Defendant Hollywood Tanning Systems, Inc. ("Hollywood Tanning") is a New Jersey corporation, whose principal place of business is in New Jersey.   Hollywood Tanning is no longer operating as a corporate entity.

The amount in controversy exceeds $75,000 exclusive of interest and costs.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1).

Hollywood Tanning was engaged in the business of franchising tanning salons to independent franchisee operators.   It owned some retail stores, most of which had been taken back from franchisees.   It also manufactured and sold tanning beds, bulbs, lotions and other supplies used in the operation of tanning salons to its franchisees.

On April 18, 2007, Hollywood Tanning entered into a Contribution and Asset Purchase Agreement ("the Agreement") with Tan Holdings, LLC ("Tan Holdings"), a limited liability company of Delaware.   Tan Holdings purchased almost all of the assets of Hollywood Tanning.   The parties disagree as to the amount of consideration paid.   Defendants assert that, according to the Agreement, the consideration was $40,000,000 plus a 25% interest in Tan Holdings subject to adjustments.

Plaintiff disagrees.   MSKP asserts that the consideration was either a) $40,000,000 in cash plus assumed liabilities and a 24.85% interest in Tan Holdings subject to adjustments at closing, b) $44,595,614 according to the Allocation of Sale Proceeds

prepared by Hollywood Tanning accountants (cash of $37,494,659 + assumed liabilities of $7,199,865) or c) $42,068,283 according to Form 8594 filed with the 2007 federal income tax return. When one factors in the $5,000,000 released from escrow and a refund of $1,430,000, the adjusted price ranges from $35,638,283 to $50,675,129.

Tan Holdings assumed responsibility for certain liabilities of Hollywood Tanning and reserved others to Hollywood Tanning. It assumed no responsibility for liabilities incurred by Hollywood Tanning with respect to the ownership or operation of the business or the assets transferred.

Hollywood Tanning received approximately 24.8% of the issued and outstanding preferred units of Tan Holdings. Hollywood Tanning was entitled to additional consideration depending on the performance of Tan Holdings. The Agreement required that Hollywood Tanning satisfy in full all its obligations save for those assumed by Tan Holdings in the Agreement.

The closing took place on June 22, 2007. Hollywood Tanning ceased its franchising operations. It continued to a) collect money owed by certain franchisees before the closing whose ability to pay was questionable and which assets the Buyer had not assumed, and b) to monitor its interest in Tan Holdings. Its assets after the closing consisted of the assets not transferred to Tan Holdings, a 24.8% interest in Tan Holdings and the right to additional income based upon the performance of Tan Holdings.

Tan Holdings paid some creditors of Hollywood Tanning from the closing proceeds. Tan Holdings paid $5,858,547.67, the balance of the consideration for the assets to each of Hollywood Tanning's four principals, the individual defendants in this action, on June 22, 2007.

Hollywood Tanning leased property on September 22, 2003 in the Oak Groves Shoppes Shopping Center in Altamonte Springs, Florida. The landlord was TSO Oak Grove, LLC, a Georgia limited liability company. TSO assigned its interest on November 7, 2005 to Woolwright Oak Groves, LLC. On January 25, 2007 Woolwright Oak Groves, LLC transferred its ownership interest to MSKP Oak Groves, LLC, a Delaware limited liability company. The only member of MSKP is Babcock Florida Corporation, which maintains its principal place of business in Florida.

3

Hollywood Tanning defaulted on its lease from MSKP.  MSKP sent notice of default to Hollywood Tanning in July 2008.  MSKP sued Hollywood Tanning.  Hollywood Tanning defaulted, and the Florida court entered judgment in favor of MSKP and against Hollywood Tanning on May 19, 2009 in the amount of $411,573.45. MSKP then recorded its judgment with the Superior Court of New Jersey on July 30, 2009.  No portion of the judgment has been satisfied.

Following the recordation of the Florida judgment in New Jersey, MSKP engaged in supplementary discovery.  Ralph Venuto, Jr., president of Hollywood Tanning, testified that the company was insolvent.  This lawsuit followed.

MSKP alleges a) that, when Hollywood Tanning sold its assets to Tan Holdings, LLC, it was part of a scheme to hinder, delay and defraud creditors of Hollywood Tanning in violation of N.J.S. A.25:2-25(a); b) that the distribution of almost $30,000,000 to or for the benefit of the shareholders of Hollywood Tanning left Hollywood Tanning without reasonably equivalent consideration in violation of N.J.S.A.25:2-25(b)(1); c) that Hollywood Tanning was insolvent when it permitted the diversion to its shareholders of $23,434,190.68 of the proceeds of sale of the assets of Hollywood Tanning and additional payments made to and for the benefit of the shareholders in violation of N.J.S.A.25:2-27(b); and d) that the transfer of assets and the diversion of a substantial portion of the proceeds of sale to the shareholders and the payment of additional money to and for the benefit of the shareholders rendered Hollywood Tanning insolvent in violation of N.J.S.A.25:2-27(a).

Defendants assert that the shareholder distribution was proper, that Hollywood Tanning was solvent at the time of the transfer and after the transfer, that the transfer did not render Hollywood Tanning insolvent and that defendants had every expectation that Tan Holdings would be a profitable company after the sale.  Defendants assert that they accepted the transfers in good faith and gave reasonably equivalent value in exchange for the transfers.  Defendants assert that they had no reason to set aside any reserve at the time of transfer because it was not expected or anticipated that the successor Tan Holdings would not be able to timely pay operating expenses or bills to creditors including landlord such as Plaintiff.

4

**Part II.**  **Stipulated Facts:**

1.    Defendant Hollywood Tanning is currently insolvent within the meaning of N.J.S.A.25:2-23.

2.    On June 22, 2007, each of the individual defendants received $5,858,547.67 from Tan Holdings or ACI Capital, the company which caused the formation of Tan Holdings and which funded the purchase of the assets of Hollywood Tanning and whose members owned and/or controlled Tan Holdings.

3.    On June 22, 2007 an alleged "dividend distribution" of $350,000 was paid from Hollywood Tanning's account at The Bank to purchase a tanning salon in Waldorf, Maryland.

4.    After payment of some liabilities and obligations of Hollywood Tanning, $4,279,399.59 was deposited into a checking account in the name of Hollywood Tanning at a banking institution named "The Bank."  This account was opened for the purpose of holding all remaining cash that Hollywood Tanning had on hand after the closing.

5.    All leases for the 300+ franchises identified the tenant as Hollywood Tanning Systems, Inc.

6.    Hollywood Tanning wanted to be the lessee on the leases to its franchisees because it believed that its name was stronger than the individual franchisees and would enable the franchisees to negotiate more favorable lease terms.  Because Hollywood Tanning was the lessee, it retained control of the premises if a franchisee defaulted.

7.    The individual defendants, Ralph A. Venuto, Jr., Carol Venuto, individually and as the executor of the Estate of Ralph A. Venuto, Sr., Deceased, Carol Rebbecchi and Richard Venuto, were the only shareholders of Hollywood Tanning as of June 22, 2007.  They were also the only officers and directors of Hollywood Tanning as of that date.

**Part III   Each of Plaintiff's Contested Facts:**

1.   Hollywood Tanning was insolvent immediately before it transferred title to its assets to Tan Holdings.

2.   Hollywood Tanning was insolvent immediately after it transferred title to its assets to Tan Holdings.

3.   The direct payment of $23,434,190.68 by Tan Holdings or ACI directly to the Venutos and the further transfer of $3,100,753.85 on June 22, 2007 from Hollywood Tanning to or for the benefit of the individual defendants, jointly and/or several-ly, rendered Hollywood Tanning insolvent.

4.   The direct payment to the Venutos of $23,434,190.68 from Tan Holdings to the individual defendants lacked considera-tion to Hollywood Tanning.

5.   The direct payment to the Venutos from Tan Holdings of $23,434,190.68 was not reflected on the books of Hollywood Tan-ning.

6.   An additional $127,812.51 was transferred into the ac-count at The Bank from other Hollywood Tanning bank accounts. This resulted in an initial opening deposit of $4,407,212.10 on June 22, 2007, the date of closing.

7.   The Venutos paid no consideration to Hollywood Tanning in exchange for the receipt of $5,858,547.67 by each of them.

8.   After Tan Holdings paid some of Hollywood Tanning's creditors and had paid $5,858,547.67 to each of the shareholders, a new checking account entitled Hollywood Tanning Systems Invest-ment account was opened at a banking institution named "The Bank."  The remaining sale proceeds of $4,279,399.59 were deposi-ted into that account plus $127,812.51 from other miscellaneous accounts. Effectively the opening deposits in the investment ac-count totaled $4,407,212.10.

9.   On the date of closing, June 22, 2007, every dollar of the closing proceeds had been spent or distributed to the Venu-tos.  According to the 2007 general ledger, all that remained in the Hollywood Tanning bank account was $117,647.38.

6

10.   On June 22, 2007, Hollywood Tanning loaned $400,000 to an entity called Venuto's Old World Pizza Systems, LLC ("Venuto's Pizza".)  The loan was not documented in writing.  The loan from Hollywood Tanning to Venuto's Old World Pizza was not documented.

11.   On June 22, 2007 Hollywood Tanning paid to Ralph Venuto, Sr. $500,000 from the checking account.  This was the amount supposedly owed by Hollywood Tanning to Ralph Venuto, Sr.

12.   On June 22, 2007 Hollywood Tanning paid $1,850,753.85 to satisfy a loan outstanding on a summer home located at 113 South 19th Avenue, Longport, New Jersey owned by the Venutos and their spouses.

13.   As the Venutos had transferred $127,812.51 into the Investment Account at The Bank from other bank accounts - which did not include any of the closing proceeds - not only were the closing proceeds completely distributed, but a portion of the funds remaining from the other accounts were spent as well.

14.   Hollywood Tanning paid additional distributions to the Venutos within weeks after the closing.  The 2007 General Ledger characterized these payments as "dividend."

15.   Although Hollywood Tanning had obligations before the closing to some franchisees for warranty and other claims, it did not maintain sufficient cash reserves to satisfy those liabilities.

16.   The payments from Hollywood Tanning and from Tan Holdings to the Venutos at the time of closing left Hollywood Tanning without assets sufficient to satisfy its existing claimants and creditors and the existing claims of third parties.

17.   The payments from Hollywood Tanning and from Tan Holdings to the Venutos at the time of closing left Hollywood Tanning without assets sufficient to satisfy contingent claimants, creditors and contingent claims of third parties.

18.   The payments of cash to the Venutos and, more particularly, the concealment of the payment from anyone who examined only the books of Hollywood Tanning, had to have been authorized or directed by the Venutos with the intent to hinder, delay or defraud creditors within the meaning of N.J.S.A.25:2-25(a) be-

cause a) the transfers were to insiders, c) the transfers were concealed in that they were not recorded on the books of the company, d) Hollywood Tanning had been sued in 2006 in a civil action pending when the transfer was made, e) the transfer was of substantially all the assets of Hollywood Tanning, h) the value of the consideration received by Hollywood Tanning was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred and I) Hollywood Tanning was insolvent or became insolvent shortly after the transfer was made.

19.    Hollywood Tanning's obligation to plaintiff arose before the Venutos directed, or Hollywood Tanning authorized, the payment of the money due to it to be diverted to its shareholders.

20.    The diversion of Hollywood Tanning's assets to its shareholders was without receipt of a reasonably equivalent value and rendered Hollywood Tanning insolvent.

21.    The diversion of Hollywood Tanning's assets to its shareholders more negatively affected the available cash reserves of an already insolvent company.

22.    At the conclusion of June 22, 2007, Hollywood Tanning had positive cash balance of $117,647.38, an amount insufficient to meet its obligations as they became due.

23.    The shareholders knew or should have known that Hollywood Tanning was insolvent before it transferred its assets on June 22, 2007.

24.    Three months before the conveyance in issue, Hollywood Tanning had substantially overstated its current assets and understated its remaining lease obligations and liabilities.

25.    As of March 31, 2007, Hollywood Tanning had liabilities which exceeded its assets and a deficiency in working capital.

26.    In the months preceding the closing, between April 2007 and June 2007, Hollywood Tanning did not have the resources which would have enabled it to cure the deficiency in working capital.

8

27.    At the time of closing, Hollywood Tanning was a defendant in class action litigation commenced by Nafar Hadis in the Superior Court of New Jersey and removed to this Court and assigned Civil Action Number 06-03826.    Hollywood Tanning's notice of removal pleaded that the damages sought exceeded $5,000,000.

28.    Hollywood Tanning was also a defendant in an action pending in the Court of Common Pleas, Bucks County, Pennsylvania. That action was commenced by the Warminster Group and assigned Docket No. 20004882-18-1.    Judgment was entered on June 13, 2005 after a trial as to damages in favor of Warminster Group and against Hollywood Hands d/b/a Hollywood Tanning Systems, Inc. in the amount of $457,725.29.

29.    The employer identification number for Hollywood Hands d/b/a Hollywood Tanning Systems, Inc., as reflected in the lease upon which Warminster Group filed suit, is the same employer identification number reflected on the tax returns for Hollywood Tanning Systems, Inc.

30.    According to the General Ledger, after the shareholders loaned $90,000 to Hollywood Tanning on September 4, 2007 and after payment of estimated taxes, the investment account had a negative balance after September 18, 2007.    In October 2007, the Venutos deposited $1,430,000 into the investment account.    The books of Hollywood Tanning classified this payment as a loan by the shareholders to satisfy the $1,430,000 escrow shortfall obligation owed Tan Holdings.    The $5,000,000 escrow was established for the benefit of Tan Holdings to satisfy obligations owed by Hollywood Tanning to Tan Holdings.

31.    The payments/distributions to the Venutos left Hollywood Tanning with almost no cash immediately after the closing and certainly insufficient cash.    Hollywood Tanning maintained no adequate reserve for other liabilies such as its remaining liabilities as Tenant on more than 300 franchise leases.

32.    GS Partners, LLC is a judgment creditor of Hollywood Tanning Systems.    In the defense of GS Partners' claim – both in arbitration and in litigation – Hollywood Tanning affirmatively hindered and delayed the adjudicative processes.

**Part IV.**   <u>**Each of Defendant's Contested Facts:**</u>

1.       Hollywood Tanning was founded by Ralph Venuto, Sr. around 1994.

2.   Ralph Venuto, Sr. was a highly successful, self-made entrepreneur.  He founded, invested in, and built up several lucrative businesses in the South Jersey region.  By the mid-2000s, he had earned a stellar business reputation by his peers, competitors and marketplace observers and insiders.

3.   Hollywood Tanning was a very successful and highly profitable business from 1994 through 2007.

4.       Hollywood Tanning grew its business the old fashioned way: building a known brand through the sale of quality and affordable tanning services to local patrons who became repeat and then long term loyal customers; adding new customers through word of mouth and strategic advertising; carefully choosing loca-tions for new stores in high traffic areas where tans were very likely to be sought by the local population; expanding from a small group of retail stores into the franchising business through implementation of vertical business practices; expansion into new states and regions as the tanning business became more attractive to wider markets on a national scale; realizing con-sistent profits and growth by containing internal operating costs; hiring family members for key positions thereby saving costs on executives; training and servicing a large staff of very dedicated in house part time and full employees; giving compre-hensive training programs to each new franchisee before store openings; taking on little outside debt; purchasing the ground where it would build its manufacturing plant and offices; provid-ing robust advertising and marketing support for existing stores; and always keeping a close eye on store by store sales and pro-ductivity.

5.   Hollywood Tanning grew from a small business into a nationally known franchising operation with over 300 stores by 2006.

6.   By 2006, in a niche market with just a few serious competitors, Hollywood Tanning was one of the top tanning franchising businesses in the U.S.A.

7.   By 2006 Hollywood Tanning had achieved industry dominance in the tanning franchising business.

8.   In the 1990s to the mid-2000s, the retail tanning business and sales of tanning services, products and equipment to end user customers grew rapidly throughout the U.S.A.

9.    In the 1990s to the mid-2000s, the consumption of tans through exposure to tanning bulbs was generally considered safe by the public.

10.   In 2004, Hollywood Tanning filed a federal income tax return disclosing substantial sales and net operating income.  It was very profitable in 2004 from an income statement and cash flow perspectives.

11.   In 2005, Hollywood Tanning filed a federal income tax return disclosing substantial sales and net operating income.  It was very profitable in 2005 from an income statement and cash flow perspective.

12.   In 2006, Hollywood Tanning filed a federal income tax return disclosing substantial sales and net operating income.  It was very profitable in 2006 from an income statement and cash flow perspective.

13.    In 2004 Hollywood Tanning made cash distributions to shareholders through the course of the year.  The cash distributions represented actual company profits. Hollywood Tanning made the distributions from its company bank accounts.

14.    In 2005, Hollywood Tanning made cash distributions to shareholders through the course of the year.  The cash distributions represented actual company profits.  Hollywood Tanning made the distributions from its company bank accounts.

15.    In 2006, Hollywood Tanning made cash distributions to shareholders through the course of the year.  The cash distributions represented actual company profits.  Hollywood Tanning made the distributions from its company bank accounts.

16.    Hollywood Tanning's federal tax returns have been accepted by the I.R.S.  Hollywood Tanning was never the subject of any fraud investigation by the I.R.S.

17.    Hollywood Tanning used the services of the same independent auditors and C.P.A.s for many years.

18.    The auditors and C.P.A.s each year audited the books and records of Hollywood Tanning according to their internal auditing standards and Generally Accepted Accounting Principles ("GAAP").

19.    Deviations from GAAP, if any, were minor and not material to the financial statements taken as a whole.

20.    The auditors and C.P.A.s each year issued formally prepared audited financial statements for Hollywood Tanning with unqualified audit opinions.

21.    The audited financial statements have never been the subject of a fraud investigation by any taxing authority or Hollywood Tanning lender.

22.    The audited financial statements and tax returns of Hollywood Tanning are fiscally sound documents having maintained their integrity for accuracy since they were first created.

23.    In 2005 and 2006, Hollywood Tanning started to receive outside interest in a possible acquisition of its franchising business.  At this time, Hollywood Tanning had over 300 stores, most owned by non related franchisees, and some owned by insiders of Hollywood Tanning.

24.    As of 2006, Hollywood Tanning had no reason to see that its decade plus of growth would slow down at any time in the near future.  If anything, because of the outside interest, Hollywood Tanning as bullish on its long term prospects.

25.    Hollywood Tanning was cash flow positive in 2004 both from an accounting perspective and by actually having the cash on hand to make payments to creditors, insiders and others.

26.   Hollywood Tanning was cash flow positive in 2005 both from an accounting perspective and by actually having the cash on hand to make payments to creditors, insiders and others.

27.   Hollywood Tanning was cash flow positive in 2006 both from an accounting perspective and by actually having the cash on hand to make payments to creditors, insiders and others.

28.   Hollywood Tanning, before the sale, always had sufficient cash on hand to meet ongoing obligations.

29.   Hollywood Tanning, before the sale, always had sufficient liquid assets to meet its working capital needs.

30.   Hollywood Tanning, before the sale, always had sufficient assets to offset any booked liabilities.

31.   In 2007, from January 1 through June 22, Hollywood Tanning was cash flow positive both from an accounting perspective and by actually having the cash on hand to make payments to creditors, insiders and others.

32.   From 2004 through June 22, 2007 Hollywood Tanning al- ways had sufficient funds to operate and pay expenses and make profit distributions.

33.   Hollywood Tanning had a line of credit with an outside lender.  Hollywood Tanning routinely drew on the line and paid it consistently and timely over the years.

34.   Hollywood Tanning was never sued by any of its lenders for loan defaults.

35.   Hollywood Tanning always timely paid its bills to out- side creditors, vendors, suppliers and landlords.

36.   Prior to the sale, each month the franchisees were re- sponsible to send to Hollywood Tanning a monthly sales report. This sales report contained itemized detail including sales by specific tanning booth; customer purchases of tans and products; employee performance and other metrics so that Hollywood Tanning would understand the month to month performance and be able to make changes/suggestions to improve sales and business practices.

13

37.   Hollywood Tanning typically did not receive individual store financials concerning the financial condition of any particular store.

38.   Hollywood Tanning was so successful and flush with cash, that over the years it was able to acquire failing stores, and pay the operating expenses, including rent, until Hollywood Tanning was able to sell the stores to a new franchisee or take other action to dispose of the asset.

39.   Hollywood Tanning was so successful that over the years it was able to keep struggling stores alive, and in doing so, routinely and in according to solid accounting practices, booked any monies owed by the franchisees to Hollywood Tanning as accounts receivable.

40.   The accounting practices of Hollywood Tanning were disclosed to its auditors and tax authorities.

41.   The accounting practices used by Hollywood Tanning in its efforts to preserve its struggling franchisees in no way ever disrupted or significantly impacted its actual cash flow.

42.   Hollywood Tanning was so flush with cash and had such great cash flow that it was able to absorb the losses of struggling stores over the years.

43.   From 1994 to June 22, 2007, Hollywood Tanning's franchise stores fail rate as a percentage of total stores was very low compared to industry and market standards.

44.   Hollywood Tanning was sued sometimes by disgruntled franchisees, including those lawsuits mentioned by the Plaintiff in its lawsuit.  Not one of these lawsuits ever resulted in an adverse decision against Hollywood Tanning.  The lawsuits were either dismissed as against the plaintiffs or settled without admission of liability.

45.   Because of its success, Hollywood Tanning decided to entertain an offer to acquire its business.

46.   In 2006 and early 2007, ACI Capital, LLC, an unrelated New York based investment fund, began its due diligence of Holly-

wood Tanning as part of its stated intention to make a very size-able buyout offer to Hollywood Tanning.

47.   ACI Capital was backed by a nationally known team of franchise builders who intended on using its track record of success to expand Hollywood Tanning from a family owned business into a mega franchise with over 500 stores.

48.   ACI Capital's due diligence was exhaustive: ACI engaged a team of accountants, consultants, advisors and lawyers to examine the status and condition of Hollywood Tanning from top to bottom.

49.   As part of the due diligence, ACI Capital researched, reviewed, considered and tested each aspect of the Hollywood Tanning business.

50.   As part of the due diligence, ACI Capital interviewed key executives, controllers, employees of Hollywood Tanning.

51.   As part of the due diligence, ACI Capital reviewed all Hollywood Tanning insurance policies, leases, contracts, loans and all other agreements with third parties for usual business expenses and practices.

52.   As part of the due diligence, ACI Capital reviewed any lawsuits then pending or threatened against Hollywood Tanning.

53.   As part of its due diligence, ACI Capital considered both the upside and the downside to the transaction.

54.   As part of its due diligence, ACI Capital considered the positives and negatives of the Hollywood Tanning historical financials.   It carefully examined each general ledger entry, testing the entries for purpose, soundness, fitness and reliability.

55.   ACI Capital understood the financial condition Holly- wood Tanning both from an accounting perspective and from an on the ground assessment of actual operations.

56.   ACI Capital was aware of the then current status of the Hollywood Tanning accounts receivables as reported on their financial statements. ACI Capital probed the accounts receivable to

15

determine status, collectability, and future worth to the enterprise. ACI Capital determined that the accounts receivable was sufficiently stated to satisfy their business intentions.

57.   ACI Capital was aware of the Hollywood Tanning method of recording income and expense on its books and tax returns.

58.   ACI Capital was aware that under Hollywood Tanning control, the individual franchise owners had distinct obligations: payment of royalties to Hollywood Tanning; payment of real property lease expenses directly to the landlords even though Hollywood Tanning was a named lessee or lease guarantor; payment of their other regular business expenses such as in-house employees, insurance, and utilities.

59.   ACI Capital was aware that over time some franchise operators were unable to meet their regular obligations.

60.   ACI Capital was aware that some of the accounts receivable of Hollywood Tanning represented a mix of delinquent franchisee obligations including unpaid royalties to Hollywood Tanning, rent and other expenses. Because Hollywood Tanning sought to protect the value of its store locations it would pay any delinquent franchisee rent directly the landlords. Hollywood Tanning would convert this into an asset booked as an account receivable as it had the right to seek reimbursement from the franchisee or foreclose the location.

61.   The value that ACI Capital assigned to the franchising business did not rely heavily on old accounts receivable aged more than 90 days. ACI Capital understood the risks involved in taking on aged out accounts receivable.

62.   ACI Capital understood that the accounts receivable represented, in some cases, years of unpaid franchisee obligations.   ACI Capital understood the financial condition of these stores.

63.   ACI Capital understood that these accounts receivable, if written off, would be a one-time bookkeeping entry.

64.   ACI Capital understood that Hollywood Tanning had the right to repossess any stores that were delinquent in expenses and also the right to close the stores.

65.   ACI Capital understood that any write-offs of old accounts receivable would actually free up cash in the future as Hollywood Tanning would no longer be absorbing the expenses on its books or otherwise.

66.   ACI Capital probed other entries in the financial statements of Hollywood Tanning including an asset called investment in stores held for resale.

67.   ACI Capital understood that the item investment in stores held for resale meant that these were stores that Hollywood Tanning repossessed over the years from franchisees and converted into company owned stores.

68.   ACI Capital understood the financial condition and quality of the investment in stores held for resale.

69.   ACI Capital, in assigning a value to Hollywood Tanning, did not rely heavily on the investment in stores held for resale.

70.   ACI Capital, in assigning a value to Hollywood Tanning, relied, in part, on the existing profitability of the more than 300 stores on solid footing.

71.   ACI Capital was aware of the downside of the struggling stores and adequately understood how these were being characterized on the books and records of Hollywood Tanning.

72.   As of spring, 2007, there was no legitimate business reason for Hollywood Tanning to write down any aged accounts receivable.  Hollywood Tanning had options to deal with aged out accounts receivable other than to write them off.

73.   As of spring, 2007, a write down of aged out accounts receivable would have been an unnecessary transaction considering that the business was thriving and a sale to Tan Holdings was imminent.

74.   As of spring, 2007, there was no legitimate reason to write down the investment in stores held for resale considering that the business was thriving and a sale to Tan Holdings was imminent.  Hollywood Tanning had options to deal with the investment in stores held for resale.

75.   ACI Capital understood the terms and conditions of all real property leases for the stores.

76.   ACI Capital understood the real property lease commitments and when it undertook to acquire the business, had already been contemplating what it would do with any struggling stores.

77.   As part of its due diligence, ACI Capital made competent long term projections in accordance with accepted valuation principles and methods.

78.   As part of its due diligence, ACI Capital created and assigned a market value for the business.

79.   As part of its due diligence, ACI Capital tested this assigned fair market value for integrity by deploying its accountants and consultants in the valuation process.

80.   ACI valued the business on a go-forward basis with an eye toward prospective earnings and the future benefit that would accrue to ACI.

81.   As part of its due diligence, ACI Capital investigated the need or lack thereof, in maintaining the Venuto family as operating executives.

82.   ACI Capital's studies of the business made them believe that the future of the Hollywood Tanning business as it meant to them would be better without the family in control.

83.   ACI Capital believed that the family control, while it was useful to grow the business up from the ground to where it was in 2007, was a weight against future growth prospects.

84.   ACI Capital believed with the Venutos out of control, that sales and profits would rise and multiply over a 3 to 5 year period going forward.

85.   ACI Capital made an offer to acquire the entire franchising business from the Hollywood Tanning pursuant a duly executed Asset Purchase Agreement, and the transaction indeed closed on June 22, 2007 and the business was sold to Tan Holdings, LLC, set up by ACI for this acquisition.

86.    Save for insignificant carve-outs of select assets, ACI Capital was buying the business lock, stock and barrel, and would use its own lenders to partially finance the acquisition in a leveraged acquisition.

87.    ACI Capital anticipated using its lender to finance, in part, the future growth of the business.

88.    At the closing on June 22, 2007, all creditors of Hollywood Tanning were paid in full.

89.    At the closing on June 22, 2007 a $5 Million escrow was set aside for certain post sale contingencies not capable of being fully anticipated and quantified.

90.    The $5 Million Escrow was a deduction from the proceeds otherwise due to Hollywood Tanning at the sale.

91.    As part the transaction, Hollywood Tanning received a 24.85% membership interest in Tan Holdings valued at $10,000,000.

92.    The $10,000,000 interest was considered equity in Tan Holdings, LLC.   In essence, rather than receive $10,000,00 in cash, Hollywood Tanning elected to treat this as equity contribution in the new business with the expectation of receiving profits and distributions (including earn out targets) for this investment.

93.    The $10,000,000 interest was properly reflected on the books and records and Hollywood Tanning and properly reported to the taxing authorities.

94.    The $10,000,000 interest is considered a tax-free exchange of roll-over equity in the new company and no write up was required.

95.    Immediately after the closing, Tan Holdings assumed control of the franchising operations.

96.    Immediately after the closing, Tan Holdings assumed control of all assets transferred including real estate, franchising business operations, manufacturing equipment, intangibles and goodwill, and books and records

97.   Hollywood Tanning, following the closing, owned an interest in Tan Holdings and other assets including promissory notes owed by franchisees, but had no other regular business operations.

98.   Ralph Venuto, Sr. decided to sell the business because he had learned his personal health was failing as a result of a cancer diagnosis.  Without him at the helm, it would be difficult to keep the business thriving as a family enterprise.

99.   The timing was right for a sale. The purpose of the sale to Tan Holdings was for Hollywood Tanning to take advantage of a very strong seller's market, satisfy its creditors, transfer assets to Tan Holdings, an operator with greater financial backing and liquidity and continue to hold an interest in the business expecting to see long term realization of the investment.

100. While following the sale to Tan Holdings Hollywood Tanning remained as a co-obligor of real property leases, most leases were assigned with the express consent of the landlords to Tan Holdings, LLC or its related companies who became the principal obligor and payor.  For those leases not assigned with express consent of the landlords, Tan Holdings nevertheless assumed responsibility for the lease obligations.

101. Following the sale, Tan Holdings implemented its business plan.  It removed the Venutos from management, replaced other employees, hired new employees, began to solicit the buyout of certain real property leases for struggling stores, changed some of the accounting practices, and looked to expand quickly into desirable areas.

102. Following the sale, Tan Holdings scheduled investor meetings. Ralph Venuto, Sr. and sometimes Ralph Venuto, Jr. attended the investor meetings.  Also in attendance were other members of the board of directors including some very prominent business figures.

103. At these investor meetings, Tan Holdings was effusive about the ongoing prospects of its business.  It made various suggestions to enhance sales including changing lotion look; marketing strategies and others.  Many of these decisions ultimately did not prove beneficial to the business.

104. All the real property leases for franchise stores were either acquired by Tan Holdings or Tan Holdings indemnified Hollywood Tanning against any future liabilities under the lease.

105. There were no amounts overdue to landlords at the time of the transaction.

106. Subsequent to the sale, Tan Holdings elected to negotiate with certain landlords to buy-out a limited number of leases. The specific leases and the amount of the buy-outs were determined by Tan Holdings and were not known or knowable prior to the sale date.

107. Generally Accepted Accounting Principles do not require, or even allow, the recognition of rent expense before the expense is incurred.

108. Following the sale, Tan Holdings elected to make a significant accounting change to how rent expense at the franchise level was recorded and booked. Previously, Hollywood Tanning booked any payments of rent as ~~ana~~ credit to cash and increased the accounts receivable balance for the applicable franchisee. Tan Holdings changed this to record both a payment of rent from the franchisee to Tan Holdings as income or revenue and the corresponding actual payment to the landlord as an expense and deduction against earnings.

109. Not too long after the sale, it is a known fact that the business and consumer lending markets and the credit and capital markets in the U.S.A. were quickly drying up making it very hard if not impossible for small businesses to gain access to the capital needed to acquire and start up new franchises.  In addition, it accelerated the demise of struggling stores who had fewer options to deal with any unforeseen financial challenges.

110. The Venuto shareholders continued to own tanning salons following the sale to Tan Holdings.  These salons were responsible to pay royalty and other obligations to Tan Holdings in the same manner as non shareholder owned salon.

111. Tan Holdings expected that as part of the sale, it would see increased revenues over Hollywood Tanning as the Venuto owned salons would begin paying royalties.

112. In 2008, the Venuto owned salons, which had being doing great prior to the sale, started to see a decline in tanning sales to customers due to the recession and other factors.

113. The U.S. entered an economic recession in December 2007. The recession was the deepest downturn since the Great Depression. The recession severely impacted the tanning business in general and the Tan Holdings business plan.

114. Tan Holdings, at some point, in 2008 was unable to keep the franchising business was profitable and began to shed stores and burdensome assets and obligations.

115. Tan Holdings sued Hollywood Tanning in New York State Court alleging, among other things, that Hollywood Tanning breached the Asset Purchase Agreement and defrauded Tan Holdings into purchasing the business.

116. That lawsuit settled amicably for under $500,000, much less than the millions sought by Tan Holdings.

117. In that lawsuit, Tan Holdings never produced an expert report or formal valuation that contradicted the ACI Capital valuation.

118. In that lawsuit, Tan Holdings never produced any financial statements for Hollywood Tanning making any of the adjustments that are currently devised by the experts for this Plaintiff, MSKP Oakgrove.

119. Tan Holdings, following the sale performed a reconciliation of the Escrow.

120. In October 2007, following advice of its accountants, Hollywood Tanning elected to write down certain accounts receivable effective for the 2006 tax year and amended its 2006 tax return. The amended 2006 tax return, despite the write downs, reflected a positive seven figure net operating income.

121. These write downs of accounts receivable had the immediate effect of improving the cash flow of the buyer Tan Holdings as they claimed the write downs against the escrow (the Asset Purchase Agreement escrow).

122. Tan Holdings, following the sale, because it had acquired over 280 healthy stores, should have had strong cash flow, adequate enough to meet its ongoing obligations to landlords and general creditors.

123. As part of the sale, any accounts receivable owed by stores owned individually by shareholders, an amount totaling $600,000, were fully paid down through the sale proceeds, effectively freeing up the cash flow of these stores going forward.

124. Following the demise of Tan Holdings, many of the former landlords filed suit against Tan Holdings and Hollywood Tanning for unpaid rent and obtained large five figure judgments.

125. Some creditors engaged counsel to collect the judgments.

126. Several lawsuits ensued similar to this one including Orchard Mall v. Hollywood Tanning Gloucester County Superior Court of New Jersey; AMC Richboro Delancey Partners; GS Partners, LLC v Venuto.

127. The Warminster Group lawsuit was against Hollywood Hands d/b/a Hollywood Tanning Systems. Inc., this entity is not the same company as Hollywood Tanning. Hollywood Hands, Inc. was set up by Ralph Venuto, Sr. as a separate legal entity in the State of New Jersey.

128. The plaintiff in the Warminster Group lawsuit chose to sue Hollywood Hands.

129. The plaintiff in the Warminster Group lawsuit chose not to sue Hollywood Tanning Systems, Inc.

130. Just two lawsuits remain, the current action before this Court and GS Partners, LLC, both handled by the same counsel.

131. Hollywood Tanning was not insolvent at the time of the shareholder distribution.

132. The investment account on the books of Hollywood Tanning did not have an actual negative balance as of September 18, 2007 or any time that month.

23

133. The shareholder distribution did not render Hollywood Tanning insolvent.

134. On June 22, 2007 the shareholders of Hollywood Tanning used part of their distribution from the sale, an amount approximating $400,000 and invested it in an entity called Venuto's Old World Pizza Systems, LLC ("Venuto's Pizza")

135. The shareholder distribution was not without consideration, as the Venutos were shareholders and held an ownership interest in the company. The shareholder distribution was payment for the Venutos' agreement to distribute the assets of the company they owned.

136. Plaintiff was not a creditor of Hollywood Tanning for purposes of NJUFTA at the time of the transfer, as Hollywood Tanning's lease with Plaintiff was not in default at the time of the transfer.

137. Defendants contest the expert report and its findings and conclusions.

138. Defendants contest that Plaintiff is owed any money, as Defendants believe Plaintiff did not make any attempt to mitigate damages as to the original judgment, as may be required under Florida law.

139. Defendants reassert all factual affirmative defenses in their Answer to the Second Amended Complaint.


**Part V.** **Witnesses and Summary of Testimony:**

    A. **Plaintiff's Witnesses and Summary of Their Testimony**

    1. Plaintiff intends to call the following witnesses with regard to liability and anticipates they will testify as follows:

Ralph Venuto, Jr., 480 West Railroad Avenue, Blackwood, New Jersey 08012

Plaintiff intends to call Ralph Venuto, Jr. to testify about a) the identity of all of the shareholders of Hollywood Tanning b) about the financial records of Hollywood Tanning and how they

were kept between 2003 and 2009.  Plaintiff will also call Mr.
Venuto to c) testify about a judgment entered, litigation pending
at the time of the sale to Tan Holdings and subsequent litigation
following the sale which was commenced by creditors alleging
breach of lease and fraudulent conveyances, d) to testify about
loans and distributions made to shareholders or entities in which
the Venutos had an interest at or around the time of, and
following the closing.  Plaintiff will also call Mr. Venuto e) to
testify about the intended or planned distribution of Hollywood
Tanning assets in advance of the closing and f) the effect of
that distribution on the creditors of Hollywood Tanning after the
closing.  Plaintiff will also call Mr. Venuto to testify g) as to
disbursements of the closing proceeds from the sale of Tan
Holdings and the implementation of the Contribution and Asset
Purchase Agreement and the effect of the Agreement on creditors
of Hollywood Tanning.  Mr. Venuto will also h) testify about the
number of franchises existing at the time of the sale and I) the
leasing liabilities of Hollywood Tanning before and after the
sale of its interest to Tan Holdings.  Plaintiff also seeks to
call Mr. Venuto j) to elicit those facts to enable plaintiff to
establish fraudulent intent as defined by statutes which give
rise to the claims asserted in this litigation.  Mr. Venuto (k)
also had knowledge of the suits against Hollywood Tanning and of
the judgments entered against it.

     <u>Richard Venuto</u>, 470 West Railroad Avenue, Blackwood, New
Jersey 08012:

     Plaintiff intends to call Richard Venuto with respect to the
disposition of Hollywood Tanning assets including a certain
Maserati automobile.  Richard Venuto may also be called to testi-
fy relating to post-closing dividends and distributions made to
him and as to loans made to or for the benefit of Hollywood Tan-
ning after the closing.

     <u>Carol Rebbecchi</u> 468 West Railroad Avenue, Blackwood, New
Jersey 08012:

     Carol Rebbecchi may also be called to testify relating to
post-closing dividends and distributions made to her as well as
to testify as to loans made to or for the benefit of Hollywood
Tanning post-closing.

<u>Carol Venuto</u>, 460 West Railroad Avenue, Blackwood, New Jersey 08012

Carol Venuto may also be called to testify relating to post-closing dividends and distributions made to her as well as to testify as to loans made to or for the benefit of Hollywood Tanning post-closing. She may also testify about the Estate of Ralph A. Venuto, Sr., Deceased.

<u>Stephen Orlofsky</u>, Blank Rome LLP, 300 Carnegie Center, Princeton, New Jersey 08540:

Mr. Orlofsky is expected to testify a) that his law firm was counsel to Hollywood Tanning Systems, Inc. in a suit filed by one Nafar Hadis in the Superior Court of New Jersey and removed to this Court and assigned Civil Action Number 06-03826, b) that Hollywood Tanning had an insurance policy which covered only counsel fees and costs but which did not require the carrier to indemnify against any settlement or judgment in the action and d) that Hollywood Tanning's notice of removal pleaded that the damages sought exceeded $5,000,000.

<u>Mira Muhtadie</u>, 28 Leonard Lane, Riverside, Connecticut 06878:

Plaintiff intends to call Mira Muhtadie for the purpose of testifying as to the financial condition of the assets and liabilities acquired from Hollywood Tanning immediately following the closing, and representations and warranties made as part of the Agreement between Hollywood Tanning and Tan Holdings which were materially breached. Ms. Muhtadie will testify a) that the financial statements supplied pre-closing to Tan Holdings reflected significant uncollectible sums as current and valid accounts which were not valid or otherwise uncollectible and should have been written off, b) that the obligations to pay rent and related lease expenses were not as represented for underperforming and closed lease locations and c) that Tan Holdings faced significant liability from numerous franchise terminations and liability for the return of unearned franchise fees. Ms. Muhtadie will also testify d) that certain franchisees were forgiven or there was an agreement between them and Hollywood Tanning to defer collection of outstanding accounts receivable, promises of discounts on the cost of equipment purchases and to supply franchisees with other

forms of financial assistance and e) that the financial records
and representations made by Hollywood Tanning were not in accord
with the actual assets received at the closing.

Ms. Muhtadie is a resident of Riverside, Connecticut.  MSKP
may read her deposition testimony into the record.  The deposi-
tion was taken on notice to counsel for defendant who declined to
appear either in person or by telephone.

William St. Clair, 28 South Centre Street, Merchantville,
New Jersey 08109, was the accountant for Tan Holdings, LLC
beginning in January 2008.  He will testify as to the books and
records of Hollywood Tanning in 2007 as reflected on the docu-
ments given to him by predecessor accountant.  He will also
discuss the formation by Tan Holdings, LLC - with the consent of
Ralph Venuto, Jr. - to create several subsidiary corporations and
their effect on the creditors of Hollywood Tanning Systems, Inc.

Carmine Gallicchio, 426 Willow Avenue, Roselle Park, New
Jersey 07204: He will testify that a) he is the only member of GS
Partners, LLC, b) that GS Partners purchased a Hollywood Tanning
franchise, c) that he believes that Ralph Venuto, Jr. and
Hollywood Tanning defrauded him in the purchase by GS Partners of
a Hollywood Tanning franchise, d) pursuant to his franchise
agreement, he filed an arbitration proceeding with the American
Arbitration Association (AAA) in June, 2008 against Hollywood
Tanning, Ralph Venuto, Sr and Ralph Venuto, Jr., e) the AAA
issued a scheduling order on January 20, 2009, f) Ralph Venuto,
Jr. and Carol Venuto, as administratrix of the Estate of Ralph
Venuto, Sr., sued him on January 26, 2009 in Chancery Division,
Camden County to enjoin the arbitration on the basis that they
were not parties to the franchise agreement, g) that the ar-
bitration proceeded against all respondents, h) that the AAA ter-
minated that proceeding on October 7, 2009 because Hollywood Tan-
ning had not paid its share of the American Arbitration Associa-
tion fee, I) that GS Partners filed suit against Hollywood Tan-
ning, the Estate of Ralph Venuto, Sr and Ralph Venuto in the Law
Division, Somerset County on February 4, 2010 for damages, j) the
defendants moved to dismiss the action on March 29, 2010, k) that
the Superior Court held a proof hearing and entered judgment on
January 7, 2011 in favor of GS Partners and against Hollywood
Tanning in the amount of $959,359, no portion of which has been
paid.

Kenneth Federman, 3103 Hulmeville Road, Bensalem, Pennsylvania 19020, will be subpoenaed to authenticate an affidavit he filed in the Court of Common Pleas, Bucks County unless defendants will stipulate that he was counsel to Hollywood Hands d/b/a Hollywood Tanning Systems, Inc. and to the admission into evidence of that affidavit.

A representative of Travelers Insurance Company will testify to coverage afforded by Travelers Insurance Company for lawsuits against Hollywood Tanning Systems and payments made under those policies.

2.   Plaintiff does not intend to call any witnesses with respect to damages.  Plaintiff will rely on the Florida judgment as recorded in New Jersey plus post-judgment interest.

B. **Defendants' Objections to Plaintiff's Witnesses**

1.   Defendants object to the introduction of any statements by Stephen Orlofsky that are protected by the attorney client privilege that covers all communications made by and between Mr. Orlofsky and his law firm and the defendants concerning the Nafar Hadis lawsuit filed in the New Jersey Superior Court, or any other lawsuit or matter that Plaintiffs attempts to raise at trial.

2.   Defendants object to all testimony of Carmine Gallichio as not relevant to any of the claims or defenses involved in this action.  F.R.E. 401.  Mr. Gallichio's testimony would not aid the factfinder as this Court has already observed in prior decisions that Plaintiff MSKP Oakgrove was a creditor as defined in the New Jersey Uniform Fraudulent Transfer Act and as such has standing to bring this lawsuit as an alleged aggrieved creditor. Mr. Gallichio's testimony would not aid the factfinder in deciding the solvency of Hollywood Tanning as the Mr. Gallichio's alleged troubles with Hollywood Tanning, namely the arbitration and lawsuits referenced, all arose long after the June 22, 2007 asset sale and were largely prosecuted in 2009, which was after the Tan Holdings franchising business had ceased operations.

3.   Defendants object to any representatives of Travelers Insurance Company for the purposes stated in Plaintiff's portion Pre-trial Statement.  Any testimony concerning alleged insurance payments made or not made by Travelers under insurance coverage

offered to Hollywood Tanning has no relevance to any of the claims asserted concerning the solvency of Hollywood Tanning. Defendants see no connection between the ability of Hollywood Tanning to pay creditors and the separate actions of an unrelated insurance company which may have been paying or not paying on claims made against Hollywood Tanning.    F.R.E. 401.

## C. Defendants' witnesses and summary of their testimony:

Ralph A. Venuto, Jr., 480 West Railroad Avenue, Blackwood, New Jersey 08012, to testify as to the financial condition of Hollywood Tanning at the time of the Sale, before the sale, after the sale and HTS's evaluation of the potential of Tan Holdings to produce profit.   Ralph A. Venuto, Jr. to testify as to all affirmative defenses in the Defendants' Answer to Second Amended Complaint; any lawsuits involving Hollywood Tanning before or after the sale; the business history and operations of Hollywood Tanning; the sale to ACI Capital; the Asset Purchase Agreement; the operations of Tan Holdings post-sale; the Tan Holdings financial records; the Hollywood Tanning financial statements and tax returns; and to any other fact or allegation of fact involving Hollywood Tanning and defense in this lawsuit.

Richard Venuto, 470 West Railroad Avenue, Blackwood, New Jersey 08012, to testify as to the same areas as Ralph A. Venuto, Jr. although Richard's scope of knowledge may be more limited than Ralph's.

David Rahn, 1000 Delsea Drive, Buildiong E-2, Westville, NJ8093, to testify concerning the financial condition of Hollywood Tanning before the sale and at the time of the sale, the business history and operations of Hollywood Tanning; the Asset Purchase Agreement; the lawsuits involving Hollywood Tanning; the Tan Holdings financial records; the Hollywood Tanning financial statements and tax returns; and his role as an advisor to Tan Holdings including his knowledge as to the financial condition, prospects and business decisions of ACI Capital after the sale.

Jack Uris, former accountant for Hollywood Tanning.  He will testify regarding his role as accountant for Hollywood Tanning and his involvement in the production of financial statements for Hollywood Tanning and his personal knowledge as to the accuracy and veracity of the financial statements.

### D.   Plaintiff's objections to defendant's witnesses

Plaintiff does not object to any of the foregoing fact witnesses although it intends to cross-examine them.   MSKP objects to Pederson's testimony for he has performed no independent valuation of the Venutos' interests in Tan Holdings or the solvency of Hollywood Tanning on or before the date of closing.   His report is only a critique of Shelley Brown's report, not an independent report setting forth a contrary opinion based upon tested analysis of the financial records.   His opinion is a net opinion.

### Part VI **Expert Witnesses**

### A.   Plaintiff's expert:

Shelley Brown, MBA, CPA/ABV/CFF, CVA   *(Curriculum Vitae* attached)

Ms. Brown's expected testimony will support her report re-garding the condition of Hollywood Tanning as of the date of closing and the value of Tan Holding.   More specifically, Brown will testify that both before and after the sale of Hollywood Tanning, it transferred assets to its shareholders, the Venutos, without receiving any equivalent value.   Hollywood Tanning also permitted Tan Holdings to pay the bulk of the cash consideration for the purchase of Hollywood Tanning's assets directly to the Venutos.   Hollywood Tanning received no consideration equivalent in value to the distribution of cash to the shareholders, and it received no consideration at all for allowing Tan Holdings to di-vert to the Venutos the bulk of the consideration for its pur-chase of the Hollywood Tanning Assets.   This diversion and dis-tribution left Hollywood Tanning with an earnings deficit which existed before and remained after the sale to Tan Holdings.

Hollywood Tanning's remaining assets after the sale, which included the non-marketable, minority investment in Tan Holdings, were not sufficient to satisfy its liabilities.   Hollywood Tan-ning knew, or should have known, that it would not be able to pay its debts as they became due.

Based on Hollywood Tanning's 2006 and 2007 operating re-sults, Hollywood Tanning should have known that accounts receiva-

ble could not be collected, the defaults on store leases and equipment leases would escalate and stores held for re-sale would not be profitably sold.   The investment in Tan Holdings was not worth $10,000,000, the projected earn outs would not be realized and that given their lack of investment in Hollywood Tanning, shareholder distributions were excessive.

Ms. Brown will also testify that Hollywood Tanning knew that it had materially overstated its 2006 earnings on its financial statements by, among other things, (I) understating bad debt expense and overstating the value of accounts receivable, (ii) overstating the value of salons held for resale rather than adjusting their carrying values for impairment (iv) understating lease obligations.   As a result, the formula used to determine Hollywood Tanning's fair market value and the value of its interest in Tan Holdings was flawed and materially overstated its value.

Hollywood Tanning realized and recorded a material write-off of accounts receivable and inventory in 2007.   Stores held for resale suffered a material impairment in 2006 and additional stores suffered a material impairment in 2007.   Several store leases went into default in 2006, and additional stores defaulted on their leases in 2007.   Historically, the shareholders also took excessive distributions and, additionally, in 2007 Hollywood Tanning realized that accounts payable and sales tax payable were materially understated.   The Venutos agreed to a $5,000,000 escrow of the proceeds on the asset sale.   Because the escrow was insufficient and had been exhausted, they were still required to contribute from monies Hollywood Tanning no longer had an additional $1,430,000 classified on the General Ledger for 2007 as a "loan in family members" as early as October 2007.   In other words, they realized 12% sales price adjustment on the nonmarketable, minority interest in the company within four months of the sale.

During the period under review, the historical compound growth rate (before normalization adjustments) was approximately 9.3%.   Its highest historical EBITDA, (before normalization adjustments) was 28.9%.   In 2006, historical EBITDA (before normalization adjustments) had declined to approximately 7%.   For Tan Holdings to meet its EBITDA growth targets and pay the projected earn outs, Tan Holdings' first year EBITDA growth would have to be approximately 58%, its second year growth target would have to

31

be 13.8% and its two-year compound annual growth rate would have to be 34%. Given historical operating results, the Venutos knew or should have known that these target growth rates were unattainable and that the earn outs would not be paid.

Based on the 2006 and 2007 declines in Hollywood Tanning's operating results, the Venutos knew, or should have known, that its ownership interest in Tan Holdings had no value. There was an increase in 2007 gross revenues, offset by a material decline in operating income resulting from inability to collect their outstanding accounts receivable, overstated inventory, understated accounts payable and taxes payable, defaults on store leases and failure to sell the stores held for resale at their carrying values. The Venutos knew or should have known that Hollywood Tanning would experience cash flow deficiencies. Yet they immediately transferred virtually all of the sale proceeds to themselves with no regard to its current and future creditors, including lease holders.

Hollywood Tanning distributed the proceeds of the sale to its shareholders without regard to the fact that Hollywood Tanning was insolvent both before and after the transfer.

Ms. Brown will also testify as to the valuation she ascribed to plaintiff's minority interest in Tan Holdings, LLC. Brown valued Tan Holdings as a continuation of Hollywood Tanning Systems.

Brown will testify that the defendants did not produce financial records for 2003. For 2004 and 2005, production was limited to audited financial statements which both Crowe Horwath and Brown found to be unreliable. For calendar years 2006 and 2007, defendants produced only partial and incomplete records.

She will testify that the buyer's accountants appear to have (it's only a preliminary report) concluded that the audited financial statements were not prepared in accordance with generally accepted accounting principles ("GAAP"); contingent liabilities were not recorded, labor and raw materials were not capitalized into inventory, the investment in stores was not tested for impairment. Further, due to Hollywood Tanning's failure to perform a monthly financial close, Crowe Horwath opined that the financial data generated from the general ledger was not sufficiently reliable to support business decisions. Based on these findings and with no supporting or third party documentation for the 2004

and 2005 audited financial statements, Brown could place no reliance upon them.

The 2006 and 2007 financial statements and other financial information was also not in compliance with GAAP. However, because defendants had produced the asset and liability sections of the general ledger and the 2006 audit work papers, she could reclassify the contingent liabilities to actual liabilities and to make normalization adjustments for bad debt, lease obligations, New York State taxes payable, etc. Given these circumstances, her valuation was based primarily on the 2006 and 2007 financial data.

In 2006 and 2007, Hollywood Tanning had operating losses for the period ending June 21, 2007 and June 22, 2007. Ms. Brown will testify that, as of the day before the sale, Hollywood Tanning had an approximate equity deficit. As of June 22, 2007, the date on which the sale closed, Hollywood Tanning had an approximate $5,500,000 equity deficit. Based on both the asset and income approaches, she opines that Hollywood Tanning was insolvent on the day before the sale and on the date the sale took place. Tan Holdings owned only the assets it purchased from Hollywood Tanning. It intended to continue the business of Hollywood Tanning. In addition, it had whatever debt it incurred to finance the purchase. It also assumed debt of Hollywood Tanning. Under these circumstances, Tan Holdings was not solvent.

Further evidence that the 25% interest in Tan Holdings, LLC was the manner in which it was treated on the corporate books and records. Had it truly been valued by the Venutos at $10,000,000, there would have been an entry in the 2007 corporate general ledger, on the 2007 income statement and the 2007 balance sheet. The entry would be recorded as a $10,000,000 asset on the balance sheet in an account entitled, "Investment in Tan Holdings, LLC." On the income statement, the $10,000,000 gain would have been reported in the other income section in an account entitled, "Gain or Loss on Sale."

It was not recorded in the 2007 General Ledger or on the June 22, 2007 balance sheet. A June 22, 2007 income statement was not provided. Although the sale had transpired six months earlier, the accountant did not record this investment and the corresponding gain was not recorded on the December 31, 2007 Profit and Loss or the December 31, 2007 balance sheet. This in-

vestment was not recorded on the June 22, 2007 or the December 31, 2007 balance sheet prepared by the accountant. This is further evidence that the Venutos valued the 25% interest in Tan Holdings at zero.

Ms. Brown may also testify to other matters within her report.

    B.  **Defendant's objections to Plaintiff's Expert**

None Noted. D. 1/12/17.

    C.  **Defendant's expert witnesses**

<u>William J. Pederson, CPA/ABV/CFF, CIRA/CDBV, CFE</u> (*Curriculum Vitae* attached)

Mr. Pederson's testimony will be in rebuttal to Ms. Brown's testimony. Mr. Pederson will testify as to all matters set forth in his expert report, including but not limited to deficiencies in the methods used by Ms. Brown in reaching her conclusions and their application to the facts of this case. Particularly, Mr. Pederson will testify regarding the 25% interest in Tan Holdings as taxable income, as Ms. Brown has made this an issue in her report despite the fact that the 25% interest was not a taxable gain. He will testify as to SSVS and NACVA standards and their application and how Ms. Brown either failed to apply the standards at all or failed to properly adhere to them. Mr. Pederson will testify regarding the correct method of valuing a business as a going concern and how Ms. Brown improperly used hindsight to value Tan Holdings, as well as other improprieties in her reports. Plaintiff will object to any testimony by Mr. Pederson regarding the solvency of Hollywood Tanning or of the value of Tan Holdings.

D.  **Plaintiff's objections to defendant's expert**

Plaintiff objects to Pederson's testimony to the extent it is based on or refers to his report in the Orchard Mall case. In that case defendants provided incomplete evidence to Brown, plaintiff's expert in that case as well. Further, Pederson's report in the case at bar does not incorporate by reference his report in Orchard Mall and constitutes a net opinion.

**Part VII. Trial Exhibits**

## A. Joint Exhibits

1.    Contribution and Asset Purchase Agreement dated April 18, 2007 between Hollywood Tanning and Tan Holdings, LLC ("Tan Holdings") JNT1

2.    Wilmington Trust Statement of Account as of June 30, 2007 for Ralph A. Venuto, Jr.  JNT91

3.    Wilmington Trust Statement of Account as of June 30, 2007 for Ralph A. Venuto, Sr. and Carol Venuto; (Exhibit 12 at Carol Venuto deposition on June 18, 2010) JNT93

4.    Wilmington Trust Statement of Account as of June 30, 2007 for Richard Venuto and Patricia Venuto JNT96

5.    Wilmington Trust Statement of Account as of June 30, 2007 for Michael Rebbecchi and Carol Rebbecchi JNT98

6.    Distribution Sheet of closing proceeds June 22, 2007 Exhibit 32 at deposition of Ralph Venuto, Jr. - June 19, 2015 (GSV-1) JNT100

7    US Income Tax Return for Hollywood Tanning Systems, Inc. 2006 (Exhibit 4 at Jack Uris deposition on January 28, 2013 in Orchard Mall case) JNT101

8.    US Income Tax Return for Hollywood Tanning Systems, Inc. 2006 amended; (Exhibit 9 at David Rahn deposition on March 12, 2013 in Orchard Mall case) JNT135

9.    US Income Tax Return for Hollywood Tanning Systems, Inc. 2007; (Exhibit 10 at David Rahn deposition on March 12, 2013 in Orchard Mall case) JNT171

10.    Deposition Transcript, Orchard Mall, LLC v. Hollywood Tanning Systems, Inc. Superior Court of New Jersey, Mercer County DJ#271393-08 Ralph A. Venuto, Jr. September 22, 2009 JNT207

11.    Deposition of David Rahn Orchard Mall v. Carol Venuto et al. Superior Court of New Jersey, Gloucester County GLO-L-2044-10 March 12, 2013 JNT245

12.    Deposition of Ralph Venuto, Jr.  Orchard Mall v. Carol

Venuto et al. Superior Court of New Jersey, Gloucester County GLO-L-2044-10 February 12, 2013 JNT626

13.   Hollywood Tanning General Ledger 2006 JNT1344

14.   Hollywood Tanning General Ledger 2007 JNT1944

15.   Deposition Transcript of Mira Muhtadie, June 22, 2015 JNT2554

16.   Hollywood Tanning Systems tax return 2005   JNT2622

17.   2010 transactions - State of New Jersey notification schedule of Liabilities for 2007 of $114,158 JNT2660

18.   Warrant issued by State of New York for taxes owed from 2007 in the amount of $107,409.10 NJT2662

19.   HTS, Inc. balance sheet as of June 21, 2007 (Exhibit 10 to Brown report) JNY2666

20.   Hollywood Tanning Systems, Inc.: Report on Audits of Financial Statements and Additional Information *Years Ended December 31, 2006 and 2005,* Altenburger, Uris, Caglioti & Heymann, LLC (March 13, 2007) JNT2670

**B  Plaintiff's exhibits**

1.   Final Judgment entered May 19, 2009 in case of MSKP Oak Grove, LLC v. Hollywood Tanning Systems, LLC in the Circuit Court, Eighteenth District, Seminole County, case No. 08-CA-6420-15-G $411,573.45 MSKP1

2.   Docketed Judgment, July 30, 2009 MSKP Oak Grove, LLC v. Hollywood Tanning Systems, LLC., Superior Court of New Jersey, Mercer County, DJ-171176-09 MSKP4

3.   Transcript of the deposition of Ralph A. Venuto, Jr. June 18, 2010 MSKP Oak Grove, LLC v. Hollywood Tanning Systems, LLC, Superior Court of New Jersey, Mercer County. DJ#171176-09 MSKP8

4.   Consent to Sublease, March 19, 2004 between Tenant Hollywood Tanning Systems, Inc. ("Hollywood Tanning") and

Altamonte Chic Shades, Inc. (Marked Exhibit 2 at Ralph Venuto, Jr. Deposition on June 18, 2010) MSKP114

5. Side Letter Agreement dated June 22, 2007 between Hollywood Tanning and Tan Holdings MSKP120

6. Final Adjusted Working Capital: Final Net Debt/Shortfall of $6,339,643.85 October 19, 2007 MSKP139

7. Confidential Settlement Agreement and Release dated February 10, 2010 between Hollywood Tanning, et. al and Tan Holdings et al. (GSV285-GSV331) MSKP146

8. Purchaser Earn Out Statement July 8, 2009 for calendar years December 31, 2007 and December 31, 2008 (Bates 91-93) MSKP173

9. Demand for payment of final salon adjustment dated July 16, 2009; (Bates 94-95) MSKP176

10. Assignment and Assumption Agreements June 22, 2007 (HTS19-26) [10(a) - 10(g)]

10(a) Assignment and Assumption Agreement between Hollywood Tanning Systems, Inc as Assignor and HT Systems, LLC as Assignee MSKP182

10(b) Assignment and Assumption Agreement between Hollywood Tanning Systems, Inc as Assignor and Tan Holdings, LLC as Assignee MSKP189

10© Assignment and Assumption Agreement between Hollywood Tanning Systems, Inc as Assignor and Hollywood Tanning Systems, LLC as Assignee MSKP195

10(d) Assignment and Assumption Agreement between Hollywood Tanning Systems, Inc as Assignor and HT Franchising, LLC as Assignee MSKP200

10(e) Assignment and Assumption Agreement between Hollywood Tanning Systems, Inc as Assignor and Hollywood Tans, LLC as Assignee MSKP205

10(f) Assignment and Assumption Agreements between

Hollywood Tanning Systems, Inc as Assignor and HT Overseas, LLC as Assignee MSKP211

10(g)  Assignment and Assumption Agreement between Hollywood Tanning Systems, Inc as Assignor and HT Manufacturing, LLC as Assignee MSKP216

11.  Notice of assignment to CMA Business Credit Services of assets by HT Liquidating, LLC May 9, 2009 f/d/b/a Hollywood Tans, LLC et al MSKP221

12.  Deposition Transcript Rowen Petroleum v. Hollywood Tanning Systems, Inc. United States District Court, District of New Jersey 08-4764 Deposition of Ralph Venuto, Jr. February 14, 2011 MSKP225

13.  E-mail trail between Ralph Venuto, Jr. and David Rahn dated May 14, 2007 MSKP268

14.  Involuntary Bankruptcy Petition HT Systems, LLC filed July 20, 2009 United States Bankruptcy Court, District of New Jersey Case 09-28741-GMB MSKP272

15.  Summary of Schedules prepared by HT Systems, LLC filed July 20, 2009 United States Bankruptcy Court, District of New Jersey Case 09-28741-GMB MSKP276

16.  Class Action Complaint, Nafar et al. v. Hollywood Tanning Systems, Inc. Superior Court of New Jersey, Law Division, Middlesex County MID-L-4879-06 filed June 21, 2006 MSKP310

17.  Notice of Removal Nafar et al. v. Hollywood Tanning Systems, Inc. United States District Court, District of New Jersey, 06-3826 filed August 14, 2006 MSKP332

18.  Docket Report Nafar et al. v. Hollywood Tanning Systems, Inc. United States District Court, District of New Jersey 06-3826 filed August 14, 2006 MSKP360

19.  Initial Disclosures filed by Stephen M. Orlofsky, Esq., Blank Rome on behalf of Hollywood Tanning System in Nafar et al. v. Hollywood Tanning Systems, Inc. United States District Court, District of New Jersey 06-3826 dated November 8, 2006 MSKP375

38

20.    Audited   Financial   Statements   of   Hollywood   Tanning
Systems, Inc. for the years ended December 31, 2006 and 2005,
Altenburger, Uris, Caglioti & Heymann, LLC dated March 17, 2007.
(Exhibit 47 at deposition of Ralph A. Venuto, Jr. dated June  19,
2015) MSKP419

21.   Letter   from   Ralph   Venuto,   Sr.   and   David   Rahn   to
Altenburger, Uris, Caglioti & Heymann, LLC dated October 11, 2007
stating that $3,260,882.95 of accounts receivable included in
Hollywood Tanning Systems financial statements were uncollectible
and should been written-off as bad debts as of December 31, 2006;
Includes Bad Debt Write-Off Analysis; (Exhibit 8 at Ralph Venuto,
Jr. deposition on February 12, 2013 in Orchard Mall case) MSKP439

22.   Notice of Default Wilmington Trust to Hollywood Tanning
Systems, Inc. 3/27/2007 MSKP449

23.   Hollywood Tanning Systems, Inc. Account Aging as of
December 31, 2006 with accounting work papers MSKP454

24.   Independent Auditors' Report on Additional Information
March 13, 2007 MSKP464

25.   Profit and Loss Comparison Hollywood Tanning Systems,
Inc. 2005/2006 MSKP468

26.   Claim for Indemnification December 8, 2008 Tan Holdings
to Hollywood Tanning MSKP492

27.   Hollywood Tanning Systems, Inc. Accounts Receivable
aging summary as of December 31, 2006 MSKP496

28.   Letter dated March 15, 2007 from Hollywood Tans to
Altenburger, Uris, Caglioti & Heyman signed by Ralph Venuto, Sr.,
David   Rahn   and   Michelle   Ernst   stating   representations   of
Hollywood Tanning (Exhibit 1 at David Rahn deposition on March
12, 2013 in Orchard Mall case) MSKP495

29.   Mutual Separation of Employment Agreement Hollywood
Tanning and David Rahn February 27, 2007 MSKP512

30.   E-mail dated September 8-9, 2011 from Ralph Venuto, Jr.
to Chuck Dugan, Parente Beard, LLC regarding Hollywood Tanning
sales tax assessment paid for 2007 MSKP522

31. Seller's Disclosure Schedules pursuant to the Contribution and Asset Purchase Agreement provided at closing June 22, 2007 MSKP524

32. Schedule K-1 2007 Tan Holdings - $975,420 partner share of loss  MSKP631

33. 2008 U.S. Income Tax Return Hollywood Tanning Systems, Inc.  MSKP635

34. The Bank Statements for Hollywood Tanning Investment Account June 20, 2007 - January 31, 2009 (Exhibit 33 at deposition of Ralph A. Venuto, Jr. June 19, 2015) MSKP718

35. Cancelled checks drawn on investment account at The Bank MSKP743

36. Letter dated April 26, 2007 from Hollywood Tanning to Rowen Petroleum Products, LLC regarding sale of substantially all of the assets of Hollywood Tanning and request to execute an assignment and assumption agreement MSKP751

37. Letter Travelers to Ralph Venuto, Jr. dated July 26, 2006 acknowledging receipt of the Hadis Nafar lawsuit. Bates T34 MSKP762

38. Letter Travelers to Ralph Venuto Jr. dated August 16, 2006 declining coverage under defendant's WRAP policy Bates T35-37 MSKP763

39. Letter Travelers to Ralph Venuto Jr. dated April 11, 2007. reconsidering coverage with reservation of rights Bates T38-42 MSKP766

40. Complaint filed by GS Partners, LLC v. Hollywood Tanning Systems, Inc., HT Franchising, LLC, Ralph Venuto, Jr. and Ralph Venuto, Sr. in June 2008 with American Arbitration Association (AAA) MSKP771

41. Letter dated January 20, 1999 from AAA with order entered at January 14, 2009 preliminary hearing MSKP789

42. Notice dated January 20, 2009 of AAA hearing for May 4, 2009 MSKP794

43.   Answer of Venuto respondents in AAA proceeding dated January 26, 2009) MSKP795

44.   Motion of Venuto respondents filed with AAA to enjoin arbitration MSKP800

45.   Memorandum of law filed by Venutos with AAA seeking to enjoin arbitration dated January 26, 2009) MSKP802

46.   Verified complaint in Superior Court of New Jersey, Chancery Division, Camden County ("the Camden County action") filed by Ralph Venuto Jr. and Carol F. Venuto, as Administratrix of the Estate of Ralph Venuto, Sr. v. GS Partners, C-16-09 (Filed January 26, 2009) MSKP812

47.   Letter dated January 26, 2009 from counsel for Venutos to Hon. Mary Eva Colalillo, P.J.S.C.   MSKP899

48.   Letter from AAA dated January 28, 2009 acknowledging receipt of respondents' motion to dismiss  MSKP901

49.   Order to show cause entered January 29, 2009 in Camden County action MSKP902

50.   Brief filed on behalf of plaintiffs in Camden County action dated February 9, 2009 MSKP904

51.   Reply brief filed on behalf of Respondents with AAA (Dated February 19, 2009) MSKP927

51A.  Order of Chancery Division, Camden County entered March 9, 2009  MSKP934

52.   Order of American Arbitration Association entered March 20, 2009 in GS Partners, LLC v. Hollywood Tanning Systems, Inc. MSKP936

53.   Invoices and Statements issued June 15, 2009 by AAA for arbitration of dispute between GS Partners, Hollywood Tanning Systems, Inc., HT Franchising, LLC, Ralph Venuto, Jr. and Ralph Venuto, Sr.  MSKP938

54.   Order terminating arbitration dated October 7, 2009 MSKP940

55.   Amended complaint filed January 29, 2008 in United States District Court in action entitled HT of Highlands Ranch, Inc. v. Hollywood Tanning Systems, Inc. Civil Action 07-5718 ("HT of Highlands action") MSKP941

56.   Brief of defendants filed April 17, 2008 seeking to dismiss HT of Highlands action and compel arbitration  MSKP991

57.   Reply brief of defendants filed June 2, 2008 seeking to dismiss HT of Highlands action and compel arbitration MSKP1000

58.   Opinion of Court dated December 1, 2008 in HT of Highlands action denying defendants' motion to compel arbitration MSKP1012

59.   Complaint filed February 4, 2010 by GS Partners against Hollywood Tanning, Ralph Venuto, Jr. and Estate of Ralph Venuto, Sr. in Law Division, Somerset County MSKP1048

60.   Judgment entered January 7, 2011 in Superior Court of New Jersey, Law Division, Somerset County in favor of GS Part- ners, LLC and against Hollywood Tanning Systems, Inc. in the amount of $959,359.00 MSKP1076

61.   Motion of defendants to dismiss Somerset County Action (Dated March 29, 2010) MSKP1078

62.   Information Subpoena answered by Ralph Venuto, Jr. for Hollywood Tanning MSKP1098

63.   Asset search of Hollywood Tanning  MSKP1101

64.   MSKP Oak Grove, LLP vs. Hollywood Tanning Second Amended Complaint MSKP1362

65.   Defendants' Answer to the Second Amended complaint MSKP1377

66.   Plaintiff's First Request for the Production of Documents and defendants' response MSKP1388

67.   Plaintiff's Second Request for the Production of Documents and defendants' response  MSKP1400

68.   Plaintiff's  Third  Request  for  the  Production  of
Documents and defendants' response to it MSKP1402 and MSKP1409

69.   Plaintiff's  Fourth  Request  for  the  Production  of
Documents and defendants' response to it   MSKP1416

70.   Defendants' responses to Requests for Admissions in the
matter of Orchard Mall v. Carol Venuto et. al. Superior Court of
New  Jersey,  Gloucester  County  GLO-L-2044-10  (Exhibit  16  at
deposition of Ralph Venuto, Jr. February 12, 2013) MSKP1424

71.   Trial  Transcripts  Rowen  Petroleum  Properties,  LLC  v.
Hollywood  Tanning  Systems,  Inc.,  et  al,  United  States  District
Court,  District  of  New  Jersey  Civil  Action  No.  08-4764  December
3, 2012   MSKP1444

72.   Trial  Transcripts  Rowen  Petroleum  Properties,  LLC  v.
Hollywood  Tanning  Systems,  Inc.,  et  al,  United  States  District
Court,  District  of  New  Jersey  Civil  Action  No.  08-4764  December
4, 2012 MSKP1619

73.   Trial  Transcripts  Rowen  Petroleum  Properties,  LLC  v.
Hollywood  Tanning  Systems,  Inc.,  et  al,  United  States  District
Court,  District  of  New  Jersey  Civil  Action  No.  08-4764  December
5, 2012 MSKP1710

74.   Deposition transcript of David Rahn, Rowen Petroleum v.
Hollywood  Tanning  Systems,  LLC  et.  al.  United  States  District
Court, District of New Jersey 08-4764 November 11, 2010 MSKP1852

Exhibit  17:  Asset  and  Contribution  Agreement  (Listed  above
as J-1 MSKP1892

Exhibit  18:  Certification  of  Rahn  dated  August  18,  2009
MSKP1980

75.   Schedule  of  accounts  receivable  of  Hollywood  Tanning
Systems,  Inc.  as  of  December  31,  2005  (Exhibit  5  at  David  Rahn
deposition on March 12, 2013 in Orchard Mall case) MSKP2006

76.   Letter dated March 23, 2007 from Wilmington Trust Co.
to Hollywood Tanning Systems, Inc. declaring event of default
(Exhibit 6 at David Rahn deposition on March 12, 2013 in Orchard
Mall case) MSKP2007

43

77.  e-mail chain dated September 15, 2008 between John Breza and David Rahn (Exhibit 12 at David Rahn deposition on March 12, 2013 in Orchard Mall case) MSKP2010

79.  Deposition of Ralph Venuto, Jr. MSKP Oak Grove v. Venuto, June 19, 2015  MSKP2013

80.  Final Net Debt computation and escrow shortfall dated October 19, 2007 $6,305,143.85 (Exhibit 39 at the Deposition of Ralph Venuto, Jr. June 19, 2015) MSKP2124

81.  Check for $80,000 from Ralph A. Venuto, Jr. to Hollywood Tanning Systems, Inc. dated July 23, 2007 (Exhibit 40 at deposition June 19, 2015) MSKP2131

82.  Check from Ralph A. Venuto, Jr. dated May 21, 2008 to Hollywood Tanning Systems, Inc. in amount of $9,500 (Exhibit 41 at deposition June 19, 2015) MSKP2132

83.  Check from Ralph A. Venuto, Jr. dated June 23, 2008 to Hollywood Tanning Systems, Inc. in amount of $6,250 (Exhibit 42 at deposition June 19, 2015) MSKP2133

84.  Deposition of Richard Venuto, MSKP Oak Grove v. Venuto, June 18, 2015 MSKP2192

85.  Check from Richard Venuto dated June 17, 2007 to Hollywood Tanning Systems, Inc. in amount of $80,000 (Exhibit 26 at deposition June 18, 2015) MSKP2216

86.  Check from Richard Venuto dated May 20, 2008 to Hollywood Tanning Systems, Inc. in amount of $9,500 (Exhibit 27 at deposition June 18, 2015) MSKP2217

87.  Check from Richard Venuto dated June 23, 2008 to Hollywood Tanning Systems, Inc. in amount of $6,250 (Exhibit 28 at deposition June 19, 2015) MSKP2218

88.  Deposition of Carol Venuto, MSKP Oak Grove v. Venuto, June 18, 2015 MSKP2233

89. Check from R. C. Real Estate Invest, Inc. dated July 23,2007 to Hollywood Tanning Systems, Inc. in amount of $80,000 Exhibit 13 at deposition of Carol Venuto dated June 18,2015)

MSKP2261

90.   Check from R. C. Real Estate Invest, Inc. dated May 21, 2008 to Hollywood Tanning Systems, Inc. in amount of $9,500 (Exhibit 14 at deposition of Carol Venuto June 18, 2015) MSKP2262

91.   Check from R. C. Real Estate Invest, Inc. dated June 23,2008 to Hollywood Tanning Systems, Inc. in amount of $6,250 (Exhibit 15 at deposition of Carol Venuto June 19, 2015) MSKP2263

92.   Deposition of Carol Rebbecchi, MSKP Oak Grove v. Venuto, June 18, 2015 MSKP2278

93.   Check from Carol Rebbecchi dated July 18, 2007 to Hollywood Tanning Systems, Inc. in amount of $80,000 (Exhibit 21 at deposition June 18, 2015) MSKP2305

94.   Check from Carol Rebbecchi dated May 20, 2008 to Hollywood Tanning Systems, Inc. in amount of $9,500 (Exhibit 23 at deposition June 18, 2015) MSKP2306

95.   Check from Carol Rebbecchi dated June 23, 2008 to Hollywood Tanning Systems, Inc. in amount of $6,250 (Exhibit 22 at deposition June 19, 2015) MSKP2307

96.   Deposition of William St. Clair dated June 12, 2015 MSKP2315

    Exhibit 2 - Hollywood Tans LLC accrued expenses 12-31-2008 MSKP2343

    Exhibit 3 - Hollywood Tans LLC accrued expenses 12-31-2 2007 MSKP2344

    Exhibit 4 - Form 1065 U. S. Return of Partnership 2008 Tan Holdings, LLC  MSKP2348

    Exhibit 5 - Consolidated Balance Sheet 12-31-2007 MSKP2439

    Exhibit 6 - Independent Auditors' Report 6-30-09 MSKP2442

    Exhibit 7 - Form 1065 U. S. Return of Partnership 2008

Hollywood Tanning Company MSKP2460

Exhibit 8 - Form 1065 U. S. Return of Partnership 2008
Tan Holdings, LLC 2007 MSKP2508

Exhibit 9 - Hollywood Tans, LLC Transactions by account
as of 5-6-09 MSKP2564

Exhibit 10 - Tan Holdings LLC and subsidiaries
Consolidated Financial Statements 12-31-2007 MSKP2565

Exhibit 11 - Summary of Interpretation No. 45 MSKP2583

97.  Letter dated April 29, 2015 from William St. Clair to
Robert A. Vort MSKP2630

98.   List of partners in ACI (Exhibit 1 at Muhtadie
deposition, June 22, 2015) MSKP2634

99.   Distribution Sheet (J-11, Exhibit 2 at Muhtadie
deposition, June 22, 2015) MSKP2635

100. Letter dated April 2007 from Ableco Finance to Tan
Holdings, LLC (Exhibit 3 at Muhtadie deposition, June 22, 2015)
MSKP2636

101.  List of salons with Venuto family ownership interests
(Exhibit 4 at Muhtadie deposition, June 22, 2015) MSKP2649

102. Email chain ending July 15, 2009 (Exhibit 5 at Muhtadie
deposition, June 22, 2015) MSKP2653

103.  Organization chart for Tan Holdings, LLC (Exhibit 6 at
Muhtadie deposition, June 22, 2015) MSKP2666

104.  Tan Holdings complaint (Dated February 10, 2009)
MSKP2667

105. Answer and Counterclaim of Hollywood Tanning Systems,
Inc. (Dated April 8, 2009) MSKP2685

106.  Amended Answer and Additional Counterclaims of
Hollywood Tanning Systems, Inc. (Filed June 23, 2009) and
counter-claims MSKP2719

46

107. Tan Holdings 2007 and 2008 draft consolidated financial statements MSKP2761

108.  Hollywood Tanning System tax return 2009 MSKP2797

109.  Hollywood Tanning System 2005 financial statement MSKP2892

110. HTS – Tan Holdings settlement agreement MSKP2914

111. Loan agreement  MSKP2941

112. Note and Mortgage Modification agreement MSKP 2990

113. Revolving Credit Note MSKP2993

114. Warminster Group, LP v. Hollywood Hands, Court of Common Pleas, Bucks County, Docket No. 2000-4882-18-1. Hollywood Hands Petition to Strike Off or Open Confessed Judgment (Dated August 24, 2000) with confession of judgment for money dated August 2, 2000 and complaint in confession of judgment for money with lease attachment MSKP2997

115. Verified Petition of Hollywood Hands to stay execution dated October 2, 2000 and October 5, 2000 with memorandum of law in support of petition MSKP2999

116. List of witnesses June 2002 (multiple dates) MSKP3055

117. Brief of Hollywood Hands objecting to plaintiff's motion in limine dated June 3, 2002 MSKP3056

118. Jury Verdict, Warminster Group, LP v. Hollywood Tanning Systems, Inc. et. al. Case #2000-04882 MSKP3064

119. Undated petition of Kathy McGuire to strike off or open confessed judgment MSKP3069

120. Hollywood Hands supplemental memorandum of law in support of motion for post-trial relief (July 19, 2002) MSKP3111

121. Judgment, Warminster Group, LP v. Hollywood Tanning Systems, Inc. et. al. Case #2000-04882 entered December 19, 2002.

MSKP3140

122. Exhibit list trial of Warminster Group, LP v. Hollywood Tanning Systems, Inc. dated June 4, 2002 MSKP3148

123. Docket Sheet through November 25, 2009 (Printed August 25, 2016) MSKP3153

124. Transcript of hearing June 13, 2005 MSKP3172

125. Notice of Appeal dated January 10, 2006 MSKP3199

126. Opinion of Court of Common Pleas of Bucks County dated March 28, 2006 MSKP3200

127. Opinion, Superior Court of Pennsylvania January 5, 2007 MSKP3212

128. Order, Superior Court of Pennsylvania July 30, 2007 MSKP3220

129. Response of Hollywood Hands to Interrogatories in Aid of Execution (Dated February 28, 2006) MSKP3227

130. Response of Hollywood Hands to Document Requests in Aid of Execution (Dated February 28, 2006) MSKP3246

131. Brief of Hollywood Hands in support of motion for reconsideration of order entered August 14, 2009 MSKP3260

132. Order of Court of Common Pleas of Bucks County entered August 14, 2009  MSKP3267

133. Brief of Hollywood Hands dated October 8, 2009 in reply to papers of Warminster Group in opposition to Hollywood Hands motion for reconsideration and vacatur MSKP3268

134. Order of Court of Common Pleas of Bucks County entered October 20, 2009 MSKP3318

135. Declaration of Kenneth Federman with Lease between Warminster Plaza Shopping Center and Hollywood Hands, Inc. d/b/a Hollywood Tanning Systems, Inc. (Dated October 8, 2009) MSKP3278 AND 3322

48

136. List of cases in which Venutos or their companies were parties MSKP3364

137. Request for Document Production (Exhibit 1 to Brown report) MSKP3376

138. Subpoena to Parente Beard, LLC (Exhibit 2 to Brown report) MSKP3400

139. Subpoena to ACI Capital (Exhibit 3 to Brown report MSKP3410

140. Documents requested from Hollywood Tanning which were not received) (Exhibit 4 to Brown report) MSKP3426

141. ACI Capital Terms Outline per HTS, Inc. (Exhibit 6 to Brown report; (Exhibit 5 to Brown report was deliberately blank) MSKP3432

142. HTS, Inc. due diligence report (December 2006) (Exhibit 7 to Brown report MSKP3434

143. ACI Investment Memorandum (Exhibit 8 to Brown report) MSKP3494

144. HTS, Inc. balance sheet as of December 31, 2007 (Exhibit 9 to Brown report) MSKP3557

145. HTS, Inc. 2006 lease expenses (Exhibit 11 to Brown report) MSKP3570

146. HTS shareholder loan receivable account per general ledger (Exhibit 12 to Brown report;) MSKP3573

147. HTS, Inc. investment account per general ledger (Exhibit 13 to Brown report) MSKP3579

148. HTS, Inc. form 8594 asset acquisition statement (Exhibit 14 to Brown report) MSKP3580

149. HTS, Inc. Debt Distribution Sheet (Exhibit 15 to Brown report) MSKP3581

150. HTS, Inc. Audited Financial Statements 2005-2006

49

(Exhibit 17 to Brown report ) MSKP3582

151. HTS, Inc. Final Adjusted Working Capital (Exhibit 18 to Brown report) MSKP3597

152. HTS, Inc. Long-Term Capital Gain (Schedule K) per Tax Return (Exhibit 19 to Brown report) MSKP3599

153. HTS, Inc. Amended 2006 Corporate Tax Return (Exhibit 20 to Brown report) MSKP3603

154. Tan Holdings, LLC Balance Sheet as of May 31, 2007 (Exhibit 21 to Brown report) MSKP3604

155. HTS, Inc. Investment in Corporate Stores 2006-2007 (Exhibit 22 to Brown report) MSKP3605

156. Tan Holdings, LLC Undisclosed Liabilities (Exhibit 23 to Brown report) MSKP3607

157. HTS, Inc. Proposed Revised A/R & Royalty Revenues (Exhibit 24 to Brown report) MSKP3608

158. Tan Holdings, LLC Franchised Lease Terminations (Exhibit 25 to Brown report) MSKP 3610

159. HTS, Inc. Projected Balance Sheet as of March 31, 2007 (Exhibit 26 to Brown report) MSKP3622

160. HTS, Inc. Allocation of Sale Proceeds (Exhibit 27 to Brown report) MSKP3623

161. HTS, Inc. Sale Price and Proceeds per APA (Exhibit 28 to Brown report) MSKP3625

162. E-mail from Rebecca McDowell to Robert Vort, Quickbooks Password (Exhibit 29 to Brown report) MSKP3626

163. CNN Article, "A Popular Tanning Biz Feels the Heat" (Exhibit 30 to Brown report) MSKP3627

164. IST Magazine article, "Brighter Days Ahead for the Tanning Industry" (Exhibit 31 to Brown report) MSKP3628

165.  US News article, "It's Indoor Tanning Season.  But Watch Out" (Exhibit 32 to Brown report) MSKP3629

166. Tan Holdings' 2007 Return of Partnership Return Form 1065 (Exhibit 33A to Brown report) MSKP3630

167.  Hollywood Tanning 2007 Income Tax Return for an S Corporation, Form 1120S (Exhibit 33B to Brown report) MSKP3631

168.  Hollywood Tanning General Ledger, Salon Payoffs $955,779 (Exhibit 34 to Brown report) MSKP3632

169.  Hollywood Tanning 2006 Income Tax Return for an S Corporation, Form 1120S (Exhibit 35 to Brown report) MSKP3633

170.  Hollywood Tanning Profit and Loss, Trailing Twelve Month, July 2006 through June 2007 (Exhibit 36 to Brown report) MSKP3814

171.  Hollywood Tanning Profit and Loss 2006 (Exhibit 37 to Brown report) MSKP3816

172.  Hollywood Tanning Balance Sheet as of June 21, 2007 (Exhibit 38 to Brown report) MSKP3819

173.  Hollywood Tanning Balance Sheet as of June 22, 2007 (Exhibit 39 to Brown report) MSKP3821

174. Slip reflecting $14,379.38 deposit into investment account (Exhibit 36 at deposition June 19, 2015) MSKP3823

175.  Slip reflecting $31,298.42 deposit into investment account (Exhibit 35 at deposition June 19, 201;) MSKP3824

176.  Slip reflecting $52,100.90 deposit into investment account (Exhibit 37 at deposition June 19, 2015) MSKP3825

177.  Verified Amended Complaint in action for judgment of insolvency In the Matter of the Estate of Ralph A. Venuto, Sr., Deceased MSKP3826

178.  Order granting petition to declare insolvent the Estate of Ralph A. Venuto, Sr., Deceased 3836

## C. Defendants' Objections to Plaintiff's Exhibits

1.   Exhibit No. 16-19.  Defendants' object based on grounds of relevance and hearsay. F.R.E.  401 and 801.   The documents are not relevant as they offer no additional facts not already in the record elsewhere.  The Nafar v. Hollywood Tanning lawsuit was a known alleged liability to both Hollywood Tanning and Tan Holdings as of the asset sale, June 22, 2007.   Further, the lawsuit, a class action complaint, was dismissed as the Court did not certify the class.  Offering the lawsuit records, to prove any truth of the allegations of the lawsuit, would be tantamount to hearsay.

2.   Exhibits No. 37, 38 and 39.  Defendants object based on relevance. F.R.E. 401.  Any testimony concerning all insurance payments made or not made by Travelers under insurance coverage offered to Hollywood Tanning has no relevance to any of the claims asserted concerning the solvency of Hollywood Tanning. Defendants see no connection between the ability of Hollywood Tanning to pay creditors and the separate actions of an unrelated insurance company which may have been paying or not paying on claims made against Hollywood Tanning.   F.R.E. 401.

3.   Exhibit Nos. 40 - 54.  Defendants object to these documents as not relevant to any of the claims or defenses involved in this action. F.R.E. 401.   These documents would not aid the factfinder as this Court has already observed in prior decisions that Plaintiff was a creditor as defined in the New Jersey Uniform Fraudulent Transfer Act and as such has standing to bring this lawsuit as an alleged aggrieved creditor.   The documents would not aid the factfinder in deciding the solvency of Hollywood Tanning as Mr. Gallichio's alleged troubles with Hollywood Tanning, namely the arbitration and lawsuits referenced, all arose long after the June 22, 2007 asset sale and were largely prosecuted in 2009, which was after the Tan Holdings franchising business had ceased operations.

4.  55-58.  Defendants assert the same legal objection for Exhibits Nos. 55-58. The HT of Highlands lawsuit was settled and offering the lawsuit records, to prove any truth of the allegations of the lawsuit, would be hearsay.

5.   Exhibit No. 63.  Defendants object as this document is

not adequately described to ascertain its origin and purpose in this lawsuit.

    6.   Exhibit No. 71.  Defendants object as this document is not adequately described to ascertain its origin and purpose in this lawsuit.

    7.   Exhibits No. 114 - 135.  Defendants object to these documents based on hearsay and relevance.  F.R.E. 401 and 801. The Warminster lawsuit was a liability disclosed to Hollywod Tanning System in 2006 and which appears in its financial statements as a potential liability.  Introducing underlying state court records does not add anything further for the factfinder to consider that would be relevant in helping the factfinder understand the nature and impact of this alleged liability to Hollywood Tanning.  These documents are hearsay as Hollywood Tanning was not a named defendant in the lawsuit, and therefore, because it did not defend or participate in the action, has no knowledge about the events which occurred in the lawsuit.  Defendants' further object to the introduction of any documents on hearsay as the parties who provided in the information in the documents may not be available at trial for cross-examination.  Defendants further object as to the relevance of this Court re-examining allegations made in a lawsuit not involving any of the claims asserted in this action, namely, the solvency of Hollywood Tanning.

    8.   Exhibit no. 136.  This Court has already ruled in its Order disposing of cross-motions for summary judgment that there is no relevance in considering any prior lawsuits of the Venutos not involving Hollywood Tanning.

    9.   Exhibit 140.  Defendants object on grounds of relevance as it makes no sense for Plaintiff to reference an item describing documents not produced.  Further Defendants object based on relevance as the Court has denied Plaintiff's motion for discovery sanctions.

    10.   Exhibit 162 is not relevant. F.R.E. 401. This Court has denied Plaintiff's motion for discovery sanctions, and this email appears to be related that motion which was decided against Plaintiff.

    11.   Exhibit Nos 177-178.  Defendants objects on grounds of

relevance and hearsay. The personal records of the Estate of
Ralph Venuto and its financial condition bear no relevance or
connection to the issues which Plaintiff needs to prove at trial
regarding the solvency of Hollywood Tanning.

D. **Defendants' exhibits**

1.   William Pederson Expert Report, July 31, 2013, *Orchard
Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct.);
D1-41

2.   Defendants' Brief in Support of Motion for Judgment on
the Pleadings with Respect to Count Four of the Second Amended
Complaint Pursuant to F.R.C.P. 12© (Doc. No. 148, Sept. 18,
2015); D42-60

3.   Defendants' Motion for Summary Judgment with Exhibits
(Doc. No. 178, Nov. 5, 2015); D61-1766

4.   Defendants' Motion in Limine to Exclude Shelley Brown
as an Expert Witness with Exhibits (Doc. No. 150, Sept. 24,
2015); D1767-1780

5.   Kevin Penn Affidavit (*Orchard Mall LLC v. Venuto et
al.*, Dkt. No. L-2044-10 (N.J. Super. Ct Sept. 6. 2013); D1781-
1782

6.   Settlement check signed by Defendants (*Orchard Mall LLC
v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct.); D1783

7.   ACI Information Request List from Crowe Chizek; D1784-
1792

8.   Plaintiffs' Expert, Shelley A. Brown, CPA/ABV,CVA, CFF
Curriculum Vitae; D1793-1796

9.   Plaintiffs' Expert Report: Shelley A. Brown, "Valuation
of Tan Holdings, LLC as of June 22, 2007", August 21, 2015 (*MSKP
Oak Grove, LLP v. Venutos et al.*, Dkt. No. 10-6465 (D.N.J.);
D1797-1837

10. Plaintiffs' Expert Report: Shelley A. Brown, "Fraudulent
Conveyance Report", August 17, 2015 (*MSKP Oak Grove, LLP v.
Venutos et al.*, Dkt. No. 10-6465 (D.N.J.); D1838-1898

11.   Defendants' Expert: William Pederson, CPA/CFF/ABV/CFE, CIRA/CDBV Curriculum Vitae; D1899-1922

12. Defendants' Expert Report: William Pederson Expert Report, September 23, 2015 (*MSKP Oak Grove, LLP v. Venutos et al.*, Dkt. No. 10-6465 (D.N.J.); D1923-1946

13.   Crowe Chizek Hollywood Tanning Systems Due Diligence Document Request List; D1947-2181

14.   Hollywood Tans Group LLC, Accounts Receivable Summary Analysis as of December 31, 2011;   ---

15.   Shelley Brown Expert Report (*Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct.) D2182-2222

16.   National Association of Certified Valuators and Analysts ("NACVA") Professional Standards; D2223-2247

17.   Statements of Standards for Valuation Services (SVSS); D2248-2323

18.   Contribution and Asset Purchase Agreement between Tan Holdings, LLC and Hollywood Tanning Systems, Inc. and those holders of all of the issued and outstanding stock of Seller set forth on Exhibit attached hereto dated April 18, 2007; D2324-2492

19. Gilchinsky v. National Westminster Bank N.J, 732 A.2d 484 (N.J. 1999); ---

20. Nassif v. Jelmac, L.L.C., No. A-4100-10T2, 2012 WL 2812299 (N.J. Super Ct. App. Div. July 11, 2012); D2493-2503

21. Jecker v. Hidden Valley, Inc., 27 A.3d 964 (N.J. Super. Ct. App. Div., 2011); D2504-2511

22. Scheck v. *Bowne*, 166 A. 189 (N.J. Misc. 1933); D2512-2515

23. Moody v. Sec. Pacific Business Credit, 971 F.2d 1056 (3d. Cir. 1992); ----

24.   Peltz v. Hatten, 279 B.R. 710 (Bankr. D. Del. 2002); --

25.   In re Joy Recovery Tech. Corp., 286 B.R. 54 (N.D. Ill. 2002); D25-16-2540

26.   MFS/Sun Life Trust- High Yield Series v. Van Dusen Airport Srvs. Co., 910 F. Supp. 913(S.D.N.Y. 1995); D2541-2573

27.   In re McGarry, 230 B.R. 272 (Bankr. W.D. Pa.1999); D2574-2583

28.   In re Labrum & Doak, L.L.P., 227 B.R. 383 (Bankr. E.D. Pa. 1998); ---

29. "Final WC Agreement.xls" (*Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Sup. Ct.) (Parente Beard to Plaintiff) (December 20, 2012); D2584-2664

30.   Discovery *Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct.): Subpoena demanding Parente Beard LLC to produce "documents and things" specified in Schedule A in possession, custody, or control of Parente Beard LLC or any of its predecessor, affiliates, partners, officers, members, directors, managers, or employers, including but not limited to Jack L. Uris and/or Altenburger, Uris, Caglioti & Heyman, LLC. Each of these requests for documents shall be deemed to call for production of any and all documents which were in, or came into, existence at any time between January 1, 2006 and the course of the litigation. (*Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Sup. Ct.); D2665-2676

31.   Discovery *Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct.): Documents requested: Documents concerning the June 22, 2007 Contribution and Asset Purchase Agreement and resulting purchase and/or sale between HTS and/or Tan Holdings, LLC and/or HT Systems, LLC, including, but not limited to, any closing documents for the sale and any accounting of the disbursement of the proceeds of the purchase and/or sale; any/all documents concerning the filing or reporting of state and/or federal taxes by  or on behalf of HTS for the years 2006-2011; any/all documents reflecting the filing or reporting of state/federal taxes for all income and/or expenses filed by the Venutos, or the Rebecchis in any way concerning income received from HTS from 2006-11; any/all docs concerning business dealings acquisitions, asset divestitures, financial statements, expenditures, capital contributions, cash disbursements, loans,

gifts, transfers, bank statements, credit card payments, and any
other financial transactions of HTS from 2006-11; any/all
documents concerning annual revenues, net worth, value assets ,
and any other accounting documents concerning valuation of HTS
from 2006-11; any/all documents concerning due diligence
performed at any time in connection with the sale and purchase of
assets of HTS in 2007 and/or 2008; any/all documents concerning
payment for any purpose by HTS to the Venutos or Rebecchis; and
any/all documents concerning payment by Tan Holdings and/or HT
Systems to the Venutos or Rebecchis. (*Orchard Mall, LLC v. Venuto
et al.*, Dkt. No. L-2044-10 (N.J. Sup. Ct.); D2677-2687

32.  Discovery *Orchard Mall, LLC v. Venuto et al.*, Dkt. No.
L-2044-10 (N.J. Super. Ct.): Also subpoenaed:Kevin S. Penn, ACI
Capital, Jack L. Uris, CPA, Parente Beard, LLC, David Rahn,
Custodian of Records, ACI Capital, Custodian of Records, Tan
Holdings, LLC. . (*Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-
2044-10 (N.J. Sup. Ct.); D26688-2704

33.  Transcript of Proceedings before Judge Coleman (*GS
Partners v. Hollywood Tanning Systems, Inc., et. al*, N.J. Super.
Ct., Apr. 30, 2010); D2705-2713

34.  Hollywood Tanning Systems, Inc. Balance Sheet (June 21,
2007); D2714-1717

35.  Defendant Hollywood Hands' Motion for Reconsideration
and Vacatur (*Warminster Group, L.P. v. McGuire and Hollywood
Hands*, Dkt. No. 20004882-18-Court of Common Pleas Bucks County
(Aug. 13, 2009)) D2718-2866

36.  Order of November 24, 2009 granting Defendant's Motion
for Clarification (*Warminster Group, L.P. v. McGuire and
Hollywood Hands*, Dkt. No. 20004882-18-Court of Common Pleas Bucks
County (Nov 24, 2009)); D2867-2868

37.  Defendant Hollywood Hands' Motion for Clarification of
the Court's October 20, 2009 Order (*Warminster Group, L.P. v.
McGuire and Hollywood Hands*, Dkt. No. 20004882-18-Court of Common
Pleas Bucks County (Feb. 28, 2006) D2869-3017

38.  Hollywood Tans, Final Salon Adjustment Calculation
prepared by Tan Holdings (July 16, 2009) (Bates No. V95); D3018-
3555

39.   Stipulation of Voluntary Dismissal with Prejudice, *HT of Highlands Ranch, Inc. v. Hollywood Tanning Systems, Inc. et al.*, Dkt. No. 07-cv-5718, Doc. No. 261 (D.N.J. Apr. 2, 2010); D3556-3557

40.   HT of Highlands Ranch, Inc. v. Hollywood Tanning Systems, Inc. et al., Dkt. No. 07-cv-5718 (D.N.J.) Docket; D3558-3594

41.   IRS Revenue Ruling 59-60, § 2031, Reg. § 20.2031-2; D3595-3600

42.   Stipulation of Dismissal Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(2) with Prejudice (*Nafar v. Hollywood Tanning Systems, Inc.*, Dkt. No. 127, Civil Action No. 06-CV-03 826 (D.N.J. June 10, 2013); D3601-3650

43.   Hollywood Tans "Transaction Detail by Account" January – December, 2006 (printed March 7, 2007); D3651

44.   Hollywood Tans "Transactions by Account" as of December 31, 2006 (printed February 25, 2007) (dates include May 23, 2006 – August 1, 2006); D3652

45.   Hollywood Tans "Transactions by Account" as of December 31, 2006 (printed February 25, 2007) (dates include October 31, 2006 only); D3653

46.   Hollywood Tans "Transactions by Account" as of December 31, 2006 (printed February 25, 2007) (dates include December 31, 2006 only); D3654

47.   Hollywood Tans "Transactions by Account" as of December 31, 2006 (printed February 25, 2007) (dates include September 30, 2006 and December 31, 2006 only); D3655

48.   Status Report for Hollywood Hands, Inc. by New Jersey Business Gateway, Business Entity Information and Records Service, Business ID 0100583556 (September 9, 2016); D3656-3658

49.   Court Order granting in part and quashing in part the Subpoena directed to Parente Beard, LLC, *Orchard Mall, LLC v. Hollywood Tanning Systems, Inc.*, Dkt. No. L-2044-10, (N.J. Super. Ct., Dec. 7, 2012); D3659-3660

50.  Letter from Jack L. Uris, CPA, Parente Beard, to Ellen Nunno Corbo, Esq., Taylor, Coliccchio & Silverman, LLP (December 20, 2012); D3661

51.  Letter from John J. Barber, Assistant General Counsel, Crowe Horwarth to Joseph A. Molinaro, Law Offices of Joseph A. Molinaro, LLC and Robert A. Vort, Re: *MSKP Oak Grove LLC v. Venuto*, U.S. District Court for the District of New Jersey, Case No. 10-cv-6465 (July 24, 2015); D3662-3663

52.  Diagnostic Report for Tax Year 2008 of Taxpayer ACI HT Investors, LLC, Return No: 65464S; D3664-4184

53.  Email from Jack L. Uris, CPA, Parente Beard to Ellen Nunno Corbo. Esq., Taylor, Coliccchio & Silverman, LLP, copying Philip Santarelli, Dimitri Karapelou, and Philip M. Colicchi, (January 17, 2013); D4185-4189

54.  Steve Rhyne, Kennedy Covington, Attorneys at Law, "Private Equity Considerations in M&A Deals" (Presentation for Business Law Section and Corporate Counsel Section- Joint Annual Meeting, North Carolina Bar Association, February 22, 2008); D4190-4204

55.  Letter from Thomas G. Bailey, Jr. and Richard F. Markert, Bleakley Platt & Schmidt, LLP to Hollywood Tanning Systems Inc. (July 8, 2009) (Bates No. V91-V92); D4205-4473

56.  Ableco Finance, LLC (the Lender) ACI Capital Co., LLC/Hollywood Tanning Systems, Inc., *Outline of Terms of Conditions for Financing Facility* (April 2007) (Bates Nos. V190-V197); D4474-4742

57.  In re: Semcrude L.P., v. Whyte, No. 14-4356 (3d Cir. Jan. 25, 2016); D4743-4751

58.  Status Report for Hollywood Hands, Inc. by New Jersey Business Gateway, Business Entity Information and Records Services, Business ID: 0100583556 (September 9, 2016); D4752-4900

59.  Order and Memorandum granting in part Defendants' Motion to Dismiss, *MSKP Oak Grove, LLC v. Venuto et al.*, Dkt No. 10-6465, Doc. No. 34 (D.N.J. June 20, 2012); D4901-4931

60.   Order and Memorandum denying Plaintiffs' Motion for Discovery Sanctions (June 2016); D4932-4937

61.   Transcript of Motion Hearing Ref: Plaintiffs' Motion for Sanctions before the Honorable Joel Schneider, United States Magistrate Judge (March 18, 2016); D4938-4969

62.   Complaint, *Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct. Nov. 22, 2010); D4970-4988

63.   Ralph A. Venuto, Jr. Deposition, June, 18, 2010 (*MSKP Oak Grove, LLP v. Hollywood Tanning Systems, LLC,* Dkt. No. 171176-09, N.J. Super. Ct.); D5029-5068

64.   Letter Agreement between Hollywood Tanning Systems, Inc. and Tan Holdings, LLC, Exhibit A, (Apr. 21, 2007) (Bates Nos. V105-V129); D5069-5337

65.   Wilmington Trust Statement of Account as of June 30, 2007 for Ralph A. Venuto, Jr.; D5338-5345

66.   Wilmington Trust Statement of Account as of June 30, 2007 Ralph A. Venuto, Sr. and Carol Venuto; D5346-5353

67.   Wilmington Trust Statement of Account as of June 30, 2007 Richard Venuto and Patricia Venuto; D5354-5361

68.   Wilmington Trust Statement of Account as of June 30, 2007 Michael Rebbecci and Carol Rebbecci; D5362-5369

69.   Distribution Sheet of Closing Proceeds, June 22, 2007; D5370

70.   Letter Agreement from Kevin S. Penn, Manager, Tan Holdings, LLC to Ralph A. Venuto, Jr., President, Hollywood Tanning Systems, Inc., (Oct. 19, 2007) (reflecting Final Adjusted Working Capital of $2,354,213 and a Working Capital Shortfall of $6,339,643.85 (Bates Nos. V198-202); D5371-5639

71.   Confidential Settlement Agreement and Release between Hollywood Tanning Systems, Inc. and Tan Holdings, LLC, Feb. 10, 2010, Bates No. V29-V55; D5640-5707

72.   Purchaser Earn Out Statement for Calendar Years Ended

December 31, 2007 and December 31, 2008 (Bates No. V93); D5708-
5976

    73.   Docket Report, *Nafar et al. v. Hollywood Tanning
Systems, Inc.*, Dkt. No. 06-3826 (D.N.J. Filed Aug. 14, 2006);
D5977-5990

    74.   Hollywood Tanning Systems, Inc.: Report on Audits of
Financial Statements and Additional Information years ended
December 31, 2006 and 2005, Altenburger, Uris, Caglioti & Heymann,
LLC (March 13, 2007); D991-6058

    75.   Letter from Ralph A. Venuto, Sr., President and David
Rahn, CPA, CFO, Hollywood Tans to Altenburger, Uris, Cagliotti &
Heymann, L.L.C .(Oct. 11, 2007); D6059

    76.   Hollywood Tanning Systems, Inc. 2005 Federal Income Tax
Return; D6060-6096

    77.   Hollywood Tanning Systems, Inc. 2006 Federal Income Tax
Return; D6140-6185

    78.   Hollywood Tanning Systems, Inc. Amended 2006 Federal
Income Tax Return; D6097-6139

    79.   Hollywood Tanning Systems, Inc. 2007 Federal Income Tax
Return; D6186-6230

    80.   Hollywood Tanning Systems, Inc. Account Aging as of
December 31, 2006 with Accounting Work Papers; D6231-6241

    81.   Independent Auditors Report on Additional Information,
March 17, 2007; D6242-6261

    82.   Hollywood Tanning Systems, Inc. Profit and Loss
Comparison 2005/2006; D6262-6263

    83.   Indemnification Letter from Lewis Shender, President,
Tan Holdings, LLC to Carol F. Venuto, Carol E. Rebbecchi, Estate
of Ralph A. Venuto, Sr., Ralph A. Venuto, Jr., Richard P. Venuto,
Hollywood Tanning Systems, Inc., (December 8, 2008) (Bates Nos.
V88-V90); D6264-6532

    84.   Audit Balance Sheet Representations by Hollywood

Tanning, March 15, 2007; D6533-6536

85. Hollywood Tanning Systems, Inc., Profit and Loss Excel Spreadsheet, 2007, produced by Parente Beard, *Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct.); D6537-6597

86. Ralph A. Venuto, Jr. Deposition Transcript, September 22, 2009 (Orchard Mall, LLC v. Hollywood Tanning Systems, Inc., Docket No. 271393-08 NJ Super Ct); D6598-6613

87. E-mail from Ralph Venuto, Jr. to Chuck Dugan, Parente Beard, LLC (Sept. 9, 2011);

88. Warrant regarding Unpaid Taxes, New York State Department of Tax and Finance, December 20, 2010;

89. Audit by State of New Jersey Department of the Treasury of Hollywood Tanning, August 17, 2010;

90. Seller's Disclosure Schedules pursuant to the Contribution and Asset Purchase Agreement, April 18, 2007; D6614-6720

91. Tan Holdings' Schedule K-1, 2007; D6721-6766

92. Hollywood Tanning Systems, Inc.' 2008 Federal Income Tax Return; D6767-7287

93. Hollywood Tanning Systems, Inc. Bank Statements, Investment Account, June 20, 2007-January 31, 2009; D7288-7292

94. Defendants' Motion to Dismiss Somerset County Action (March 29, 2010);

95. Second Amended Complaint, *MSKP Oak Grove, LLP v. Hollywood Tanning Systems, LLC,* Dkt. No. 171176-09, N.J. Super. Ct.); D7293-7338

96. Answer to Second Amended Complaint, *MSKP Oak Grove, LLP v. Hollywood Tanning Systems, LLC,* Dkt. No. 171176-09, N.J. Super. Ct.); D7339-7349

97. Defendants' Response to Plaintiff's First Request for the Production of Documents, *MSKP Oak Grove, LLP v. Hollywood*

*Tanning Systems, LLC,* Dkt. No. 171176-09, N.J. Super. Ct.); D7350-7357

98.  Defendants' Response to Plaintiff's Second Request for the Production of Documents, *MSKP Oak Grove, LLP v. Hollywood Tanning Systems, LLC,* Dkt. No. 171176-09, N.J. Super. Ct.); D7358-7362

99.  Defendants' Response to Plaintiff's Third Request for the Production of Documents, *MSKP Oak Grove, LLP v. Hollywood Tanning Systems, LLC,* Dkt. No. 171176-09, N.J. Super. Ct.); D7363-7367

100. Defendants' Response to Plaintiff's Fourth Request for the Production of Documents, *MSKP Oak Grove, LLP v. Hollywood Tanning Systems, LLC,* Dkt. No. 171176-09, N.J. Super. Ct.); D7368-7373

101. Defendants' Responses to Requests for Admissions, *Orchard Mall, LLC v. Venuto et al.,* Dkt. No. L-2044-10 (N.J. Super. Ct.); D7374-7379

102. Representation letter from Hollywood Tanning to Altenburger Uris, Caglioti & Heyman, LLC; D7380-7383

103. Hollywood Tanning financial statements provided in accordance with audit for 2005 and 2006 as of December 31, 2006, Bates No. V-68-73; D7384-7403

104. Hollywood Tanning Balance Sheet as of December 31, 2006; D7404-7423

105. David Rahn Deposition, March 12, 2013, Orchard Mall, LLC v. Venuto, et al, Docket No. L-2044-10 (NJ Super Ct.); D7424-7692

106. Ralph Venuto, Jr. Deposition, February 12, 2013, Orchard Mall, LLC v. Venuto, et al, Docket No. L-2044-10 (NJ Super Ct.); D7693-7860

107. Hollywood Tanning General Ledger 2006; D7861-7865

108. Hollywood Tanning General Ledger 2007; D7866-8089

109.   Mira Muhtadie Deposition, June 22, 2014, MSKP Oak Grove, LLC v. Venuto, et al, No 10-6465 (D.N.J.); D8090-8124

110.   ACI Capital Co, LLC, Listing of Managers and Counsel (Bates No. BTVK000027; D8125-8293

111.   Letter from Ableco Finance, LLC, Lender to Tan Holdings, LLC c/o ACI Capital Co., LLC (April 2007) (Bates Nos. V185-V189; D8294-8562

112.   Salons with Venuto Family Ownership Interests (Bates No. Louis Shendler-0140-0143); D8563-8831

113.   Email from Mira Muhtadie, ACI Capital, to Thomas G. Bailey and Richard F. Markert (July 15, 2009, 5:05 p.m., Bates No. Louis Shendler-0144); D8832-8987

114.   Email from Mira Muhtadie, ACI Capital, to Thomas G. Bailey and Richard F. Markert (July 15, 2009, 1:11 p.m., Bates No. Louis Shendler-0144); D8988-9143

115.   Hollywood Tanning Systems, Inc. Audited Financial Statements for 2004 and 2005; D9144-9164

116.   Tan Holdings 2007 Tax Return; D9165

117.   Bill of Sale, Hollywood Tanning to Tan Holdings, June 22, 2007 Escrow Agreement from Hollywood Tanning Systems, Inc, to Hollywood Tanning Company, LLC, signed by Ezra S. Field, Manager, Hollywood Tanning Company, LLC and Ralph A. Venuto, Jr, President, Hollywood Tanning Systems, Inc., D9166-9178

118. Bill of Sale, Hollywood Tanning to Tan Holdings, June 22, 2007 Escrow Agreement from Hollywood Tanning Systems, Inc, to Hollywood Tans, signed by Ezra S. Field, Manager, Hollywood Tans and Ralph A. Venuto, Jr, President, Hollywood Tanning Systems, Inc.;

119. Bill of Sale, Hollywood Tanning to Tan Holdings, June 22, 2007 Escrow Agreement from Hollywood Tanning Systems, Inc, to HT Manufacturing, signed by Ezra S. Field, Manager, HT Manufacturing and Ralph A. Venuto, Jr, President, Hollywood Tanning Systems, Inc.;

120. Excel Schedule - Hollywood Tanning support for Form 8594 and allocation of sale proceeds; D9179-9224

121. Asset Acquisition Statement Form 8594; D9225-9270

122. ACI Capital, *Hollywood Tanning Systems, Inc., Investment Memorandum*, Preliminary Draft, (June, 2007); D9271-9333

123. ACI Capital Acquisition of Hollywood Tanning, Terms of Sale, January 25, 2007; D9334-9338

124. Tan Holdings Projected Opening Balance Sheet, May 31, 2007; D9339-9430

125. Tan Holdings, LLC Consolidated Financial Statements, Unaudited Draft, December 31, 2007; D9431-9470

126. Tan Holdings, LLC Consolidated Balance Sheet, Unaudited Draft, December 31, 2007; D9471-9510

127. Independent Auditors Report by St. Clair, CPA's PC, Tan Holdings, LLC, December 31, 2008, Bates No. TH 0258; D9511-9531

128. 2010 Transactions- State of New Jersey notification schedule of liabilities for 2007 of $114,158 and State of New York $107,409.10;

129. Tan Holdings' Complaint and Counterclaims; 9532-9548

130. Dismissal Order, *AMC Delancey Richboro Partners, L.P. v. Hollywood Tanning Systems, Inc.,* Dkt. No. L-5169 (N.J. Super. Ct. June 10, 2011); D9549-9551

131. Transcript Court's Dismissal, *AMC Delancey Richboro Partners, L.P.* v. Hollywood Tanning Systems, Inc., Dkt. No. L-5169 (N.J. Super. Ct. June 10, 2011); D9552-9567

132. Complaint, *AMC Delancey Richboro Partners, L.P. v. Hollywood Tanning Systems, Inc.,* Dkt. No. L-5169 (N.J. Super. Ct.); D9568-9577

133. Martinwolf, *Understanding "Rollover Equity",* Valuation & Deal Insights, May 16, 2013; D9588-9589

134.   Holland & Knight, *What to Expect if a Private Equity Firm Acquired Your Company*, September 2009; D9590-9592

135.   PRATT, REILLEY, AND SCHWEIHS, VALUING A BUSINESS (4th ed. McGraw-Hill);

136.   Shelly Brown Deposition, October 27, 2015, *MSKP Oak Grove, LLC v. Venuto et al.*, Dkt. No. 10-06465 (D.N.J.); D9593-9779

136a.   Shelly Brown Deposition, December 9, 2015 D9780-9794

137.   Hollywood Tans Proposed Revised A/R & Unreported Royalty Revenues Summary as of 6/22/2007 produced by Parente Beard *Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct.); D9795-9840

138.   Hollywood Tanning Systems, Inc. Extension Tax Docket for 2006 filed by Altenburger, Uris, Caglioti, & Heyman, LLC, produced by Parente Beard *Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct.); D9841-9934

139.   Defendant's Motion for Partial Summary Judgment, *Rowen Petroleum Properties, LLC v. Hollywood Tanning Systems, Inc., et al.*, Dkt. No. 10-6465 (D.N.J. Mar. 23, 2015); D9935-9974

140.   Hollywood Tanning Systems, Inc. Formational Documents; D9975-1024

141.   Deposition of Jack L. Uris, Jan. 22, 2013, *Orchard Mall, LLC v. Venuto et al.*, Dkt. No. L-2044-10 (N.J. Super. Ct.); D10025-10148

142.   Letter Agreement from Michael A. Pacali, Vice President, Wilmington Trust, FSB, to Ralph A. Venuto, Sr., President, and Ralph Venuto, Jr., Chairman, Hollywood Tanning Systems, Inc. (Mar. 23, 2007) (Bates Nos. BTVK000040-41); 10149-10150

143.   HTS Aging Analysis of accounts receivable prepared for trial November 2016

144.   Revolving Credit Note between HTS and Wilmington Trust D10341-10344

145.   Loan Agreement between HTS and Wilmington Trust dated October 24, 2006 D10345-10398

146.   Hollywood Tans Financial Structure. D10399

147.   Note and Mortgage Modification Agreement between the Bank and HTS dated August 28, 2006 D10400-10406

148.   Asset summary of HTS dated December 31, 2006 D10407-10414

### E.   Plaintiff's objections to defendants' documents

1.   Plaintiff objects to document 1 on grounds of relevancy and because Brown's reports in this action are based on information provided which is more than the documents provided in the Orchard Mall case.  Pederson should be held to his expert report in this action which does not incorporate by reference any portion of the Orchard Mall report.

2-4.   Plaintiff objects to documents 2, 3 and 4 on the ground that arguments of counsel are not evidential, Simmons v. South Carolina, 512 U.S. 154, 172 (1994)(Souter, J., concurring), United States v. Retos, 25 F.3d 1220, 1224 (3d Cir. 1994).

3.   Plaintiff objects to the admission of document 5 as hearsay, Fed.R.Evid. 801©.

4.   Plaintiff objects to the admission of document 6 on the basis of relevancy.  MSKP is not in privity with Orchard Mall.

5.   Plaintiff objects to the admission of document 7 on the grounds of relevancy and hearsay, Fed.R.Evid. 801©.

19-28.   Plaintiff objects to the admission of documents 19, 20, 21, 22, 23, 24, 25, 26, 27 and 28 on the ground that case law is not evidence.

29-32.   Plaintiff objects to the admission of documents 29, 30, 31 and 32 on the grounds of relevancy and hearsay, Fed.R. Evid. 801©.  Plaintiff also objects to documents 30 and 31 for lack of specificity.

33.   Plaintiff objects to the admission of document 33 on the ground of relevancy.

39-40.   Plaintiff objects to the admission of documents 39 and 40 unless defendants state the purpose for which they intend to offer these documents.

42.   Plaintiff objects to the admission of document 42 unless defendants state the purpose for which they intend to offer this document.

49-50.   Plaintiff objects to the admission of documents 49 and 50 on the basis of relevancy.  MSKP is not in privity with Orchard Mall.

53-55.   Plaintiff objects to the admission of documents 53, 54 and 55 on the grounds of relevancy and hearsay, Fed.R.Evid. 801©.

57.   Plaintiff objects to the admission of document 57 on the ground that case law is not evidence.

62.   Plaintiff objects to the admission of documents 62 on the basis of relevancy.  MSKP is not in privity with Orchard Mall.

94.   Plaintiff objects to the admission of document 94 because there were two actions in Somerset County, neither of which involved MSKP.

126.   Plaintiff objects to the admission of document 126 on the grounds of relevancy and hearsay, Fed.R.Evid. 801©.

129-132.   Plaintiff objects to the admission of documents 129, 130, 131 and 132 on the grounds of relevancy and hearsay, Fed.R.Evid. 801©.

132-134.   Plaintiff objects to the admission of document 57 on the ground that articles are not evidence and constitute hearsay, Fed.R. Evid. 801©.

143.   Plaintiff objects to the admission of Exhibit 143. This document was prepared in November 2016 and is an attempt to expand Petersen's expert testimony beyond the confines of his report.  Defendants did not produce this before discovery ended.

**Part VIII   Law**

68

1.   **Plaintiff's statement of the legal issues**

a.   Whether defendants hindered, delayed or defrauded MSKP in violation of N.J.S.A.25:2-25(a);

b.   Whether evidence of defendants' behavior toward other claimants and creditors is a) relevant to their intent to hinder, delay or de fraud MSKP under Fed.R.Evid. 401 or b) to establish a routine within Fed.R.Evid. 406;

c.   Whether Hollywood Tanning received fair consideration for the diversion to the Venutos or for the monies paid to them or for their benefit of the monies paid by Tan Holding;

d.   Whether Hollywood Tanning became insolvent and, if yes, whether it was insolvent before the transfer of its assets or as a result of the transfer of its assets;

e.   Whether, following the transfer of its assets, Hollywood Tanning had a duty to its creditors to retain sufficient cash to pay claims of creditors, including creditors whose claims have not yet matured.

f.   What is the scope of the lawyer-client privilege codified at N.J.S.A.2A:84A-20 and Fed.R.Evid. 501 and 502 regarding communications regarding the quantum of insurance coverage between defendants on the one hand and Orlofsky and Travelers on the other hand?


g.   Are disputes between Hollywood Tanning and other claimants and creditors relevant under Fed.R.Evid. 401 and 406 to the issue if defendants' intent to hinder, delay and defraud?


h.   Are statements by a litigant's counsel in the course of litigation I) hearsay within Fed.R.Evid. 801(d)(2) (C)-(E)?

## 2. Defendant's statement of the legal issues

### I.  Introduction

The essence of this lawsuit is that Plaintiff MSKP Oak Grove, LLC ("Plaintiff") alleges that a Shareholder Distribution by Defendant Hollywood Tanning Systems, Inc. ("HTS"), while solvent, as part of a forty million dollar sale of HTS's business and assets to Tan Holdings, LLC (an unrelated party) to shareholders and Defendants Carol Venuto, individually and as executrix for the estate of her husband Ralph A. Venuto, Sr., Ralph Venuto, Jr., Carol Rebbecchi, and Richard P. Venuto (collectively "Defendants") constituted a fraudulent transfer.  Plaintiff is not the first to collect money from HTS or its shareholders by suing HTS and the family who ran the family business for the same sale transaction on June 22, 2007.  In a prior Opinion, this Court explained that a key issue is whether HTS had sufficient liquidity post-asset sale to cover contingent creditor claims. That Court allowed two years of discovery while waiting for the outcome of a companion case, Rowen Petroleum v. Hollywood Tanning Systems, Inc. ("Rowen case").

In all other lawsuits, the courts have found no evidence of a fraudulent transaction.  Plaintiffs cannot show any evidence of a fraudulent transaction in the instant case either.  Plaintiff cannot show that the Shareholder Distribution was made with the intent to hinder, delay, or defraud creditors.  Plaintiff cannot show that HTS did not receive reasonably equivalent value or was left with unreasonably small assets, as HTS received a significant sum of money in addition to a twenty five percent interest in Tan Holdings.  Plaintiff cannot show that the Venutos knew or should have known that Tan Holdings would fail and that the twenty five percent interest would ultimately be worthless. Plaintiff cannot show that the Venutos had any reason to believe that HTS should have set aside a reserve for Plaintiff's alleged obligation, an unknown future claim, or a liability for which no money was due at the time of sale to Tan Holdings. Plaintiff cannot show that HTS was insolvent at the time of the transfer or that the Venutos knew it was insolvent.  Plaintiff cannot show

that Plaintiff's claim arose before the Shareholder Distribution.

II.   *Plaintiffs do not and cannot establish that Defendants violated NJUFTA.*

The New Jersey Uniform Fraudulent Transfer Act ("NJUFTA") 25:2-20 to 34:1 establishes a heightened burden of proof standard goes well beyond the preponderance of the evidence.  See Barsotti v. Merced, 788 A. 2d 802, 811 (N.J. Super. Ct. 2002) ("It is well established that fraud must be proven by 'clear and convincing' evidence.").

> Evidence is "clear and convincing" "when it produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."

*In re Jobs, 108 N.J. 394, 407 (N.J. 1987) (quoting State v. Hodge, 95 N.J. 369, 376 (N.J. 1984).).*

*(I)  Plaintiffs cannot establish HTS intended to hinder, delay or defraud any creditor.*

Courts look to "badges of fraud" to determine whether the circumstances of a particular transaction give rise to the conclusion that the transferor possessed actual intent to thwart or evade creditors.  See *Gilchinsky v. Nat'l Westminster Bank*, N.J., 732 A. 2d 482, 489 (N.J. 1999).  N.J.S.A. 25:2-26 lists the "badges of fraud."  Plaintiffs cannot establish that the HTS Asset sale was not a legitimate arm's length transaction for fair value.  Plaintiffs ask the Court to believe the ludicrous – that HTS would sell its business, pay its creditors in full, and retain value in Tan Holdings for the purpose of avoiding a

contingent liability to Plaintiff.

Second, Plaintiff cannot demonstrate any indicia of intentional fraud. N.J. Stat. Ann. § 25:2-25(a) proposes questioning whether the person making the conveyance put the asset beyond the reach of creditors or whether he or she transferred property with intent to defraud, delay, or hinder the creditor. Both elements must be alleged and proven to prevail on such a claim. See *Nassif v. Jelmac*, L.L.C., No. A-4100-10TC, 2012 WL 281229, at 4 (N.J. Super. Ct. App. Div. July 11, 2011) (quotation omitted) (plaintiff asserting the U.F.T.A. claim "bears the burden of proving the transfer was fraudulent by clear and convincing evidence.").

*(ii) Plaintiff also cannot demonstrate that HTS received a transfer that was fraudulent due to constructive fraud.*

Under this section, Plaintiff must prove both (1) that HTS did not receive equivalent value in exchange for the transfer and (2) that HTS was engaged, or about to be engaged, in a business for which the remaining assets were unreasonably small in relation to that business. First, Plaintiff argues that HTS did not receive reasonably equivalent value for the distribution to the Venutos. HTS asserts that the sale of all of HTS' assets constituted a reasonably equivalent value. As shareholders, the Venutos held an ownership interest in HTS. Receiving excess money from HTS's asset sale constituted a payment for distributing the assets of the company in which they held an ownership interest. See Scheck v. Bowne, 166 A. 189 (N.J. 1933) ("One who conveys his property to a corporation in payment of capital stock of approximately equal value does not thereby render himself insolvent, nor is the conveyance void upon the ground that it is a voluntary assignment without consideration and in fraud of creditors.") Moreover, at the time of the transfer, Defendants expected their twenty five percent interest in Tan Holdings to create a steady and significant revenue stream, leaving HTS with ample capital reserve.

The Third Circuit Court of Appeals defines the term "unreasonably small capital" as "a financial condition short of equitable insolvency." *Moody v. Sec. Pacific Business Credit*, 971 F.2d 1056, 1070 (3d Cir. 1992). The test for "unreasonably small capital" is "reasonable foreseeability." Id. Plaintiff cannot demonstrate that HTS did not possess sufficient capital or assets to carry on its business. HTS retained substantial and valuable consideration following the execution of the APA and Shareholder Distribution including twenty-five percent of the issued and outstanding preferred units of Tan Holdings and contingent earn-outs from Tan Holdings, and constituted a value so great it exceeded any then-existing potential liability to Plaintiff. On the date of the Shareholder Distribution, HTS could not reasonably foresee that it would not have sufficient assets with which to carry on its business.

I.   *Plaintiff's lawsuit fails because they cannot show that HTS was insolvent at the time of transfer or that HTS became insolvent as a result of the transfer, and that the Venutos knew the business would be unsuccessful.*

N.J.S.A. 25:2-27(a) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value for the transfer or obligation in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

*Id.* In the instant case, on the Closing date, HTS sold its business at the top or near the top of the market in June, 2007. The buyer, Tan Holdings, was a non-related party and Plaintiff has not alleged any facts to suggest the sale was not arms' length. HTS received proper consideration for the sale. In

2008, the United States fell into a great recession affecting
market prices and businesses throughout the country.  HTS could
not have predicted the recession and believed it sold its
business for fair value.


    A debtor is insolvent if the sum of the debtor's debts is
greater than all of its assets at a fair valuation.  N.J.S.A.
25:2-23(a).  Based upon the evidence and case law, HTS was
solvent at the time of the alleged transfer and immediately
following the transfer.

II.  *Plaintiff's Claims are Barred by Collateral Estoppel.*


In a nearly identical case before the Honorable Faustino J.
Fernandez-Vina in the Superior Court of New Jersey for Camden
County, AMC Delancey Richboro Partner, LP ("AMC"), a commercial
landlord with interests similar to that of Plaintiff MSKP, filed
an identical lawsuit against Defendants, making the same claim
that Defendants fraudulently transferred corporate funds to its
shareholders.  Defendants also filed a motion to dismiss this
other complaint.  On June 10, 2011, Judge Fernandez-Vina ruled
that under the facts, the same facts that form the basis of
Plaintiff's lawsuit now before the Court, AMC had failed to plead
a claim under NJUFTA, and he dismissed the complaint.  More
specifically, he made it clear that there were no facts in the
complaint or that could be produced in discovery to support the
plaintiff's complaint.  He ruled that under the facts, HTS and
its shareholders could not have had any knowledge, imputed or
otherwise, that they sold their company to a company that would
not be able to assume their financial obligations, and therefore
had no knowledge they would have any liability to plaintiff under
the lease after their assets were sold.


This Court should follow Judge Fernandez-Vina's ruling and
dismiss this case pursuant to the doctrine of collateral
estoppel.  The doctrine of collateral estoppel, or issue
preclusion, prohibits re-litigation of issues that have already
been adjudicated in a prior lawsuit.  State v. Gonzalez, 380 A.2d

1128, 1131 (N.J. 1977).  There is a strong public policy argument for collateral estoppel in order to avoid the multiplicity of litigation over the same issue and to conserve judicial resources.  *See Zirger v. General Accident Ins. Co.*, 676 A.2d 1065, 1072 (N.J. 1996).  To invoke the doctrine of collateral estoppel, a party must show that:

> (1)  the issue to be precluded is identical to the issue decided in the prior proceeding;
>
> (2)  the issue was actually litigated in the prior proceeding;
>
> (3)  the court in the prior proceeding issued a final judgment on the merits
>
> (4)  the determination of the issue was essential to the prior judgment;
>
> (5)  the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*Twp. of Middleton v. Simon*, 937 A.2d 949, 954 (N.J. 2008).  Since HTS can show all of these elements, the Court should preclude Plaintiff's fraudulent transfer claim.


I.   *The instant lawsuit is barred by the District of New Jersey's Holding in Rowen Petroleum Properties, LLC v. Hollywood Tanning Systems, Inc., No. 08-4764 (D.N.J. Sept. 28, 2012) whereby the Court found no evidence of fraud.*


In Rowen Petroleum Properties, LLC v. Hollywood Tanning Systems, Inc., No. 08-4764 (D.N.J. Sept. 28, 2012), the District Court of New Jersey again faced identical facts and the identical Defendant.  The Court held:


> Plaintiff has presented no facts that the individual

defendants used HTS as their alter ego or otherwise
disregarded the corporate form to commit fraud. For example,
plaintiff has not presented any evidence that HTS was
grossly undercapitalized, failed to observe corporate
formalities, failed to pay dividends, was insolvent,
maintained non-functioning officers or directors, or failed
to maintain corporate records. Although the facts show that
HTS's assets were assigned to Tan Holdings, while the leases
were assigned to HTS plaintiff has not come forward with
evidence that any of the individual defendants knew that HT
Systems was undercapitalized. The evidence indicates that
ACI Capital, a private equity firm in New York City, formed
the deal with Tan Holdings and HTS. Rahn testified that the
terms of the deal formed by ACI were not disclosed to him or
the Venutos, and that he personally found out about the deal
after it closed on or around June 22, 2007. Plaintiff has
not presented evidence that could show that defendants'
intention in selling HTS's assets was to commit fraud.
Rather, based on Rahn's undisputed testimony, the Venutos
decided to sell HTS after Ralph, Sr. was diagnosed with
terminal cancer and wanted to provide for his children after
his death.

In sum, plaintiff has not presented evidence that HTS was a
mere facade for the operations of defendants or that any of
the individual defendants failed to observe corporate
formalities or otherwise dominated the corporation.
Plaintiff has not presented evidence that any of the
defendants were directly involved in the formation of Tan
Holdings or HTS or knew that those companies were
undercapitalized. HTS and Tan Holdings are not subsidiaries
of HTS. While HTS may no longer have adequate assets, this
fact alone does not provide grounds for piercing the
corporate veil. See Lutyk, 332 F.3d at 197 ("Companies
commonly become insolvent, then bankrupt; piercing the
corporate veil is an exception reserved for extreme
situations, rather than the rule."); Port Drivers Fed'n 18,
Inc. v. All Saints Exp., Inc., 757 F.Supp.2d 443, 458
(D.N.J. 2010) ("While plaintiffs have shown that All Saints
is grossly undercapitalized, does not pay dividends, and
does not have a functioning board of directors, they have
not established the other factors necessary to find that All

Saints is a mere instrumentality of St. George.").

As such, defendants' motion for summary judgment on Count Five will be granted.

Id. at 12-14.  Similarly, in the instant case, Plaintiff has not and cannot show any evidence that HTS was insolvent at the time of sale or that Defendants had any intention to commit fraud. Accordingly, Plaintiff's fraud claims must be dismissed for collateral estoppel reasons.

II.  *Plaintiffs' Expert, Shelly Brown, relies on faulty legal standards for fraudulent transfer and valuation reports.*

Plaintiff's expert, Shelly Brown ("Brown"), is an unreliable witness.  She does not rely on the correct legal standard for fraudulent transfer.  She deemed HTS insolvent as of the date of the asset sale in the Orchard Mall valuation report, but stated at her deposition that she did not have enough information to make such a determination.  Brown has only performed a handful of valuation reports as an expert witness and none appear to be for proof of solvency.  She is a forensic accountant who has tried to learn how to perform valuations, but has instead blurred the lines between the two.   For these reasons, the Court cannot rely on Brown's reports or testimony.

**Part IX Miscellaneous**

Defendants have agreed not to dispute the authenticity of certain discovery and depositions produced in other litigations involving the same or similar issues as this case.  However, Defendants did not agree that non-party depositions from other

cases can be used as trial testimony.  (Deposition Ralph A. Venuto, Jr. 6/19/15 6-3 to 6-23.)  Defendants reserve the right to require plaintiff to call any non-party witnesses such as David Rahn to testify at trial as the depositions of non-party witnesses in other cases were taken for discovery purpose and not for trial testimony.  Plaintiff responds that any use of the testimony of a non-party witness such as David Rahn and/or Mira Muhtadie will be consistent with Fed.R.Civ.P. 32(a)(3) and (8).

Defendants also object to the entry into evidence of any information regarding the Warminster matter, as it is not relevant to the instant suit.  The Warminster judgment was not entered against any of the Defendants.


    Pursuant to Fed.R.Evid. 807, if unable to secure the testimony of Kenneth Federman pursuant to subpoena, plaintiff will offer into evidence an affidavit he filed in the Court of Common Pleas (Document 143).


## X.  Non-Jury trials

    No later than seven days prior to the scheduled trial date, counsel for each party shall submit to the District Judge, with a copy to opposing counsel, proposed findings of fact and conclusions of law.  There is reserved to counsel the right to submit additional requests during the course of the trial on those matters that cannot reasonably be anticipated.



**EACH OF THESE ITEMS IS TO BE FILED JUST PRIOR TO THE FIRST TRIAL DATE EVEN IF THE CASE IS CONTINUED.**


**COUNSEL ARE ON NOTICE THAT FAILURE TO PROVIDE TIMELY COMPLIANCE WITH THE REQUESTS OF PART X AND XI MAY RESULT IN THE POSTPONEMENT OF TRIAL AND THE ASSESSMENT OF JUROR AND OTHER COSTS AND/OR THE IMPOSITION OF SANCTIONS.**

**CONCLUDING CERTIFICATION**

We hereby certify by the affixing of our signatures to this Final Pretrial Order that it reflects the efforts of all counsel and that we have carefully and completely reviewed all parts of this Order prior to its submission to the Court.  Further, it is acknowledged that amendments to this Joint Final Pretrial Order will not be permitted except where the Court determines that  manifest injustice would result if the amendment is not allowed.

Attorneys for Plaintiff:        Attorneys for Defendants:

*Robert Vort*                         s/

Robert A. Vort, Esq            Dimitri Karapelou, Esq.

Entry of the foregoing Joint Final Pretrial Order is hereby APPROVED this 12th day of January, 2017

_____
JOEL SCHNEIDER, U.S.M.J.

United States District Court, District of New Jersey

**Shelley A. Brown, MBA, CPA/ABV, CVA, CFF**
**PFK O'Connor Davies**
**106 Prospect Street**
**Ridgewood, NJ 07450**
**Shelley.brown@pkfod.com**
**(201)-639-5760**

**Experience**

As a Principal in the Forensic, Litigation and Valuation Services Department for O'Connor Davies, Shelley Brown provides business valuation and forensic accounting services to the legal and business communities.  For more than two decades, she has served as an expert witness on matters involving business and marital dissolution, shareholder disputes, insurance claims related to business interruption, estate challenges, bankruptcy litigation, buy/sell agreements and more.

Ms. Brown has served as the Plaintiff's expert in an insurance fraud investigation perpetrated by a security company; the Plaintiff's expert for a bank in a fraudulent conveyance complaint; the Defendant's expert in a commercial damage claim; the Plaintiff's expert for a condominium association in a lawsuit filed against its Board of Directors; and the government's expert in a white collar crime investigation resulting in the recovery of millions of dollars on behalf of the state.

Ms. Brown is accredited in Business Valuation (ABV) and Financial Forensics (CFF) by the American Institute of Certified Public Accountants (AICPA), and is certified to perform business valuations by the National Association of Certified Valuation Analysts (NACVA).

Ms. Brown has been certified as an expert witness in Bergen, Essex, Hudson, Morris, Passaic, and Union counties. She has been court appointed in Bergen, Hudson, Passaic, Morris and Sussex counties by the Honorable Judge Robert Brennan, the Honorable Judge Miguel De La Carrera, the Honorable Judge Bonnie Mizdol, the Honorable Judge Maryann Neergard, the Honorable Judge Maritza Berdote Byrne, the Honorable Judge Louis Sceusi, the Honorable Judge John Seltzer, the Honorable Judge Ronnie Siegal and the Honorable Judge James Troiano.

Ms. Brown is a speaker on forensic and business valuation matters and has addressed The New Jersey Family Bar, New York State Society of Certified Public Accountants, The Hispanic Bar Association, The National Association of Certified Valuation Analysts, The New Jersey Council on Economic Education, The New Jersey Center for Consumer Education Services, The New Jersey Association for Justice, The Essex County Chapter of the New Jersey State Society of Certified Public Accountants, The New Jersey Association of Women Business Owners, and the Displaced Homemakers Association of America.

**Publications and Course Work**

Ms. Brown published "Calculating Capitalization/Discount Rates in the Build-Up Method for Business Valuations" in the National Litigation Consultants Review; and "the Role of the Forensic Accountant" for In Brief, a publication of the New Jersey Association for Justice.  She has written and taught the course, "Valuation of Medical Practices for Divorce," on behalf of the National Association of Certified Valuation Analysts

**Expert Witness and Litigation Support**

Ms. Brown's industry experience includes the auto lift, auto repair, collision repair, construction, dental practices, distribution, home health care, insurance, janitorial, lobbying, manufacturing, medical, packaging, medical practices, pharmacy, plumbing, printing, professional service, real-estate franchise, restaurant, and title industries.

**Shelley A. Brown, MBA, CPA/ABV, CVA, CFF**
Curriculum Vitae, continued

**Education**

Bachelor of Science in Business Education
Rider University, 1973
Lawrenceville, New Jersey

MBA in Finance
Rutgers University, 1981
Newark, New Jersey

**Professional Affiliations**

American Institute of Certified Public Accountants
New Jersey State Society of Certified Public Accountants
National Association of Certified Valuation Analysts

**Professional Credentials**

Certified Public Accountant States of New Jersey and New York
Certified Valuation Analyst (CVA)
Accredited in Business Valuation (ABV)
Accredited in Financial Forensics (CFF)

<u>Exhibit 1</u>



**William J. Pederson CPA/CFF/ABV, CIRA/CDBV, CFE**
**Bankruptcy and Restructuring Group**
*Director*
**(215) 881-8859 (Office)**
**(610) 772-6097 (Mobile)**

<u>Employment History:</u>

| | | |
|---|---|---|
| 5/09 – Present | EisnerAmper<br>*Bankruptcy and Restructuring* | Philadelphia, Pennsylvania<br>National, 1,200 Professionals |
| 9/00 – 5/09 | Protiviti<br>*Litigation Services and Bankruptcy* | Baltimore, Maryland<br>International,<br>3,000 Professionals |
| 5/97-5/00 | Richard Martinez, PLC | New Orleans, Louisiana<br>Bankruptcy Attorney |
| 8/95 - 8/96 | Entergy | New Orleans, Louisiana<br>Regional Utility |
| 2/90-7/95 | USF&G | Baltimore, Maryland<br>National P&C Insurer |
| 1/86-2/90 | Ernst & Young | Baltimore, Maryland<br>International Accounting Firm |

<u>Representative Engagements</u>:

- Accountant and Financial Advisor – FTC investigation and suit against the owner of a debt counseling service and his companies – damages exceeded $100 million.

- Financial Advisor – Computer fraud case involving fictitious sales and leases – damages exceeded $300 million.

- Accountants and Financial Advisor – Computer fraud conducted by the former owner of a small insurance finance company. Through a number of forensic techniques, we were able to locate and quantify the damages attributable to the actions of the insider.

<u>**Exhibit 1**</u>

**William Pederson, CPA/CFF/ABV, CFE, CIRA/CDBV**
**Page 2 of 2**

- Financial Advisor – Fraudulent conveyance case involving an LBO of a large metal press machine manufacturer. The Trust for which we were working prevailed in the lower courts on its multi-million dollar claim.  Case is being appealed.

<u>*Expert Testimony*</u>

U.S. District Court for the Eastern District of Pennsylvania – *Hipple v SCIX, et al*
  o   Provided expert testimony in valuation.

U.S. Bankruptcy Court of the Eastern District of Pennsylvania – *M.Krasny v. P.Bagga*
  o   Provided deposition testimony.
  o   Counsel Reference – Eugene Malady, Eugene Malady, LLC

American Arbitration Association – *RBC Mortgage Company*
  o   Provided expert testimony in support of rejection of damages.
  o   Provided deposition testimony.
  o   Counsel Reference– Daniel Tobin, Ballard Spahr Andrews & Ingersoll.

**Education:**
- Roanoke College, BBA
- University of Baltimore, MBA
- University of Baltimore, MS – Finance
- Loyola University College of Law, JD

**Professional Designations:**
- Certified Public Accountant (CPA), Maryland & Pennsylvania
- Accredited in Business Valuation (ABV)
- Certified in Financial Forensics (CFF)
- Certified Insolvency and Restructuring Advisor (CIRA)
- Certified in Distressed Business Valuation (CDBV)
- Certified Fraud Examiner (CFE)

**Affiliations:**
- Turnaround Management Association, Pennsylvania
- American Institute of Certified Public Accountants
- Association of Insolvency and Reorganization Advisors
- Association of Certified Fraud Examiners
- American Bankruptcy Institute
- American Bar Association
- Maryland Bar Association
- Louisiana Bar Association