**JOSEPH A. MOLINARO, LLC**
648 Wyckoff Avenue
Wyckoff, New Jersey 07481
jam@molinarolaw.com
Bar Id. 00149 1994
201-857-3075
    and
**ROBERT A. VORT**
2 University Plaza
Hackensack, New Jersey 07601
rvort@vortlaw.com
Bar Id. 24640 1968
201-342-9501
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MSKP OAK GROVE, LLC,** a limited: liability company of Florida,              :<br>           Plaintiff,<br>                    :<br>  -vs-<br>                    :<br>**CAROL VENUTO,** individually and as executrix of the Estate of : RALPH A. VENUTO, Sr., deceased, **RALPH A. VENUTO, JR., CAROL** : **REBBECCHI, RICHARD P. VENUTO and HOLLYWOOD TANNING SYSTEMS,:  INC.,** a New Jersey corporation,<br>                    :<br>          Defendants.<br>_____: | Civil Action No. **10-6465**<br>(Hon. Jerome B. Simandle)<br><br>**STIPULATION OF FACTS** |

The parties stipulate as follows:

    1.   In 2006 one Nafar Hadis filed suit against Hollywood Tanning Systems, Inc. in the Superior Court of New Jersey.

    2.   Hollywood Tanning removed that action to the United States District Court.  In removing the action Hollywood Tanning pleaded that the amount in controversy exceeded $5,000,000.

    3.  Hollywood Tanning had one insurance policy which was issued by Travelers Insurance Company.  A copy of the policy is attached as Exhibit A.

4.   Mira Muhtadie resides in Riverside, Connecticut.

5.   Riverside, Connecticut is more than 100 miles from the courthouse in Camden New Jersey.

6.   The documents on which Carmine Gallichio will rely on, to wit, P-41 to P-61 and P-63, are authentic.  Defendants reserve their right to object to the relevance of these documents.

7.   The documents on which Kenneth Federman will rely on, to wit, P-41 to P-61 and P-63, are authentic.  Defendants reserve their right to object to the relevance of these documents.

8.   The documents, which plaintiff intends to offer into evidence, are authentic.  Defendants reserve their right to object to the relevance of these documents.

9.   The signature on the lease attached to the Kenneth Federman affidavit is the signature of Ralph Venuto, Sr.

10.   MSKP Oak Grove, LLC is a Florida limited liability company.

11.   At the inception of this action, the only member of MSKP was Babcock Florida Company, a Florida corporation whose principal place of business was in Florida.

12.   Babcock Florida Company changed its name to KE Retail Holdings, LLC on December 31, 2012.   KE Retail Holdings, LLC is organized under Florida law.  No member of KE Retail Holdings, LLC is a citizen of New Jersey.  A true copy of the filed articles of amendment is attached as Exhibit B.

13.   The amount in controversy exceeds $75,000 exclusive of interest and costs.

14.   P – 177 is a true copy of a complaint filed to declare the Estate of Ralph Venuto, Senior. insolvent.

15.   P – 178 is a true copy of an order declaring insolvent the Estate of Ralph Venuto, Sr.

Dated:   4-13-17

_____
                                    s/ Dimitri L. Karapelou
                                    Dimitri L. Karapelou
                                    Attorney for Defendants

Dated:   4-13-17

_____
                                    Robert A. Vort
                                    Attorney for Plaintiff

2

# EXHIBIT A

W-1037 03-99, W-1 100 01-03, WDO-2019 03-99, WDO-2077 03-99, WDO-2125 01-03, WEP-1098 01-03

The Declaration Pages, the signed and completed Applications, the Common Terms and Conditions, each Coverage Part purchased, and any endorsements, constitute the entire agreement between the Company and the Insu reds.

Countersigned By                                                                      Authorized Company Representative

W-1000 3/99 Page 2 of 2

T (# 3 5 9

STPAU
L
TRAVE
LERS

The
Wrap

Common Terms and Conditions

THE LIABILITY COVERAGE PARTS OF THIS POLICY ARE WRITTEN ON A CLAIMS-MADE BASIS, WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.

IN CONSIDERATION of the payment of the premium stated in the Wrap Declarations, in reliance on the statements in The Wrap Application and each Coverage Part Application and subject to all Declarations for this Policy and for each Coverage Part, the Common Terms and Conditions, all of the terms, exclusions, conditions and limitations of all purchased Coverage Parts, and all endorsements, the Company and the Insureds agree as follows:

I. TERMS AND CONDITIONS.

The Common Terms and Conditions of this Policy apply to all Coverage Parts. Unless stated to the contrary in any Coverage Part, the terms and conditions of each Coverage Part of this Policy apply only to that Coverage Part and shall not apply to any other Coverage Part of this Policy. If any provision in the Common Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

DEFINITIONS.

Whenever appearing in this Policy, words and phrases appearing in bold type shall have the meanings set forth in this provision:

A. "Coverage Part(s)" means, individually or collectively, the Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability, Fidelity, and Kidnap and Ransom/Extortion Coverage Parts, if purchased.

B. "Coverage Part Application" means the application completed for each Coverage Part and any materials submitted in connection therewith.

C. "Crime Coverage Part(s)" means, individually or collectively, the Fidelity and Kidnap and Ransom/Extortion Coverage Parts, if purchased.

D. "Defense Expenses" means reasonable and necessary legal fees and expenses incurred in the investigation, defense, settlement and appeal of a Claim, including the premium for appeal bonds regarding such Claim; but Defense Expenses shall not include salaries, wages, benefits or overhead of any Insured or any of the Insured Organization's directors, officers, members of the Board of Managers, trustees or Employees.

E. "Discrimination" means:

any actual or alleged failure or refusal to hire or employ an applicant for employment with the Insured Organization;

2. any actual or alleged termination or constructive termination of an employment relationship with the Insured Organization;

3. any actual or alleged refusal to train or promote, or demotion of, an Employee; or

4. any other act or omission by which an Insured allegedly treats one Employee differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying Employees or applicants for employment with the Insured Organization in their compensation terms, conditions, opportunities or privileges of employment;

W-1001 3/99
Page 1 of 15

T 0 3
6 0

on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance, including but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Americans With Disabilities Act or the Family Medical Leave Act.

F. "Employee" means any natural person whose labor or service is engaged by and directed by the Insured Organization and who is paid through the payroll of the Insured Organization, including part-time, seasonal and temporary workers. Leased workers and independent contractors are not Employees. The status of an individual as an Employee shall be determined as of the date of the alleged Wrongful Act, Wrongful Employment Practice, or act or event giving rise to loss under the Crime Coverage Parts.

With regard to the Fidelity Coverage Part only:

    1. "Employee" also means:

        a. any Employee for 60 days after termination of service;

        b. any natural person leased to the Insured Organization, under an agreement between the Insured Organization and a labor leasing firm, while that person is subject to the direction and control and performing services for the Insured Organization;

        c. any non-compensated natural person:

            (i) other than one who is a fund solicitor, while performing services for the Insured Organization that are usual to the duties of an Employee or officer; or

            (ii) while acting as a fund solicitor during fund raising campaigns;

        d. any natural person who is:

            (i) a trustee, officer, employee, administrator or manager, except an administrator or a manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan insured under the Fidelity Coverage Part , and

            (ii) a director, Officer-shareholder or trustee of the Insured Organization while that person is handling funds or other property of any ERISA Plan insured under the Fidelity Coverage Part.

    2. But "Employee" does not mean:

        a. any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character;

        b. any seasonal or temporary workers while having care and custody of the Insured Organization's property outside the Premises; or

        c. any director or trustee except while performing acts coming within the scope of the usual duties of an Employee or while acting as a member of any of the Insured Organization's elected or appointed committees to perform on its behalf specific, as distinguished from general, directorial acts.

G. "Employee Benefit Plan" means:

    1. any Welfare Plan which was, is now, or becomes sponsored solely by the Insured Organization or jointly by the Insured Organization and a labor organization exclusively for the benefit of Employees of the Insured Organization;

    2. any Pension Plan or other plan identified in the endorsements to this Policy;

W-1001 3/99 Page 2 of 15

T 0 3 6 1

    3. any Pension Plan for which coverage is provided pursuant to Section III.H (Changes in Exposure) of the Common Terms and Conditions.

H. "ERISA" means the Employee Retirement Income Security Act of 1974, including amendments thereto and regulations promulgated thereunder.

I. "Executive Officer" means the chairperson, chief executive officer, president, chief financial officer, in-house general counsel, chief information officer, managing director, and any equivalent executive officer of the Insured Organization. For purposes of the Employment Practices Liability Coverage Part only, Executive Officer shall also include the members of the staff of the human resources department and the staff of the corporate legal department or the staff of the general counsel's office of the
Insured Organization.

J. "Financial Insolvency" means, with respect to the Parent Corporation and each Subsidiary, the appointment of a receiver, conservator, liquidator, trustee, or similar official; or the inability of the Insured Organization financially or under applicable law to indemnify the Insured Persons.

K. "Insured Organization" means the Parent Corporation and any Subsidiary.

L. "Liability Coverage Part(s)" means, individually or collectively, the Directors and Officers Liability, Employment Practices Liability, and Fiduciary Liability Coverage Parts, if purchased.

M. "Parent Corporation" means the entity named in ITEM 1 of the Declarations for this Policy and for each Coverage Part.

N. "Pension Plan" means any plan so defined in Section 3(2) of ERISA or in any related or similar state, local or foreign law or regulation.

O. "Policy" means, collectively, the Wrap Declarations, The Wrap Application, the Common Terms and Conditions, each purchased Coverage Part, each Coverage Part Application, each Coverage Part Declarations, and any endorsements thereto.

P. "Policy Period" means the period from the Inception Date to the Expiration Date in ITEM 2 of the Wrap Declarations, or the dates set forth in the most recent Renewal Certificate with respect to the Policy, whichever period is later; in no event, however, shall the Policy Period continue past the effective date of cancellation or termination of the Policy.

Q. "Pollutants" means any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or
contaminants.

R. "Pollution" means any actual, alleged or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, escape, treatment, removal or disposal of Pollutants; or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or any action taken in contemplation or anticipation of any such regulation, order, direction or request.

S. "Related Claims" means all Claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, events, Wrongful Acts or Wrongful Employment Practices or the same or related series of facts, circumstances, situations, transactions, events, Wrongful Acts or Wrongful Employment Practices.

T. "Retaliation" means adverse employment action with regard to an Employee on account of such Employee's exercise or attempted exercise of rights protected by law, including but not limited to the Family Medical Leave Act, or on account of the Employee having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

U. "Sexual Harassment" means unwelcome sexual advances or requests for sexual favors and other verbal, physical or other conduct of a sexual nature (i) which is made a term or condition of an Employee's employment or advancement, or (ii) submission to or rejection of

which is used as a basis for decisions affecting an Employee or applicant for employment, or (iii) which has the purpose or effect of creating an intimidating, hostile or offensive work environment which unreasonably interferes with the job performance of an Employee.

W-1001 3/99 Page 3 of 15

# 70 3 6 2

V. "Single Loss" means all covered loss under the Crime Coverage Parts:

    1. caused by any Employee(s) or in which any Employee(s) is (are) concerned or implicated, either resulting from a single act or any number of such acts, regardless of when, during the period of the Crime Coverage Part such acts occurred;

    2. caused by Forgery or alteration committed by any person or in which such person is concerned or implicated, either resulting from a single act or any number of such acts, regardless of the number of Covered Instruments involved, or when, during the period of the Crime Coverage Part, such acts occurred; or

    3. resulting from an actual or attempted fraudulent or dishonest act or event or a series of related acts or events whether committed by one or more persons;

    4. resulting from any single act or series of related acts of Kidnapping, Extortion, or Detention/Hijack by one or more persons or collaborating persons; or

    5. resulting from any single casualty or event or series of related casualties or events not specified in subsections 1, 2, 3 or 4 preceding.

W. "Subsidiary" means:

    1. any corporation in which, on or prior to the Inception Date in ITEM 2 of the Wrap Declarations, the Parent Corporation owns, directly or through one or more Subsidiaries, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such corporation's directors;

    2. any limited liability company organized under the laws of any state, in which, on or prior to the Inception Date in ITEM 2 of the Wrap Declarations, the Parent Corporation owns, directly or through one or more Subsidiaries, the right to elect, appoint or designate more than fifty percent (50%) of the members of such limited liability company's Board of Managers; and

    3. subject to the terms of Section III.H, any entity that the Insured Organization forms or acquires during the Policy Period in which the Parent Corporation owns, directly or through one or more Subsidiaries, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

X. "Welfare Plan" means any plan so defined in Section 3(1) of ERISA or in any related or similar state, local or foreign law or regulation.

Y. "Workplace Harassment" means harassment, other than Sexual Harassment, which actually or allegedly creates a work environment that interferes with job performance, or creates an intimidating, hostile, or offensive working environment.

Z. "The Wrap Application" means the Wrap Application and any materials submitted in connection therewith.

AA. "Wrongful Employment Practice" means any of the following actual or alleged matters occurring in the course of and arising out of an Employee's employment or an applicant's application for employment with the Insured Organization: (1) Discrimination, (2) Sexual Harassment, (3) Wrongful Termination, (4) Retaliation, (5) Workplace Harassment, (6) breach of oral, implied or written employment agreement, (7) negligent evaluation, (8) wrongful discipline, (9) wrongful deprivation of career opportunity, (10) wrongful denial of training, (11) wrongful deprivation or denial of seniority, (12) wrongful evaluation, (13) wrongful failure to grant tenure, (14) wrongful failure to employ or promote, (15) invasion of privacy, (16) employment-related misrepresentation, (17) employment-related defamation, and (18) employment-related infliction of emotional distress.

BB. "Wrongful Termination" means actual or constructive termination of an employment relationship with the Insured Organization in a

manner or for a reason which is contrary to applicable law or in violation of a written, oral or implied agreement, other than a collective bargaining agreement, for continued employment.

CONDITIONS.

A. TERRITORY.

This insurance applies to Claims or loss occurring anywhere in the world.

W-1001 3/99 Page 4 of 15

r 0 3 6 3

B. RETENTIONS.

1. Liability Coverage Parts

The Company's liability under any Liability Coverage Part with respect to Loss arising from any single Claim shall apply only to that part of such Loss which is excess of the applicable Retention set forth in the Declarations for such Coverage Part. If different parts of Loss arising from a single Claim are subject to different Retentions, the applicable Retentions will be applied separately to each part of such Loss, but the sum of such Retentions shall not exceed the largest applicable Retention. The Insureds shall bear uninsured at their own risk the amount of any applicable Retention. The Company shall have no obligation to pay Loss, including Defense Expenses, until the Retention amount has been paid by the Insured; however the Company may, at its sole discretion, pay all or part of the Retention amount on behalf of any Insured, in such event, the Insureds agree to repay the Company any amounts so paid.

2. Crime Coverage Parts

The Company will not pay for any loss under any Insuring Agreement of the Crime Coverage Parts unless the amount of loss exceeds the Retention for the Insuring Agreements in ITEM 2 of the Crime Coverage Part Declarations. The Company will then pay for the amount of loss in excess of the Retention subject to any applicable Aggregate Limit(s) of Liability stated in ITEM 4 of the Wrap Declarations and/or the Coverage Part Limit(s) of Liability and Single Loss Limits of Liability stated in ITEM 2 of the Crime Coverage Part Declarations. This provision does not apply to legal expenses paid under Insuring Agreement B of the Fidelity Coverage Part. In the event more than one Retention could apply to the same loss, only the highest Retention may be applied.

C. LIMITS OF LIABILITY.

1. Aggregate Limit(s) of Liability

Regardless of the number of persons or entities bringing Claims or the number of persons or entities who are Insureds, and regardless of when payment is made by the Company:

a. If the Aggregate Limit of Liability for all purchased Coverage Parts is applicable as provided in ITEM 4(a) of the Wrap Declarations, the Company's maximum limit of liability in a single Policy Period for all Claims, including Related Claims, under all applicable Liability Coverage Parts and all loss under all applicable Crime Coverage Parts shall not exceed the Aggregate Limit of Liability for all purchased Coverage Parts stated in ITEM 4(a) of the Wrap Declarations.

b. If the Aggregate Limit of Liability for all purchased Liability Coverage Parts is applicable as provided in ITEM 4(b) of the Wrap Declarations, the Company's maximum limit of liability in a single Policy Period for all Claims, including Related Claims, under all applicable Liability Coverage Parts shall not exceed the Aggregate Limit of Liability for all purchased Liability Coverage Parts stated in ITEM 4(b) of the Wrap Declarations.

c. If the Aggregate Limit of Liability for all purchased Crime Coverage Parts is applicable as provided in ITEM 4(c) of the Wrap Declarations, the Company's maximum limit of liability in a single Policy Period for all loss under all applicable Crime Coverage Parts shall not exceed the Aggregate Limit of Liability for all purchased Crime Coverage Parts stated in ITEM 4(c) of the Wrap Declarations.

2. Coverage Part Limit(s) of Liability

Regardless of the number of persons or entities bringing Claims or the number of persons or entities who are Insureds, and regardless of when payment is made by the Company; and further subject to any applicable Aggregate or Single Loss Limit(s) of Liability:

W-1001 3/99 Page 5 of 15

0 3 6 4

If Coverage Part Limit(s) of Liability are applicable for a Coverage Part as provided in ITEM 3 of the Wrap Declarations, the Company's maximum limit of liability for all Claims, including Related Claims, under each applicable Liability Coverage Part or all loss under each applicable Crime Coverage Part in a single Policy Period shall not exceed the Coverage Part Limit of Liability stated in the Declarations for each applicable Coverage Part. In the event that a Claim or loss triggers more than one Coverage Part, the Company's maximum limit of liability shall not exceed the highest available remaining Coverage Part Limit of Liability of the applicable Coverage Parts.

3. Single Loss Limit(s) of Liability

Regardless of the number of persons or entities bringing Claims or the number of persons or entities who are insureds, and regardless of when payment is made by the Company; and further subject to any applicable Aggregate or Coverage Part Limit(s) of Liability:

If a Single Loss Limit of Liability for each Insuring Agreement is applicable for the Crime Coverage Part(s) as provided in ITEM 2.B. of the Declarations for the Crime Coverage Parts, the Company's maximum limit of liability for each Single Loss under the applicable Insuring Agreement shall not exceed the Single Loss Limit of Liability for the applicable Insuring Agreement. In the event that a loss triggers more than one Insuring Agreement in any of the Crime Coverage Parts, the Company's maximum limit of liability for each Single Loss shall not exceed the highest available Single Loss Limit of Liability for the applicable Insuring Agreements.

4. Other Provisions

a. If any Claim against the Insureds gives rise to coverage both under this Policy and under any other liability policy or similar insurance issued by the Company or any of its affiliates to any Outside Entity, the Company's maximum aggregate limit of liability under all such policies for all Loss, including Defense Expenses, from such Claim shall not exceed the largest single available limit of liability under such policy, including this Policy.

b. Defense Expenses incurred by the Company or by the Insureds in defense of a Claim are part of and not in addition to all applicable Limit(s) of Liability. The payment by the Company or by the Insureds of Defense Expenses reduces all applicable Limit(s) of Liability.

c. All Aggregate and Coverage Part Limit(s) of Liability applicable to this Policy or a Coverage Part shall be reduced by the amount of any payment made under the terms of each applicable Coverage Part. If the Aggregate or Coverage Part Limit(s) of Liability applicable to this Policy or a Coverage Part are exhausted by the payment of amounts covered under this Policy or the Coverage Part, the premium under the Policy or Coverage Part will be fully earned, all obligations of the Company under the Policy or Coverage Part will be completely fulfilled and exhausted, including any duty to defend, and the Company shall have no further obligations of any kind or nature whatsoever under this Policy or Coverage Part.

d. The purchase of any Extended Reporting Period shall not increase or reinstate any applicable Limit(s) of Liability, and said Limit(s) of Liability shall be the Company's maximum liability for the Policy Period and Extended Reporting

Period, combined.

e. Regardless of the number of years any of the Crime Coverage Parts or similar insurance issued by the Company or its affiliates remains in force or the number of premiums paid, no Limit of Liability under any Crime Coverage Part or Insuring Agreement thereunder cumulates from year to year or period to period.

f. In the event that any director of the Insured Organization who is not an Employee thereof is an Insured Person under any other similar policy issued by the Company and a loss, as respects such director, is reported under the Kidnap and Ransom/Extortion Coverage Part of this Policy and one or more such other policies, then the aggregate liability of the Company for each Single Loss shall not be cumulative and shall in no event exceed the highest Limits of Liability applicable to each Single Loss under the Kidnap and Ransom/Extortion Coverage Part or such other applicable policy.

D. DEFENSE, INVESTIGATION AND SETTLEMENT.

1. If duty-to-defend coverage is provided with respect to the Liability Coverage Parts as indicated in ITEM 5 of the Wrap Declarations:

W-1001 3/99
Page 6 of 15

# T & 3
# 6 5

a. The Company shall have the right and duty to defend any Claim covered by such Liability Coverage Part, even if any of the allegations are groundless, false or fraudulent; provided however, that the Company shall not be obligated to defend or continue to defend any Claim after the applicable Limit of Liability for such Coverage Part has been exhausted by payment of Loss; and

b. The Insured shall cooperate with the Company and, upon the Company's request, assist in making settlements and in defense of Claims and in enforcing rights of contribution or indemnity against any person or entity which may be liable to the Insured because of an act or omission covered under this Policy, shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

2. If reimbursement coverage is provided with respect to the Liability Coverage Parts as indicated in ITEM 5 of the Wrap Declarations:

a. The Company has no duty to defend any Claim. It shall be the duty of the Insureds to defend Claims. The Company shall have the right to associate with the Insureds in the investigation, defense and settlement, including but not limited to the negotiation of a settlement of any Claim that appears reasonably likely to be covered in whole or in part by this Policy and the selection of appropriate defense counsel;

b. Upon written request, the Company will advance Defense Expenses for which such Liability Coverage Part provides coverage. Such advanced payments by the Company shall be repaid to the Company by the Insureds severally according to their respective interests in the event and to the extent that the Insureds shall not be entitled to payment of such Loss under the Policy. As a condition of any payment of Defense Expenses or other Loss under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any Defense Expenses or other Loss paid to or on behalf of any Insured if it is finally determined that any such Loss incurred by such Insured is not covered under the Policy.

3. The Insureds shall not settle or offer to settle any Claim, incur any Defense Expenses, assume or admit any liability, or otherwise assume any obligation without the Company's prior written consent, such consent not to be unreasonably withheld.

The Company shall not be liable for any settlement, Defense Expenses, assumed obligation or admission to which it has not consented.

4. The Company may, with the written consent of the Insured, make such settlement or compromise of any Claim as the Company deems expedient, and if the Insured shall refuse to consent to the settlement of any Claim as recommended by the Company based upon a judgment or a bona fide offer of settlement, then the Insured thereafter shall negotiate and/or defend such Claim independently of the Company and on the Insured's own behalf and solely at the expense of the Insured; in such event, all Defense Expenses and other costs and expenses incurred or paid by the Insured after the date the Insured refused to consent to settlement as recommended by the Company shall be the sole responsibility of the Insured and shall not be recoverable under this Policy, and the Insured also shall be solely responsible for all Loss in excess of the lower of the amount for which settlement could have been made as recommended by the Company or the remaining portion of the applicable Limit(s) of Liability.

5. The Insureds will provide the Company with all information, assistance and cooperation that it reasonably requests, and will do nothing that my prejudice its position or potential or actual rights of recovery. The Company will be subrogated to the extent of any payment to all of the rights of recovery of the Insureds. The Insureds will execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Company effectively to bring suit in their name. The obligations of the Insureds under this subsection survive the Policy.

6. With regard to the Kidnap and Ransom/Extortion Coverage Part, the Company shall have the right to investigate, negotiate or settle any claim or suit subject to coverage under that Coverage Part, or to take over the conduct of the defense thereof. The Insured shall cooperate with the Company to these ends and shall not admit liability in any such claim or suit. The Insured shall use due diligence and do all things reasonably practical to avoid or diminish any loss.

E. CLAIMS.

1. A Claim shall be deemed to have been made on the date of service upon or receipt of notice by any Insured of the written demand or proceeding, whichever occurs earlier.

W-1001 3/99 Page 7 of 15

T 0 3 6 6

2. All Related Claims are a single Claim for purposes of all applicable Liability Coverage Parts, and all Related Claims shall be deemed to have been made at the time the first of such Related Claims was made, regardless of whether such date is
before or during the Policy Period.

F. CLAIMS MADE EXTENSION CLAUSE.

With respect to the Liability Coverage Parts, if, during the Policy Period, the Insured shall first become aware of any Wrongful Act or Wrongful Employment Practice which may subsequently give rise to a Claim under a purchased Liability Coverage Part, and shall, during such Policy Period, give written notice thereof as set forth herein to the Company, then any Claim which subsequently is made against the Insured with regard to such Wrongful Act or Wrongful Employment Practice shall be deemed to have been first made during such Policy Period. The written notice shall include the particulars of such Wrongful Act or Wrongful Employment Practice, including all facts constituting the alleged Wrongful Act or Wrongful Employment Practice, the identity of each person allegedly involved in or affected by the Wrongful Act or the Wrongful Employment Practice, and the dates of the alleged event(s), all of which shall be provided as soon as practicable, but in any event prior to the end of the Policy Period. All notices under this subsection must be sent by certified mail or prepaid overnight mail to the address set forth in ITEM 5 of the applicable Liability Coverage Part Declarations. Notice of any actual Claim which is subsequently made with respect to such Wrongful Act or Wrongful Employment Practice must be given in accordance with Section III .K of the Common Terms and

Conditions.

G. SPOUSAL EXTENSION.

1. The coverage afforded under the Liability Coverage Parts will, subject to all of their terms, conditions, limitations and exclusions, be extended to apply to Loss resulting from a Claim made against a person who, at the time the Claim is made, is a lawful spouse of an Insured Person, but only if:

a. the Claim against such spouse results from a Wrongful Act or Wrongful Employment Practice actually or allegedly committed by the Insured Person, to whom the spouse is married, and

b. such Insured Person and his or her spouse are represented by the same counsel in connection with such Claim.

2. No spouse of an Insured Person will, by reason of this subsection, have any greater right to coverage under any of the Liability Coverage Parts than the Insured Person to whom such spouse is married.

3. The Company shall not be liable under this subsection to make any payment of Loss in connection with any Claim against a spouse of an Insured Person for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse.

h. CHANGES IN EXPOSURE.

1. Formation or Acquisition of Subsidiary, Premises or Pension Plan

a. With regard to the Liability Coverage Parts, if, during the Policy Period, the Insured Organization forms or acquires a Subsidiary or Pension Plan (other than an employee stock ownership plan) which is then solely sponsored by the Insured Organization or jointly by the Insured Organization and a labor organization exclusively for the benefit of the Employees of the Insured Organization, the Policy will provide coverage for that acquired or formed Subsidiary or Pension Plan and their respective Insured Persons, subject to all other terms and conditions of this Policy, but only for Claims for Wrongful Acts or Wrongful Employment Practices under the Liability Coverage Parts which occur wholly during the time that the Insured Organization is sole sponsor with regard to the Pension Plan or owns more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors, provided written notice of such formation or acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for the acquired or formed Subsidiary or Pension Plan shall not be afforded following such 90-clay period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the Parent Corporation has paid the Company any additional premium as may be required by the Company.

W-1001
3/99 Page 8
of 15

70 3
6 7

The 90-day notice requirement shall not apply, however, if (1) the assets of the acquired or formed Subsidiary do not exceed ten percent (10%) of the total assets of the Insured Organization as reflected in the Insured Organization's most recent audited consolidated financial statements, (2) the total assets of the acquired or formed Pension Plan, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the Insured Organization, or (3) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period.

Notwithstanding the foregoing, no coverage shall be provided pursuant to this Subsection 111.1-1.1. for any employee stock ownership plan or any natural person or Insured Organization with respect thereto unless the Company, by specific written endorsement hereto, agrees to provide such coverage. Any such coverage shall be at the terms and conditions set forth in the endorsement and for such additional premium as may be required by the Company.

      b. With regard to the Crime Coverage Parts, if through consolidation or merger with, or purchase of assets of, some other entity any additional persons become Employees or the Insured Organization acquires the use and control of any additional Premises, or if the Insured Organization acquires an additional Subsidiary, any insurance afforded for Employees, Premises or Subsidiaries also applies to those additional Employees, Premises, or Subsidiaries, provided that the Insured (1) gives the Company written notice within ninety (90) days thereafter; and (2) pays the Company an additional premium. Any Pension Plan or Welfare Plan acquired a. above and sponsored exclusively by the Insured Organization shall be included as an Insured(s) under Insuring Agreement G of the Fidelity Coverage Part. The 90-day notice requirement shall not apply and the Company agrees to extend automatically such coverage under the Crime Coverage Parts, without payment of an additional premium, to any consolidatation or merger with, or purchase of assets of, some other entity or Subsidiary (1) the assets of which do not exceed ten percent (10%) of the Insured Organization's total assets, or (2) which occurs less than ninety (90) days prior to the end of the Policy Period, subject to all other terms and conditions of the Crime Coverage Parts and only for so long as the Coverage Part(s) remain in effect as to the Insured Organization.

      2. Merger of Plans

If, during the Policy Period, a Welfare Plan or Pension Plan for which coverage is provided under the Fiduciary Liability Coverage Part is merged with another Welfare Plan or Pension Plan for which coverage is also provided under that Coverage Part, the
Fiduciary Liability Coverage Part shall continue to provide coverage for both plans, subject to all other terms and conditions of that Coverage Part and only for so long as that Coverage Part remains in effect as to the Parent Corporation.

If, during the Policy Period, a Welfare Plan or Pension Plan for which coverage is provided under the Fiduciary Liability Coverage Part ("Covered Plan") is merged with another Welfare Plan or Pension Plan for which coverage is not provided under this
Coverage Part ("Uncovered Plan"), the Fiduciary Liability Coverage Part shall continue to provide coverage for only the Covered Plan, subject to all other terms and conditions of the Fiduciary Liability Coverage Part and only for so long as that Coverage Part remains in effect as to the Parent Corporation, but only for Claims with regard to Wrongful Acts which occurred prior to the date of such merger.

      3. Sale or Termination of Plan

If, prior to or during the Policy Period, any Welfare Plan or Pension Plan, other than an employee stock ownership plan not identified in the endorsement, is sold or terminated, the Fiduciary Liability Coverage Part shall provide coverage for such plan, subject to all other terms and conditions of the Fiduciary Liability Coverage Part and only for so long as the Fiduciary Liability Coverage Part remains in effect as to the Parent Corporation. The coverage provided pursuant to this Subsection 11I.H.3 shall apply only:

      a. for Claims with regard to Wrongful Acts which occurred prior to the date of such sale or termination,

      b. while such plan was sponsored solely by the Parent Corporation or jointly by the Parent Corporation and a labor organization exclusively for the benefit of employees of the Parent Corporation, and

      c. if notice of such sale or termination is given to the Company prior to the end of such Policy Period.

      4. Change of Control

If during the Policy Period, any of the following events occur:

W-1001 3/99 Page 9 of 15

# T O 3 68

      a. the acquisition of the Parent Corporation, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the Parent Corporation into or with another entity such that the Parent Corporation is not the

surviving entity;

      b. the appointment of a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official, for or with respect to the Parent Corporation; or

      c. the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least fifty percent (50%) of the directors of the Parent Corporation

(hereinafter "Change of Control"), coverage under the Policy shall continue in full force and effect, subject to all other terms and conditions of the Policy, but only with respect to Claims for Wrongful Acts or Wrongful Employment Practices or loss under the Crime Coverage Parts committed or incurred before such Change of Control, but coverage will cease with respect to Claims for
Wrongful Acts and Wrongful Employment Practices or loss under the Crime Coverage Parts committed or incurred after such Change of Control, and further provided that any loss under the Kidnap and Ransom/Extortion Coverage Part must be discovered and reported to the Company within twelve months of the Change of Control. After a Change of Control, the Liability Coverage Parts may not be cancelled, regardless of Section III.J. of the Common Terms and Conditions, and the entire premium for the Liability Coverage Parts will be deemed fully earned.

I. EXTENDED REPORTING PERIOD.

If the Company or the Parent Corporation fails or refuses to renew an applicable Liability Coverage Part or if the Parent Corporation cancels an applicable Liability Coverage Part, the Parent Corporation shall have the right, upon payment of the additional premium as determined by ITEM 4 of the applicable Liability Coverage Part Declarations, to the period of time set forth in ITEM 4 of that Coverage l'art Declarations following the effective date of such nonrenewal or termination ("the Extended Reporting Period") in which to give the Company written notice of Claims first made during the Extended Reporting Period against persons or entities who at the effective date of nonrenewal or cancellation were Insureds, but only for Wrongful Acts or Wrongful Employment Practices occurring wholly prior to the effective date of the nonrenewal or cancellation and which otherwise would be covered by the applicable Liability Coverage Part, subject to the following conditions:

    1. The Extended Reporting Period shall not provide a new, additional or renewed limit(s) of liability. The Company's total liability for all Claims made during the Extended Reporting Period shall be limited to the remaining portion of the maximum aggregate limit of liability set forth in ITEM 4 of the Wrap Declarations and, if applicable, ITEM 2 of the applicable Liability Coverage Part Declarations as of the effective date of the nonrenewal or cancellation;

    2. The entire premium for the Extended Reporting Period, if purchased, shall be deemed to have been fully earned at the commencement of such Extended Reporting Period;

    3. Section III.F of the Common Terms and Conditions ("Claims Made Extension Clause") does not apply and may not be invoked during the Extended Reporting Period; and

    4. The right to elect the Extended Reporting Period under this subsection 111.1 shall termina e unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days of the effective date of the nonrenewal or cancellation.

J. CANCELLATION.

    1. The Company may cancel this Policy or any Coverage Part for failure to pay a premium when due, in which case twenty (20) days written notice shall be given to the Parent Corporation, unless however payment is made within (20) days of the Parent Corporation's receipt of such notice of cancellation. The Company shall have the right to the premium amount for the portion of the Policy Period during which the Policy or Coverage Part was in effect.

W-1001 3/99 Page 10 of 15

r'
*L12 3d 6l) 99*

2. The Parent Corporation may cancel this Policy or any Coverage Part by mailing the Company written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Wrap Declarations, such cancellation will be effective.

In the event the Parent Corporation cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

3. The Company will not be required to renew this Policy or any Coverage Part upon its expiration. If the Company elects not to renew this Policy or any Coverage Part, it will deliver or mail to the Parent Corporation written notice to that effect at least sixty (60) days before the Expiration Date set forth in ITEM 2(b) of the Wrap Declarations.

K. INSURED'S DUTIES IN THE EVENT OF A CLAIM.

I. As to all Liability Coverage Parts, it is a condition precedent to all insurance provided thereunder that:

a. In the event of a Claim made against any Insured, written notice concerning all particulars of such Claim, including all facts constituting the alleged Wrongful Act or Wrongful Employment Practice, the identity of each person allegedly involved in or affected by such Wrongful Act or Wrongful Employment Practice, and the date(s) of the alleged events, shall be provided to the Company as soon as practicable; and

b. All notices under this subsection must be sent by certified mail or prepaid overnight mail to the address set forth in ITEM 5 of the applicable Liability Coverage Part Declarations.

2. As to the Fidelity Coverage Part, it is a condition precedent to all insurance provided thereunder that:

a. After discovery by the Insured Organization or any of its partners, officers or directors of a loss or a situation that may result in loss of, or loss from damage to, Money, Securities and other property that would be covered under the Fidelity Coverage Part, the Insured Organization must:

(i) provide the Company with written notice as soon as possible and if the Insured Organization has reason to believe that any loss (except for loss under Insuring Agreements A or B of the Fidelity Coverage Part) involves a violation of law, the Insured Organization must also notify the police;

(ii) submit to examination under oath at the Company's request and give the Company a signed statement of the Insured Organization's answers;

(iii) give the Company a detailed, sworn proof of loss within 120 days. Proof of loss under Insuring Agreement B of the Fidelity Coverage Part must include an affidavit of forgery setting forth the amount and cause of loss and (1) the original instrument(s) or (2) a copy of the instrument(s) involved in that loss; and

(iv) cooperate with the Company in the investigation and settlement of any claim.

b. The Company waives the written notice requirement if the amount of loss does not exceed 25% of the Retention for the applicable Fidelity Coverage Part Insuring Agreement.

3. As a condition precedent to the Company's liability under Insuring Agreement A of the Kidnap and Ransom/Extortion Coverage Part:

a. The Insured Organization shall have approved the payment of Ransom Monies. In the event of a Kidnapping or Extortion of an Insured Person or Guest during the Policy Period, and prior to the payment of Ransom Monies, the Insured shall make every reasonable effort to:

(i) determine that the Kidnapping or Extortion has actually occurred;

(ii) give immediate oral or written notice to the Company and Control Risks Group at the addresses

provided in Item 3 of the Kidnap and Ransom/Extortion Coverage Part Declarations; and

W-1001 3/99

Page 11 of 15

# 1-0
# 37 0

       (iii) notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction thereover of the demand for Ransom Monies and comply with their recommendations and instructions.

      b. As additional conditions precedent to the Company's liability under the Kidnap and Ransom/Extortion Coverage Part, the Insured must:

       use all due diligence and do all things reasonably practicable to avoid or diminish any loss(es) insured under the Kidnap and Ransom/Extortion Coverage Part;

       (ii) use all reasonable efforts not to disclose the existence of the Kidnap and Ransom Coverage Part;

       (iii) establish a procedure in writing and shall furnish a copy of that procedure to at least three senior officials, so as to enable those persons to comply with this subsection; and

       (iv) immediately notify the Company of any claim or suit potentially subject to coverage under the Kidnap and Ransom/Extortion Coverage Part, and shall not admit liability in any such claim or suit.

L. ACTION AGAINST THE COMPANY.

    l. With regard to the Liability Coverage Parts only:

      a. No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial, or by written agreement of the Insured, the claimant and the Company.

      b. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy, in a court of competent jurisdiction in the United States, its territories or possessions, or Canada, to the extent of the insurance afforded by this Policy. No person or organization shall have any right under this Policy to join the Company as a party to any action against the Insured to determine the Insured's liability, nor shall the Company be impleaded by an Insured or said Insured's legal representative. Bankruptcy or insolvency of any Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

    2. With regard to the Crime Coverage Parts only:

      a. Fidelity Coverage Part: An Insured may not bring any legal action against the Company involving loss (l) unless it has complied with all the terms of this Policy; (2) until 90 days after it has filed proof of loss with the Company; and (3) unless brought within 2 years from the date the Insured Organization discovered the loss.

      b. Kidnap and Ransom/Extortion Coverage Part: No suit, action or proceeding for recovery of any claim under this Coverage Part shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this Coverage Part shall have been complied with and the same be commenced within twenty-four (24) months next after a claim for actual Loss or Expenses has been reported to the Company by the Insured.

M. OTHER INSURANCE.

This Policy shall apply only as excess insurance over, and shall not contribute with, any other insurance (whether collectible or not), including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically in excess of this Policy. This Policy will not be subject to the terms of any other insurance.

N. CHANGES.

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or change in any part of this Policy, or estop the Company from asserting any right under the terms, conditions and limitations of this Policy, nor may the terms, conditions and limitations of this Policy be waived or changed, except by a written endorsement issued by the Company to form a part of this Policy.

NV-1001 3/99 Page 12 of 15

# T 7 1

O. ASSIGNMENT.

Assignment of interest under this Policy shall not bind the Company, until its consent is endorsed hereon, except in the case of the death of individuals included as additional Insureds under the Fidelity Coverage Part. In that event, the deceased individual's rights and duties will be transferred to his legal representative but only while acting within the scope of duties as his legal representative.
Until the legal representative is appointed, anyone having proper temporary custody of the deceased individual's property will have his rights and duties but only with respect to that property.

P. REPRESENTATIONS.

By acceptance of this Policy, each Insured represents that the statements contained in The Wrap Application, any Coverage Part Application, or any other application completed for the proposed Policy, all of which are deemed to be attached to, incorporated into, and form a part of, this Policy, are said Insured's agreements and representations, that such representations are material to the Company's acceptance of this risk, that this Policy is issued in reliance upon the truth of such representations, and that this Policy embodies all agreements existing between said Insured and the Company or any of its agents relating to this insurance.

In the event that any statement or representation in The Wrap Application or Liability Coverage Part Application is untrue, the Policy or such Liability Coverage Part(s), respectively shall be void and of no effect whatsoever, but only with respect to:

   any Insured Person who knew, as of the Policy Inception Date, that the statement or representation was untrue;

   2. the Insured Organization, to the extent it indemnities any such Insured Person under any Liability Coverage Part; and

   3. the Insured Organization, under any Liability Coverage Part, if any Executive Officer knew, as of the Policy Inception Date, that the statement or representation was untrue.

Whether an Insured Person or Executive Officer had such knowledge shall be determined without regard to whether the Insured Person or Executive Officer actually knew The Wrap Application or applicable Coverage Part Application contained such untrue statement or representation.

With regard to the Crime Coverage Parts, this insurance is void in any case of fraud by the Insured Organization as it relates to this insurance at any time. It is also void if the Insured Organization or any other Insured, at any time, intentionally conceals or misrepresents a material fact concerning:

   a. this insurance;

   b. the Money, Securities or other property;

c. the Insured's interest in the Money, Securities or other property; or

d. a claim under this insurance.

Q.     CONTINUITY OF COVERAGE.

The Liability Coverage Parts shall not apply to any Claims based upon, alleging, arising out of, directly or indirectly resulting from, or in any way relating to any fact, circumstance, situation, transaction, event, Wrongful Act, or Wrongful Employment Practice about which an Insured under the Directors and Officers Liability and Fiduciary Coverage Parts or an Executive Officer under the Employment Practices Liability Coverage Part had knowledge prior to the Continuity Date set forth in ITEM 7 of the Declarations for each applicable Liability Coverage Part.

W-1001 3/99 Page 13 of 15

R. AUTHORIZATION.

By acceptance of this Policy, the Parent Corporation agrees to act on behalf of all Insureds with respect to the payment of premiums, the receiving of any return premiums that may become due under the Policy, and the receiving of notices of cancellation, nonrenewal, or change of coverages, and the Insureds each agree that they have, individually and collectively, delegated such authority exclusively to the Parent Corporation; provided, however, that nothing herein shall relieve the Insureds, and each of them, from giving any notice to the Company that is required under Section I11.17 and III.K of the Common Terms and Conditions of this Policy.

S. LIBERALIZATION.

If during the period that insurance is in force under this Policy, the Company shall be required, by law or by insurance supervisory authorities of the state in which the Policy was issued, to make any changes in the form of this Policy, by which the insurance afforded by this Policy could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the Insured hereunder as though such endorsement or substitution of form had been made.

T. ENTIRE AGREEMENT.

The Insureds agree that this Policy, including any endorsements, The Wrap Application, and each Coverage Part Application, constitutes the entire agreement between them and the Company or any of its agents relating to this insurance.

U. HEADINGS.

The descriptions in the headings and sub-headings of this Policy are solely for convenience and form no part of the terms and conditions of coverage.

V. VALUATION.

   1. Money

All premiums, Limits of Liability, Retentions, Loss, Defense Expenses, and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement or invoice is denominated, or other element of Loss or Defense Expenses is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the Wall Street Journal on the date the final judgment is entered, the settlement agreement is executed, the invoice is dated, or the other element of Loss or Defense Expenses is due, respectively. The Company may, at its option, pay for loss of Money issued by any country other than the United States of America at face value in the Money issued by that country.

   2. Securities

Loss of Securities are expressed and payable by their value at the close of business on the day the loss was discovered. The Company may, at its option:

   a. pay the value of such Securities or replace them in kind, in which event the Insured must assign to the Company all its rights, title and interest in and to those Securities; or

   b. pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the Securities. However, the Company will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the Securities at the close of business on the day the loss was discovered or any applicable remaining limit of liability.

T0 3 7 3

W-1001 3/99 Page 14 of 15

   3. Property

     a. Loss of, or loss from damage to, other property or loss from damage to the Premises are expressed and payable by the:

       actual cash value of the property on the day the loss was discovered;

      (ii) cost of repairing the property or Premises; or

      (iii) cost of replacing the property with property of like kind and quality.

The Company may, at its option, pay the actual cash value of the property or repair or replace it. If the Company cannot agree with the Insured upon the actual cash value or the cost of repair or replacement, the value or cost will be determined by arbitration.

b. The Company may, at its option, pay for loss of, or loss from damage to, property other than Money:

in the Money of the country in which the loss occurred; or

(ii) in the United States of America dollar equivalent of the Money of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered based on the New York foreign exchange selling rates as quoted at 3:00 PM Eastern Standard Time.

c. Any property that the Company pays for or replaces becomes its property.

(xxiii) RECOVERIES.

1. All recoveries from third parties for payments made under this Policy shall be applied (after first deducting the costs and expenses incurred in obtaining such recovery) in the following order of priority:

a. the Insureds shall first be reimbursed for the amount they have paid which would have been paid under the Policy but for the fact that it is in excess of the applicable Limit(s) of Liability under this Policy;

b. the Company shall then be reimbursed for the amount paid under this Policy, and

c. any remaining sum shall be applied towards reimbursement of the Retention borne by the Insured under this Policy.

2. Recoveries do not include any recovery:

a. from insurance, suretyship, reinsurance, security or indemnity of the Company; or

b. with regard to the Fidelity Coverage Part, of original Securities after duplicates of them have been issued.

3. The Insured must transfer to the Company all of its rights of recovery against any person or organization for any loss under the Fidelity Coverage Part sustained by the Insured and for which the Company has paid or settled. The Insured must also do everything necessary to secure those rights and do nothing after loss to impair them.

IN WITNESS WHEREOF, the Company has caused this Policy to be signed by its authorized Company officers at Hartford, CT.

*14.4,,eL*

Executive Vice President Corporate Secretary

W-1001 3/99 Page 15 of 15

0 3 7 4

The Wrap

M'STPAL/L
1W..
TRAVELERS

RENEWAL CERTIFICATE

Travelers Casualty and Surety Company of America
llartford, CT 06183
(A Stock Insurance Company, herein called the Company)

POLICY NO. 104540889

NOTE: THE DIRECTORS AND OFFICERS LIABILITY, EMPLOYMENT PRACTICES LIABILITY AND FIDUCIARY
LIABILITY COVERAGE PARTS ARE WRITTEN ON A CLAIMS-MADE BASIS. THOSE COVERAGE PARTS COVER
ONLY CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING
PERIOD, IF PURCHASED. THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE
REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION.

PLEASE READ THE ENTIRE POLICY CAREFULLY.

| | |
|---|---|
| ITEM 1. | PARENT CORPORATION and PRINCIPAL ADDRESS |
| | Hollywood Tanning Systems |
| | 1 120 Rt 73 S. Suite 400 |
| | MOUNT LAUREL, NJ 08054 |
| ITEM 2. | POLICY PERIOD: |
| | (a) Inception Date: May 31, 2006 (b) Expiration Date: May 31, 2007 |
| | standard time both dates at the Principal Address stated in ITEM 1. |
| ITEM 3. | PREMIUM FOR THE POLICY PERIOD: $26,007.30 |
| | NOTICE: A state surcharge applies. Please refer to your billing statement. |
| ITEM 4. | EXTENDED REPORTING PERIOD (This renewal certificate modifies insurance provided under the |
| | following Coverage Parts as indicated by ): |
| | Directors & Officers Coverage Part: months for % of that part of the Policy Period Premium for |
| | the Directors & Officers Liability Coverage Part. |
| | (If exercised, in accordance with Section 111.1. of the Common Terms and Conditions.) |
| | Employment Practices Liability Coverage Part: months for % of that part of the Policy Period |
| | Premium for the Employment Practices Liability Coverage Part. |
| | (If exercised, in accordance with Section 111.1. of the Common Terms and Conditions.) |

| | |
|---|---|
| | Fiduciary Liability Coverage Part: months for % of that part of the Policy Period Premium |
| | for the Fiduciary Liability Coverage Part. |
| | (If exercised, in accordance with Section 111.1. of the Common Terms and Conditions.) |

1- 0 3 7 5

ITEM 5. ENDORSEMENTS ATTACHE!) TO THIS POLICY AT RENEWAL:

    W-1037 (03-99)

In consideration of the stated renewal premium, the policy is renewed for the Policy Period indicated.

Countersigned By

W-1003 (12-00)

| C7 6



ST
PAUL
TRAVE
LERS

IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND
BROKER COMPENSATION

For information about how St. Paul Travelers compensates
independent agents and brokers, please visit
www.StPaulTravelers.com, or you may request a written copy
from Marketing at One Tower Square, 2GSA, Hartford,
Connecticut 061 83; Fax (860) 954 - 5987

ILT-1037 (04-05)

T 03 77

STPAUL
TRAVELERS

The Wrap

Directors and Officers Liability Coverage Part Declarations                    Policy No.104540889

THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED
IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.

| | |
|---|---|
| ITEM 1 | PARENT CORPORATION: |
| | Hollywood Tanning Systems |
| | Principal Address: |
| | 1 120 Rt 73 S. Suite 400 |
| | MOUNT LAUREL, NJ 08054 |
| ITEM 2 | COVERAGE PART LIMIT OF LIABILITY (inclusive of Defense Expenses): |
| | (maximum limit of liability for all Claims under this Coverage Part.) |
| ITEM 3 | RETENTIONS (inclusive of Defense Expenses): |
| | A. $0.00 under Insuring Agreement A. for each Insured Person for each Claim. |
| | B. I. $25,000.00 under Insuring Agreement B.1. for each Claim. |
| | B. 2. $25,000.00 under Insuring Agreement B.2. for each Claim. |
| ITEM 4 | EXTENDED REPORTING PERIOD: |
| | 12 months for 100% of that part of the Policy Period Premium for the Directors and Officers Liability Coverage Part. |
| | (If exercised, in accordance with Section WI of the Common Terms and Conditions.) |
| ITEM 5 | NOTICE UNDER SECTIONS III.F. AND III.K. OF THE COMMON TERMS AND CONDITIONS |
| | MUST BE ADDRESSED TO: |
| | Travelers Property Casualty |
| | Bond Claim Department |
| | One Tower Square |
| | Hartford, Connecticut 06183-9062 |
| ITEM 6 | PRIOR AND PENDING PROCEEDING DATE: |
| | May 31, 2003 |
| | (If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |

| ITEM 7 | CONTINUITY DATE: |
|---|---|
| | May 31, 2003 |
| | (If no Continuity Date is entered above, the Continuity Date shall be the Inception Date shown in ITEM 2 |
| | of the Wrap Declarations.) |

WDO-1000 12/00

**0 3 7.8**

STPAUL

eiTs,

TRAVELERS

The Wrap

## Directors and Officers Liability Coverage Part

THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED
IN THE LIMIT OF LIABILITY. PLEASE READ IT CAREFULLY.

I. INSURING AGREEMENTS.

A. The Company shall pay on behalf of the Insured Persons Loss resulting from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts, including Wrongful Employment Practices, except for Loss which the Insured Organization pays to or on behalf of the Insured Persons as indemnification.

B. The Company shall pay on behalf of the Insured Organization:

1. Loss resulting from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts, including Wrongful Employment Practices, which the Insured Organization pays to or on behalf of the Insured Persons as indemnification; and

2. Loss resulting from Claims first made during the Policy Period against the Insured Organization for Wrongful Acts other than Wrongful Employment Practices.

DEFINITIONS.

Whenever appearing in this Coverage Part, words and phrases appearing in bold type shall have the meanings set forth in this provision:

A. "Claim" means:

1. a written demand for monetary or non-monetary relief;

2. a civil proceeding commenced by service of a complaint or similar pleading;

3. a criminal proceeding commenced by return of an indictment;

4. a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, including proceedings before the Equal Employment Opportunity Commission or similar state or federal agency; or

5. an arbitration or mediation or other alternative dispute resolution proceeding if the Insured is obligated to participate in such proceeding or if the Insured agrees to participate in such proceeding, with the Company's written consent, such consent not to be

unreasonably withheld;

against an Insured Person for a Wrongful Act, including a Wrongful Employment Practice, or against the Insured Organization for a Wrongful Act other than a Wrongful Employment Practice.

B. "Insured" means the Insured Persons and the Insured Organization.

C. "Insured Person(s)," either in the singular or the plural, means any one or more past, present or future duly elected or appointed directors or officers or members of the Board of Managers of the Insured Organization.

In the event of the death, incapacity or bankruptcy of an Insured Person, any Claim against the estate, heirs, legal representatives or assigns of such Insured Person for a Wrongful Act of such Insured Person will be deemed to be a Claim against such Insured Person.

WDO-1001 3/99 Page 1 of 5

r 0 3 7 9

D. "Loss" means Defense Expenses incurred by the Company or by the Insureds in the defense of a Claim, and damages (including any punitive or exemplary damages, where insurable under applicable law), judgments, settlements, pre- judgment interest, post-judgment interest, or other amounts that an Insured is legally obligated to pay as a result of a Claim; provided, however, that Loss shall not include civil or criminal fines; sanctions; liquidated damages; payroll or other taxes; penalties; the multiplied portion of any multiplied damage award; or damages or types of relief deemed uninsurable under applicable law.

E. "Outside Entity" means a corporation or organization, other than the Insured Organization, which is exempt from taxation under Section 50I(c)(3) of the Internal Revenue Code, as amended.

F. "Outside Position" means service by an Insured Person as a director, officer, trustee, regent, governor or equivalent position with an Outside Entity, but only during such time that such service is with the knowledge and consent and was at the specific written request of the Insured Organization.

G. "Wrongful Act" means:

1. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any Wrongful Employment Practice, by an Insured Person in his or her capacity as a director, officer or member of the Board of Managers of the Insured Organization;

2. any matter asserted against an Insured Person solely by reason of his or her status as a director, officer or member of the Board of Managers of the Insured Organization;

3. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any Wrongful Employment Practice, by an Insured Person in his or her Outside Position; or

4. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Insured Organization other than Wrongful Employment Practices.

III. EXCLUSIONS.

A. This Coverage Part shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse Defense Expenses for, any Claim:

1. for damage to, or destruction of, loss of, or loss of use of, any tangible property; or for or arising out of any actual or alleged libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, bodily injury, loss of consortium, sickness, emotional distress, loss of reputation, mental anguish, humiliation, disease or death of any person; provided,